CASE NO. 23-3274

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JOSE NAVARRO,
*Plaintiff-Appellant,*

v.

EXXON MOBIL CORPORATION, et al.,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
HON. DALE FISCHER - CASE NO. CV-17-2477

**APPELLANT'S MOTION TO EXCEED WORD COUNT FOR
OPENING BRIEF; DECLARATION OF KIRAN PRASAD**

MATERN LAW GROUP, PC
Matthew J. Matern (SBN 159798)
Joshua D. Boxer (SBN 226712)
Kiran Prasad (SBN 255348)
Max N. Sloves (SBN 217676)
1230 Rosecrans Avenue, Ste. 200
Manhattan Beach, CA 90266
Telephone: (310) 531-1900

*Attorneys for Plaintiff and Appellant
Jose Navarro*

Pursuant to Circuit Rule 32-2(a), Plaintiff and Appellant Jose Navarro requests an order permitting him to file his Opening Brief with a type-volume limit in excess of the 14,000 prescribed by Circuit Rule 32-1(a). Appellant's Opening Brief contains 20,279 words.

The grounds for this request are set forth in the attached Declaration of Kiran Prasad.

Respectfully submitted,

Dated: May 24, 2024

*/s/ Kiran Prasad*

**MATERN LAW GROUP, PC**
MATTHEW J. MATERN
JOSHUA D. BOXER
KIRAN PRASAD
MAX N. SLOVES
Attorneys for Plaintiff and Appellant
JOSE NAVARRO

# DECLARATION OF KIRAN PRASAD

1.      I am an attorney admitted to practice law before this Court and am a Senior Associate at Matern Law Group, PC, counsel of record for Plaintiff and Appellant Jose Navarro ("Navarro") in this matter.

2.      All of the facts stated in this declaration are based on my personal knowledge and if called as a witness, I could and would competently testify to them.

3.      I prepared the briefing in this appeal.

4.      This appeal arises from an oil refinery's toxic contamination of the residential community where Navarro lives.  Navarro is appealing the following four orders:

      a.      An order granting summary judgment of Navarro's private and public nuisance claims.

      b.      An order granting a motion for judgment on the pleadings regarding Navarro's claim for trespass based on the migration of contaminants onto his property from the oil refinery.

      c.      An order denying a motion to appoint Navarro as class representative.

      d.      An order decertifying two subclasses.

5.      In addition to reviewing these orders, I had to review the order granting in part Navarro's renewed motion for class certification.  In total, the orders relating to the appeal comprise almost 100 pages.

6.      Also, the orders raise numerous complex factual and legal issues and sub-issues and different legal standards.  Most of these issues require discussion of complicated scientific concepts and expert analyses involving the migration of numerous airborne pollutants from the oil refinery's operations, the migration of subsurface plumes of pollutants from the refinery through soil and groundwater, and the health risks posed to Navarro and the community by exposure to the airborne and subsurface pollution from the refinery.

7.      The district court addressed these technical issues differently at different stages of the litigation. Accordingly, each of these issues requires a separate discussion relating to the many legal issues on appeal, including summary judgment of Navarro's private nuisance and public nuisance claims, judgment on the pleadings of Navarro's trespass claim, and decertification of Navarro's class claims for trespass, private nuisance, and public nuisance.

8.      Furthermore, this case has a complicated procedural history which had to be explained.  And, the Excerpts of Record is massive; it contains 41 volumes and nearly 12,000 pages.

9.      In drafting the Opening Brief, I made my arguments as concise as possible, however, due to the sheer number and complexity of the issues and arguments that needed to be made, and the extensive number of legal authorities that needed to be addressed, it was impossible to keep the Opening Brief within the maximum word limit of 14,000, without compromising the merits of Navarro's arguments and use of legal authorities.  The Opening Brief contains 20,279 words.

10.     For the above reasons, Navarro requests that the Court authorize the filing of his Opening Brief in excess of the 14,000 maximum authorized word count.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 24, 2024 at San Ramon, California.

                                        /s/ Kiran Prasad_____

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) 23-3274**

I am the attorney or self-represented party.

**This brief contains 20,279 words,** including 230 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ X ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Kiran Prasad*           **Date** May 24, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

CASE NO. 23-3274

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JOSE NAVARRO,
*Plaintiff-Appellant,*

v.

EXXON MOBIL CORPORATION, et al.,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
HON. DALE FISCHER-CASE NO. CV-17-2477

**APPELLANT'S OPENING BRIEF**

MATERN LAW GROUP, PC
Matthew J. Matern (SBN 159798)
Joshua D. Boxer (SBN 226712)
Kiran Prasad (SBN 255348)
Max N. Sloves (SBN 217676)
1230 Rosecrans Avenue, Ste. 200
Manhattan Beach, CA 90266
Telephone: (310) 531-1900

*Attorneys for Plaintiff and Appellant*
*Jose Navarro*

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ...........................................4

STATUTORY AND REGULATORY AUTHORITIES ...............................4

ISSUES PRESENTED...........................................................4

STATEMENT OF THE CASE ...................................................5

    A.    The Refinery's contamination of the ground and air ............. 5

    B.    The Complaint……………………………………………..13

    C.    Certification of Ground and Air Subclasses. ...........................13

    D.    *Sua Sponte* decertification of the class. ..................................15

    E.    Judgment on the pleadings on Navarro's trespass claim. .........18

    F.    Summary judgment on Navarro's nuisance claims…………. 19

SUMMARY OF THE ARGUMENT ...........................................21

STANDARD OF REVIEW ......................................................25

ARGUMENT.......................................................................26

I.    THE ORDER GRANTING JUDGMENT ON THE PLEADINGS ON NAVARRO'S TRESPASS CLAIM RESTS ON MULTIPLE LEGAL ERRORS, EACH OF WHICH INDEPENDENTLY REQUIRES REVERSAL. ................................................................26

    A.    Navarro did not abandon trespass claims based on physical intrusion of pollutants into the soil and groundwater of his property. ..................................27

    B.    The soil vapor physically intruding into Navarro's property is not "intangible."....................................33

    C.    The complaint alleges that the Refinery's contamination resulted in the deposit of particulate matter in Navarro's soil, groundwater, and home. ..................................39

i

# TABLE OF CONTENTS (Cont'd)

**Pages**

II. MATERIAL DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT ON NAVARRO'S NUISANCE CLAIMS, REQUIRING REVERSAL……………………………………….41

    A. The court improperly ignored evidence demonstrating harm caused by the Refinery's *subsurface* contamination…...44

    B. The district court erred in discounting expert testimony demonstrating the substantial impact the Refinery's air emissions alone had on Navarro's health. ...............................47

    C. The district court incorrectly found that policy concerns favored dismissal of Navarro's nuisance claims even though it is well-established that compliance with regulatory standards does not preclude such claims. ...............54

    D. The court improperly resolved disputed facts in concluding that a normal person in Navarro's community would not be substantially annoyed or disturbed by the Refinery's contamination. ......................................................57

        1. The court improperly discounted evidence of community concern regarding the Refinery's emissions……………………………………………57

        2. The court applied incorrect legal principles when it discounted Navarro's own perception of substantial harm. ......................................................59

III. THE DISTRICT COURT ERRED IN *SUA SPONTE* DECERTIFYING THE CLASS ........................................................................62

    A. The district court's decertification of the Air Subclass relied on legal errors and prematurely decided the merits of Plaintiff's nuisance claims based on air pollution. ..........................................................63

# TABLE OF CONTENTS (Cont'd)

Pages

1. The district court's holding that Plaintiff's nuisance claims lacked commonality was based on errors of law. ..................................63

2. The district court decertified the nuisance claim based on an improper merits analysis. ..........................68

3. The district court erred in holding that the Air Subclass did not satisfy Rule 23(b)(2)....................72

B. The district court's decertification of the Ground Subclass relied on errors of law and prematurely reached the merits of Plaintiff's trespass claim based on groundwater and soil pollution...........................................74

1. The court's holding that Navarro's trespass claims lacked commonality was based on errors of law..................................................74

2. The district court decertified the trespass claim based on an improper merits analysis ..........................75

3. The district court erred in holding that the Ground Subclass did not satisfy Rule 23(b)(3)..........................78

   a. Laton's plume map is common evidence.. ..........81

   b. Whether the Refinery was the source of ground contamination poses a common question……………………….………82

   c. Common evidence demonstrated that the Refinery's ground emissions polluted the soil of all properties in the class………………. 83

   d. Plaintiff sought a common remedy for the classwide trespass claims………………………. 84

   e. Class treatment was the superior method for adjudicating the trespass claim…………………..88

iii

## TABLE OF CONTENTS (Cont'd)

**Pages**

IV.   THE DISTRICT COURT ERRED BY DENYING NAVARRO'S
      REQUEST TO SERVE AS CLASS REPRESENTATIVE. ..............86

  A.   Navarro's claims are typical of the class ................................87

  B.   The district court's conclusion that Navarro is not
       an adequate class representative rests on
       fundamental legal errors……………………………………..89

  C.   The district court's conclusion that Navarro's
       counsel were not adequate was also grounded
       on legal errors .........................................................................97

CONCLUSION ........................................................................................99

CERTIFICATE OF COMPLIANCE.........................................................100

STATEMENT OF RELATED CASES .....................................................101

ADDENDUM .........................................................................................102

# TABLE OF AUTHORITIES

**Federal Cases**                                          **Pages**

*Aguayo v. U.S. Bank,*
No. 08-CV-2139-W LSP, 2015 WL 13344755 (S.D. Cal. 2015)………………………………………………………..93

*Andrews v. Plains All Am. Pipeline, L.P.,* No. CV154113PSGJEMX, 2018 WL 2717833 (C.D. Cal. Apr. 17, 2018)……………….…*passim*

*Bias v. Wells Fargo & Co.,*
312 F.R.D. 528 (N.D. Cal. 2015)…………………………..……..94

*Bell v. DuPont Dow Elastomers, LLC,*
640 F.Supp. 2d 890 (W.D. Ky. 2009) ……………………….…..…79

*Birmingham Steel Corp. v. Tennessee Valley Auth.,*
353 F.3d 1331 (11th Cir. 2003)………………………………...…87

*Bonds v. Nicoletti Oil Inc.,*
No. CV-F-07-1600OWW/DLB, 2008 WL 281532 (E.D. Cal. Jan. 30, 2008)………………………….…………29, 36, 40

*Buus v. WAMU Pension Plan,*
251 F.R.D. 578 (W.D. Wash. 2008)………………………………...95

*California Dept. of Toxic Substances Control v. Payless Cleaners, College Cleaners,* 368 F.Supp.2d 1069 (E.D. Cal. 2005)……………..……...76

*California Rural LegalAssistance, Inc. v. Legal Servs. Corp.,*
917 F.2d 1171 (9th Cir. 1990)…………………………………...91

*Carson Harbor Village, Ltd. v. Unocal Corp.,*
270 F.3d 863 (9th Cir. 2000)……………………………….…..46

*Com. of Puerto Rico v. M/V Emily S.,*
158 F.R.D. 9 (D.P.R. 1994)…………………….…………………..92

*Cummings v. Connell,*
316 F.3d 886 (9th Cir. 2003)…………………………………..89

## TABLE OF AUTHORITIES (CONT'D)

**Federal Cases (Cont'd)**                                            **Pages**

*Docmagic, Inc. v. Ellie Mae, Inc.,*
    2011 WL 871480 (N.D. Cal. 2011)…………………………………31

*DuFour v. Be LLC,*
    291 F.R.D. 413 (N.D. Cal. 2013)……………………………..…..94

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011)……………………………………..…..97

*Fisher v. Ciba Specialty Chemicals Corp.,*
    238 F.R.D. 273 (S.D. Ala. 2006)…………………………………83

*Fishon v. Premier Nutrition Corp.,*
    No. 16-CV-06980-RS, 2022 WL 958378
    (N.D. Cal. Mar. 30, 2022)...........................................................86, 96

*Gates v. Rohm & Haas Co.,*
    655 F.3d 255 (3d Cir. 2011)………………………….………....…71

*Greenfield MHP Assocs., L.P. v. Ametek, Inc.,*
    145 F.Supp.3d 1000 (S.D. Cal. 2015)………………….………28, 35, 76

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998)…………………………….…87, 89

*Harris v. County of Orange*,
    682 F.3d 1126 (9th Cir. 2012)……………………………………25

*Hart v. J.H. Baxter & Co.,*
    No. 6:21-CV-00663-MK, 2023 WL 2918632
    (D. Or. Mar. 14, 2023)………………………………….……65, 79

*Guido v. L'Oreal, USA, Inc.,*
    No. CV 11-1067 CAS JCX, 2013 WL 3353857
    (C.D. Cal. July 1, 2013)……………………………………………95

## TABLE OF AUTHORITIES (CONT'D)

**Federal Cases (Cont'd)** **Pages**

*Gunnells v. Healthplan Servs., Inc.,*
    348 F.3d 417 (4th Cir. 2003)………………………………....…94

*Gutierrez v. C&H Sugar, Inc.,*
    No. 23-CV-03192-SI, 2023 WL 7927771 (N.D. Cal. Nov. 15,
    2023)………………………………………………………....…68

*In re Delta Air Lines, Inc.,*
    2023 WL 2347074, at (C.D. Cal., Feb. 8, 2023, No.
    LACV2000786JAKSKX)……………………………....74, 79, 81, 82

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010,*
    910 F.Supp.2d 891 (E.D. La. 2012)………………....……………66

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    277 F.R.D. 52 (D. Mass. 2011)……………………………....…95

*Jones v. Royal Admin. Services, Inc.,*
    887 F.3d 443 (9th Cir. 2018)…………………………………..25

*Kanawi v. Bechtel Corp.,*
    254 F.R.D. 102 (N.D. 2008) ……………………………....…94

*Konkol v. Oakwood Worldwide Loc., LLC,*
    No. 2:14-CV-06596-ODW, 2015 WL 46177
    (C.D. Cal. Jan. 2, 2015)……………………………….……..…38

*Lane v. Facebook, Inc.,*
    696 F.3d 811 (9th Cir. 2012)…………………………....…90

*Laurens v. Volvo Car USA, LLC,*
    No. 218CV08798JMVCLW, 2020 WL 10223641
    (D.N.J. Dec. 8, 2020)……………………………….…....94

# TABLE OF AUTHORITIES (CONT'D)

**Federal Cases (Cont'd)** **Pages**

*Lautemann v. Bird Rides, Inc.,*
2019 WL 3037934 (C.D. Cal., May 31, 2019, No.
CV1810049PARAOX)………………………..…………....…..65

*Limo Co. v. Chem. Milling Int'l Corp.,*
Case No. 217CV02345SVWRAO, 2017 WL 4358423
(C.D. Cal. Sept. 28, 2017)………………….............................35, 41

*MacDonald v. General Motors Corp.,*
110 F.3d 337 (6th Cir. 1997)…………………………….……..33

*Marlo v. United Parcel Service, Inc.,*
639 F.3d 942 (9th Cir. 2011)…………..............................................25

*MDR Hotels, LLC v. Dow Chem. Co.,* No. 220CV08008FLAJPRX, 2024
WL 650406 (C.D. Cal. Jan. 5, 2024)………………………………..35

*Mission Linen Supply v. City of Visalia,*
2019 WL 446358 (E.D. Cal., Feb. 5, 2019, No. 1:15-CV-0672
AWI EPG)………………………………………………………..35

*O'Connor v. Boeing North American, Inc.,*
180 F.R.D. 359 (C.D. Cal. 1997)…………………………………91

*Olson v. Beck,*
2011 WL 4634026 (N.D. Cal., Oct. 5, 2011,
No. C-06-07487 JCS)…………………………………………….41

*Pace v. PetSmart Inc.,*
No. SACV 13-00500 DOC, 2014 WL 2511297 (C.D. Cal. June 3,
2014)………………………………………………………..…..95

*Palmisano v. Olin Corp.,*
C-03-01607 RMW, 2005 WL 6777560 (N.D. Cal. June 24,
2005)……………………………………………………..38

## TABLE OF AUTHORITIES (CONT'D)

**Federal Cases (Cont'd)**                                **Pages**

*Parsons v. Ryan,*
754 F.3d 657 (9th Cir. 2014)……………………………...……….87

*People of California v. Kinder Morgan Energy Partners, L.P.,*
569 F.Supp.2d 1073 (S.D. Cal. 2008)………………….........28, 29, 55

*Rodriguez v. Hayes,*
591 F.3d 1105 (9th Cir. 2010)…………………………………….73

*Romero v. Producers Dairy Foods, Inc.,*
235 F.R.D. 474 (E.D. Cal. 2006)…………………….…………88

*Sali v. Corona Reg'l Med. Ctr.,*
909 F.3d 996 (9th Cir. 2018)……………………………….…..98

*San Diego Unified Port Dist. v. Monsanto Co.,*
612 F.Supp.3d 1028, 1049 (S.D. Cal. 2020)……………….………..69

*Schaeffer v. Gregory Village Partners, L.P.,*
105 F.Supp.3d 951 (N.D. Cal. 2015)………….…………28, 41, 52, 69

*Sloan v. Gen. Motors LLC,*
No. 16-CV-07244-EMC, 2020 WL 5517244 (N.D. Cal. Sept. 14, 2020)………………………………………………………..87

*Singer v. State Farm Mut. Auto. Ins. Co.,*
116 F.3d 373 (9th Cir. 1997)………………………………..33

*Sisters of Notre Dame de Namur v. Garnett-Murray*, No. C10-01807 HRL, 2012 WL 2050377 (N.D. Cal. June 6, 2012)……………………41, 52

*Soc. Servs. Union, Local 535 v. County of Santa Clara,*
609 F.2d 944 (9th Cir.1979)…………………………………...……90

# TABLE OF AUTHORITIES (CONT'D)

**Federal Cases (Cont'd)**                                          **Pages**

*Soto v. United States,*
No. 2:22-CV-03607-AB-RAO, 2024 WL 51193 (C.D. Cal. Jan. 4, 2024)……………………………………………………………...61

*Stockwell v. City & Cnty. of San Francisco,*
749 F.3d 1107 (9th Cir. 2014)……………………………...75, 78

*Torres v. Mercer Canyons Inc.,*
835 F.3d 1125 (9th Cir. 2016)……………………..……………67

*United Alloys, Inc. v. Baker,*
797 F.Supp.2d 974 (C.D. Cal. 2011)……………………………35, 40

*Vaquero v. Ashley Furniture Indus., Inc.,*
824 F.3d 1150 (9th Cir. 2016)………………………….…...……67

*Ventura Packers, Inc. v. F/V Jeanine Kathleen,*
305 F.3d 913 (9th Cir. 2002)………………………..…...……..25

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)……………………………………………..72

*Welling v. Alexy,*
155 F.R.D. 654 (N.D. Cal. 1994)……………………………...94

*Wit v. United Behav. Health,*
No. 14-CV-02346-JCS, 2023 WL 8717488 (N.D. Cal. Dec. 18, 2023)………………………………………………...……..96

*Zinser v. Accufix Rsch. Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001)………………………...………86

**State Cases**

*Acadia California Ltd. v. Herbert,*
54 Cal.2d 328 (1960)………………………………………………54

# TABLE OF AUTHORITIES (CONT'D)

**State Cases (Cont'd)**                                          **Pages**

*Barclay Hollander Corp. v. California Regional Water Quality Control Bd.*,
    38 Cal.App.5th 479 (2019)…………………………………...35, 41

*Birke v. Oakwood Worldwide*,
    169 Cal.App.4th 1540 (2009)………………………………….*passim*

*Bradley v. Am. Smelting & Ref. Co.*,
    104 Wash.2d 677 (1985)…………………………………………….40

*Capogeannis v. Superior Court*,
    12 Cal.App.4th 668 (1993)………………………………..26, 28, 36

*Chase v. Wizmann*,
    71 Cal.App.5th 244 (2021)………………………………………….42

*City of Norwalk v. City of Cerritos*,
    99 Cal.App.5th 977 (2024)…………………………………………..55

*City of San Jose v. Superior Ct.*,
    12 Cal.3d 447 (1974)………………………………………………..63

*Elton v. Anheuser-Busch Beverage Group, Inc.*,
    50 Cal.App.4th 1301 (1996)……………………………………...36

*Freeman v. Grain Processing Corp.*,
    895 N.W.2d 105 (Iowa 2017)………………………………………67

*Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.*,
    190 Cal.App.4th 1502 (2010)………………………………………55

*Kahn v. Price*,
    69 Cal.App.5th 223 (2021)…………………………………………68

*KFC Western, Inc. v. Meghrig*,
    23 Cal.App.4th 1167 (1994)…………………………………….…..28

**TABLE OF AUTHORITIES (CONT'D)**

**State Cases (Cont'd)** **Pages**

*Kornoff v. Kingsburg Cotton Oil Co.,*
  45 Cal.2d 265 (1955)……………………………………………………..37

*Lind v. City of San Luis Obispo,*
  109 Cal. 340 (1895)……………………………………………………68

*Martin v. Reynolds Metals Co.,*
  221 Or. 86 (1959)…………………………………………….…… 36

*Miller v. National Broadcasting Co.,*
  187 Cal.App.3d 1463 (1986)……………………………....……..26

*Newhall Land & Farming Co. v. Superior Court,*
  19 Cal.App.4th 334 (1993)…………………………….....………41

*Olden v. LaFarge Corp.,*
  383 F.3d 495 (6th Cir. 2004)……………………...…….…..79

*Pac. Gas & Elec. Co. v. Zuckerman,*
  189 Cal.App.3d 1113 (1987)…………………………...…….…..34

*People v. ConAgra Grocery Prod. Co.,*
  17 Cal.App.5th 51 (2017)…………………………….…….……42

*Ralphs Grocery Co. v. Victory Consultants, Inc.,*
  17 Cal.App.5th 245 (2017)…………………………….….…......79

*San Diego Gas & Electric Co. v. Superior Court,*
  13 Cal.4th 893 (1996)………………………………...……..…passim

*San Francisco Unified School Dist. v. W.R. Grace & Co.,*
  37 Cal.App.4th 1318 (1995)……………………….……..……….76

*Save Livermore Downtown v. City of Livermore,*
  87 Cal.App.5th 1116 (2022)……………………….……..……..40

# TABLE OF AUTHORITIES (CONT'D)

**State Cases (Cont'd)**      **Pages**

*Shamsian v. Atlantic Richfield Co.,*
    107 Cal.App.4th 967 (2003)……………………………………28, 36

*Starrh & Starrh Cotton Growers v. Aera Energy LLC,*
    153 Cal.App.4th 583 (2007)…………………………………………..26

*Tesoro Refining & Marketing Co. LLC v. Los Angeles Regional Water*
    *Quality Control Bd.,*
    42 Cal.App.5th 453 (2019)……………………………………………27

*Thrifty-Tel, Inc. v. Bezenek,*
    46 Cal.App.4th 1559 (1996)………………………………………...36

*Venuto v. Owens-Corning Fiberglas Corp.,*
    22 Cal.App.3d 116 (1971)……………………………….54, 55, 68

*Vowinckel v. N. Clark & Sons,*
    216 Cal. 156 (1932)…………………………………………………58

*Wade v. Campbell,*
    200 Cal.App.2d 54 (1962)…………………………………………..58

*Watson Land Co. v. Shell Oil Co.,*
    130 Cal.App.4th 69 (2005)……………………………………………27

*Wilson v. Interlake Steel Co.,*
    32 Cal.3d 229 (1982)…………………………………………..*passim*

*Wilson v. S. California Edison Co.,*
    21 Cal.App.5th 786 (2018)……………………………………...42, 43

**Federal Rules**

Fed. R. Civ. P. 23……………………………………………….3, 62, 94

Fed. R. Civ. P. 23(a)………………………………………………..87

## TABLE OF AUTHORITIES (CONT'D)

**Federal Rules (Cont'd)** **Pages**

Fed. R. Civ. P. 23(a)(2)…………………………………………………23

Fed. R. Civ. P. 23(b)(2)………………………………………*passim*

Fed. R. Civ. P. 23(b)(3)……………………………………1, 24, 78, 85

Fed. R. Civ. P. 23(f)……………………………………………..98

**Federal Statutes**

28 U.S.C. § 1291……………………………………………….4

**State Statutes**

Cal. Civ. Code § 3334……………………………………...26

Cal. Civ. Code § 3479……………………………………...41

Cal. Health & Safety Code § 25249.5……………………………..48

**State Regulations**

Cal. Code Regs. Tit. 22, § 12703(a)……………………………….48

Cal. Code Regs. Tit. 22, § 12703(b)……………………………….48

Cal. Code Regs. Tit. 22, Div. 4.5, Ch. 51, § 69021…………………..52, 56

Cal. Code Regs. Tit. 22, Div. 4.5, Ch. 51, App. I to § 69021……………..52

Cal. Code Regs. Tit. 23, § 2923………………………………….27

Cal. Code Regs., Tit. 27, § 25703……………………………….48

# INTRODUCTION

For years, the oil refinery in Torrance, California (the "Refinery"), formerly operated by Defendant Exxon Mobil Corporation ("Exxon") and currently operated by Defendant Torrance Refining Company ("TORC"), released toxic chemicals into the air and leaked petroleum products into the ground, contaminating the groundwater and soil of neighboring properties and causing toxic vapors to seep up from the ground into homes and businesses, exposing the community to substantially increased cancer risks and other harmful conditions.

Plaintiffs from that community sued, and the court certified two subclasses: a Rule 23(b)(3) Ground Subclass for trespass claims; and a Rule 23(b)(2) Air Subclass for nuisance claims.

When the lead plaintiff moved away, Plaintiff and Appellant Jose Navarro ("Plaintiff" or "Navarro"), a neighbor living a few houses down the block, moved to be substituted as class representative. The court then reversed course, decertified both subclasses, and granted judgment on the pleadings against Navarro's individual trespass claim and summary judgment against his nuisance claims, entering final judgment for Defendants. Those orders—which together deny relief to community members imperiled by the Refinery's contamination of their soil,

1

groundwater and air—were each premised on legal errors and warrant reversal.

The court granted judgment on the pleadings on Navarro's trespass claim because it ignored his allegation that the Refinery contaminated his soil, which constitutes trespass under California law. The court erroneously concluded that the complaint was based only on "vapor" migration into Navarro's home, which the court wrongly analogized to intangible intrusions like noise and electromagnetic fields. The court incorrectly held that Navarro had abandoned claims based on soil contamination, but he had not. Even if he had, the "soil vapors" that migrated through his soil into his home are not "intangible" like noise or light. Intrusion of toxic vapors from soil into homes and businesses constitutes actionable trespass under California law.

The court also erred in granting summary judgment on Navarro's nuisance claims on the ground that the contamination did not cause "substantial" interference with his enjoyment of life or property, disregarding both expert and Navarro's testimony demonstrating significant harm. Viewed in the light most favorable to Navarro as required on summary judgment, the evidence demonstrated that he faced a significant risk of harm from exposure to the combined effects of groundwater, soil, and

air pollution; the Refinery's emissions increased his risk of cancer up to 2,666 times.  A jury could conclude based on the record evidence that just a 10-fold increase justified immediate remediation to protect Navarro's health.  Rather than drawing all inferences in Navarro's favor and leaving material disputed facts for the jury to resolve, the court weighed, and in some respects ignored, the evidence.

The court's decertification order was infected by the same legal errors.  The court decertified the Ground Subclass trespass claims based on an impermissible (and incorrect) merits conclusion that "soil vapor intrusion" is not "appropriately adjudicated as a trespass claim" and "do[es] not pose a health risk."  The court decertified the Air Subclass nuisance claims on the purported ground that class members suffered no harm from the Refinery's air pollution, based on its erroneous interpretation of expert testimony.  The court compounded these legal errors when it reasoned that trespass and nuisance claims are "inherently individual" and can *never* be certified.

The court's incorrect conclusions about the merits, along with additional legal errors in applying Rule 23, also led the court to hold that Navarro was not a typical or adequate class representative and that his counsel were also inadequate.

The orders granting judgment on the pleadings on Navarro's trespass claim, granting summary judgment on his nuisance claims, and decertifying the class should be reversed.

## JURISDICTIONAL STATEMENT

Navarro appeals the judgment. 1-ER-1. The court's orders decertifying the class, granting judgment on the pleadings, and granting summary judgment are all reviewable from the judgment. 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY AUTHORITIES

Relevant statutory and regulatory authorities appear in the Addendum.

## ISSUES PRESENTED

1.     Whether the court erred as a matter of law when it held that Navarro did not state a trespass claim under California law despite allegations that the Refinery contaminated the soil of his property resulting in soil vapor intrusion into his home.

2.     Whether the court erred in granting summary judgment on Navarro's nuisance claims when it held that his exposure to toxic contamination and emissions from the Refinery while on his property did not cause a "substantial" interference with his interests.

4

3.      Whether the court erred in decertifying the Ground and Air

Subclasses, based on its misapplication of the law applicable to the trespass

and nuisance claims, its incorrect conclusion that trespass and nuisance

claims can never be certified, and its erroneous conclusions that Navarro

was an atypical and inadequate class representative and his counsel was

inadequate.

## STATEMENT OF THE CASE

This case involves California trespass and nuisance claims arising

from the Refinery's ground and air pollution that has been threatening the

health of the neighboring community for years.

### A.      The Refinery's contamination of the ground and air.

The Refinery produces gasoline, jet and diesel fuel.  3-ER-524-25; 26-

ER-7474.  Exxon operated the Refinery until September 2015.  26-ER-7476.

TORC operates the Refinery now.  35-ER-10141.

Refinery operations resulted in well-documented releases of toxic

liquid petroleum products into the ground and emissions of hazardous

pollutants into the air.  3-ER-486-90, 494-99; 5-ER-1265-78, 1283-84; 6-

ER-1302; 10-ER-2628-29; 26-ER-7455; 31-ER-9023; 32-ER-9100-01; 35-

ER-10141.

**Ground contamination.** The Refinery's release of petroleum products into the ground created a pool of contaminants, including benzene and other chemicals, that extends directly under adjacent residential properties. 5-ER-1277-83; 6-ER-1302, 1309; 8-ER-2075. The benzene and other toxic substances in the groundwater volatize and intrude into the soil forming "soil vapors"—physically contaminating the soil. 5-ER-1279-82; 6-ER-1309.

Those vapors then migrate into the overlying homes and businesses contaminating the air and harming the health of exposed individuals. 5-ER-1279-82; 27-ER-7777-80; Motion for Judicial Notice ("MJN"), Ex. A, pp. 1-2. Where petroleum products are present, the "vapor intrusion pathway often generates the highest cancer risk and hazard index." 9-ER-2210. At least 107 residential and commercial properties are affected by the Refinery's soil contamination plumes. 30-ER-8606, 8619.



6-ER-1309[1]

In 2008, the Refinery's own tests showed substantial exceedances of current "environmental screening levels" ("ESL") for benzene and three other hazardous substances in the indoor air of properties around the Refinery, demonstrating that those exposed to the contamination had increased cancer risk. 5-ER-1204-05, 1210-11, 1274, 1279; 27-ER-7669.[2]

---

[1] Plaintiff's expert prepared a plume map delineating the contours of soil contamination. 6-ER-1309. The Refinery also mapped the extent of benzene groundwater pollution, identified on the map as "Benzene Isoconcentration in Gage Aquifer." 6-ER-1311.

[2] Environmental agencies and consultants use screening levels to determine whether concentrations of contaminants are present at levels harmful to human health. 3-ER-490-92, 5-ER-1270-72; 8-ER-2029-30, 2033, 2080-82; 27-ER-7758-59. At the time the tests were conducted in 2008, the screening

The Environmental Protection Agency ("EPA") and California publish ESLs expressed as concentrations of hazardous chemicals that correlate to a one in one million ($1 \times 10^{-6}$) cancer risk.  3-ER-569; 9-ER-2204-08, 2169, 2322-23, 2438-39.  "The cancer risk is calculated by taking the [chemical of concern] concentration divided by its screening level and then multiplying by one in a million ($1 \times 10^{-6}$)."  9-ER-2207.  For example, an exceedance of 8,125 times the ESL for benzene equates to an 8,125 in one million chance of developing cancer.

ESLs are generally used to identify and evaluate the health risks posed by contamination.  3-ER-569; 9-ER-2207, 2010-12, 2322-23, 2384-85; Cal. Code Regs. Tit. 22, § 69020. Concentrations five times the applicable ESL require mitigation to reduce the risk of adverse health impacts, and concentrations 10 times the ESL pose an unacceptable risk requiring active mitigation.  3-ER-483, 569.

The 2008 indoor air sampling at residences within the Del Amo neighborhood next to the Refinery showed benzene concentrations as high as 5.74 µg/m$^3$, or almost 60 times the ESL of 0.097 µg/m$^3$ for benzene.  5-ER-1204, 1210-11, 1272; 34-ER-9973; 35-ER-10145.

---

level for benzene was 0.25 µg/m$^3$; it is currently much lower, 0.097 µg/m$^3$. 3-ER-490; 5-ER-1272**.**

Testing in 2018 and 2019 demonstrated concentrations of benzene and other contaminants at high levels that "pose an immediate unsafe condition" and a "health risk." 3-ER-569-72; 5-ER-1212-14, 1218, 1267-71, 1276. The concentration of benzene in the soil vapor was as high as 8,125 times the ESL for one property, indicating an increased cancer risk of 8,125 in one million.[3] 5-ER-1218.

The testing of indoor air also revealed ESL exceedances for 1,2-Dichloroethane, Bromodichloromethane, Carbon Tetrachloride, Chloroform, Trichloroethene, Methylene Chloride, and Tetrachloroethene. 5-ER-1214. The health risk posed by multiple contaminants is determined by adding the individual risk posed by each contaminant. 3-ER-503-04; 8-ER-2081-82; 9-ER-2217. For example, exposure to indoor benzene equating to a cancer risk of 13 in one million *and* exposure to chloroform with a cancer of risk of 20 in one million, would result in an additive risk of at least 33 in one million.

---

[3] The EPA's screening level to identify a harmful concentration of benzene in the soil is 3.2 µg/m³. Soil concentrations were as high as 26,000 µg/m³ in the residential properties sampled. 5-ER-1218; 26-ER-7459.

Recent testing also demonstrated that rather than dissipating, the extent and concentrations of the Refinery's subsurface contaminants have *increased* since this action was filed. 3-ER-486-48; 5-ER-1279, 1281.

The Refinery's ground pollution is well documented. Since 1985, the Los Angeles Regional Water Quality Control Board ("Regional Board") has issued four Cleanup and Abatement Orders requiring the Refinery to remediate petroleum product releases into the soil and groundwater. 5-ER-1277; 27-ER-7637-38. The Refinery engaged in some remediation in the area east of the Del Amo community, but a final remedial action plan has not been developed and the partial remediation that occurred was not designed to remedy the ongoing contamination underlying the Del Amo community. 5-ER-1207, 1277-78, 1283-84.

Given the substantial risk of cancer posed by the Refinery's ground pollution, remediation is necessary in the Del Amo neighborhood to abate the health risks posed by the contamination of the property. 3-ER-569-72; 5-ER-1212-14, 1218, 1267-71, 1276.

**Air contamination.** In addition to the ground contamination, the Refinery releases unsafe levels of contaminants into the air, including benzene and diesel particulate matter ("DPM"). 3-ER-521-24, 526-30, 563-66; 4-ER-778-85.

Expert analysis demonstrates that Navarro continues to be exposed to unsafe levels of airborne diesel particulate matter, hexavalent chromium, and benzene, among other toxic air contaminants. 3-ER-565.

The Refinery's own reporting demonstrates its emissions increased the surrounding community's cancer risk. 3-ER-528-43; 4-ER-786, 864, 944; 10-ER-2628; 24-ER-6879. In 2017, TORC entered into a voluntary risk reduction program with the South Coast Air Quality Management District ("SCAQMD") due to dangerous levels of toxic air emissions from the Refinery and submitted three Voluntary Risk Reduction Plans ("VRRP"). 4-ER-789. TORC's VRRP asserted that it planned to reduce emissions by October 2019 which would decrease the cancer risk to the surrounding community. 4-ER-799-01. The VRRP's model of air contamination showed cancer risk zones based on 50 in one million, 25 in one million, and 10 in one million. 4-ER-795.



Figure 4. Contours for Current Facility Risk Characterization

The modeling also showed that with planned emissions reductions, the Refinery would *no longer* pose a significant cancer risk. 4-ER-799-01. Despite the Refinery's statement that it would cut emissions by 2019, its two most recent 2020 VRRPs showed an *increased* cancer risk to the community of 38% (up to 29.8 in one million) over the prior assessments. 4-ER-873, 952, 963-64.

The community cannot rely on TORC's voluntary promises to regulatory authorities that it will reduce this risk when the Refinery has been cited with multiple "notices of violations" over the years for emissions that exceed state standards for health and safety (31-ER-9023-24; 32-ER-9100-

01) and emissions of toxic air contaminants have actually increased from the year 2000 to at least 2019.  3-ER-479, 494, 502; 30-ER-8745.

### B.    The Complaint.

On February 17, 2017, former Plaintiffs Goldstein, La Bella, and Covas sued TORC and Exxon.  41-ER-11840.  TORC removed the action to federal court.  41-ER-11830.  Plaintiffs amended the complaint to add Plaintiff Hany Youssef ("Youssef").  36-ER-10537.

### C.    Certification of Ground and Air Subclasses.

On October 15, 2019, the court certified two subclasses, holding that "Plaintiffs' contention[] that . . . the Refinery's emissions are harmful to health or offensive to the senses, are all questions capable of resolution for the entire class in one stroke."  1-ER-79.

The court cited classwide expert testimony from Dr. W. Richard Laton ("Laton"), an expert in hydrogeology and environmental contamination, and Dr. James Clark ("Clark"), an expert toxicologist, risk analyst, and air dispersion modeler.  1-ER-76, 78,  82, 86, 89-90, 93.  Laton testified there is a clearly defined geographic area of soil contamination extending from the Refinery into the surrounding community.  30-ER-8607, 8614-17, 8700.  He identified specific Zones (A, B, and C) that were experiencing contamination at specified levels and described remediation actions that could remove

contaminants from the groundwater, soil, and indoor air. 30-ER-8616-17, 8618-24, 8700. Clark testified about the harm to human health resulting from soil vapors seeping up through the soil. 27-ER-7777-80. Both Laton and Clark opined that the ground contamination posed an immediate threat to human health and require remediation. 27-ER-7778-80; 30-ER-8614, 8618-20.

Clark also testified that contaminated air emissions from the Refinery further elevate the risk to human health in specific zones delineating two areas bordering the Refinery, one where the cumulative risk of cancer from air emissions is over ten times the ESL (Zone A includes 1,550 properties), and another where the cumulative risk is over five times the ESL (Zone B includes 6,589 properties). 21-ER-5943-44; 25-ER-7164; 26-ER-7512.

Based on this and other classwide evidence, the court certified a Soil and Groundwater Subclass ("Ground Subclass") under Federal Rule of Civil Procedure 23(b)(3) for trespass claims including "[p]ersons who currently own real property within the boundaries of Zones A, B, and C of the plume maps attached to the declaration of W. Richard Laton." 1-ER-94. Ninety-four homes and fourteen businesses (108 properties) with the highest concentration of contaminants were encompassed in the class definition. 30-

ER-8619, 8622.[4]  Plaintiff sought remediation measures that included

extraction of soil vapors, treatment of indoor air, sealing openings, and long-

term monitoring.  30-ER-8620-22.

The court also certified an Air Subclass under Rule 23(b)(2) for

nuisance claims seeking injunctive relief.  1-ER-94.  The Air Subclass

included "[p]ersons who currently own or lease real property within the

boundaries of the Contaminated Area, and who currently occupy said

property" in areas where "air emissions currently exceed safe levels" as

identified in Clark's declaration.  1-ER-94.

The court appointed Youssef as the representative of the certified

subclasses.  1-ER-94.

**D.    *Sua Sponte* decertification of the class.**

In November 2020, Youssef moved out of the area, and counsel

moved to amend the complaint to replace him with Navarro.  21-ER-5835.

Navarro lived a few houses down from Youssef in Zone A, the most

contaminated Zone in the certified class, and directly above the soil

contamination plume.  5-ER-1281; 18-ER-5054, 5089, 5133.

---

[4] Test results at 5 out of the 27 locations showed benzene in a range between
five to ten times the ESL.  *Id*.  No test found benzene at levels below five
times the ESL.  *Id*.

Testing of soil and indoor air at Navarro's property, as well as data regarding benzene groundwater pollution, revealed a cancer risk due to benzene and other contaminants that ranged from 34.7 to as high as *2,666 times* the one in one million level.  3-ER-415-16, 422-23, 487-89; 5-ER-1206, 1212, 1214, 1218; 11-ER-2814-15.

Navarro's indoor air showed severe contamination from six toxic chemicals that pose a combined increased cancer risk of 34.7 in  one million;[5] soil vapor testing showed a 170 in one million risk of cancer;[6] and groundwater data close to Navarro's home showed a risk that ranged from 1,800 to 2,666 in one million.[7]

The court granted the motion to amend the complaint.  19-ER-5303. Navarro filed a corrected Third Amended Complaint ("TAC") alleging trespass, private nuisance, and public nuisance claims based on the Refinery's groundwater, soil, and air contamination.  19-ER-5213.

---

[5] Testing showed a 13-fold exceedance of the ESL for benzene; exceedances as high as 2.9 times the ESL for 1.2 dichloroethane; a 5.9-fold exceedance for Bromodichloromethane; a 7.5-fold exceedance for carbon tetrachloride; and a 2.1-fold exceedance for methylene chloride.  5-ER-1206, 1212.

[6] Concentrations of benzene in soil vapor at Navarro's residence ranged from 550 $\mu g/m^3$ to 17,000 $\mu g/m^3$ against an ESL of 3.2 $\mu g/m^3$.  1-ER-1218.

[7] ESLs for benzene in groundwater are 1.5 $\mu g/L$ when screening for vapor intrusion risk.  The ESL was exceeded by 1,800 to 2,666 times in samples taken from around Navarro's residence.  11-ER-2814-15.

Navarro moved to be appointed as class representative. 18-ER-4979. The court denied the motion and *sua sponte* decertified the class. 1-ER-26. Although the court's original certification order recognized that the former plaintiffs had alleged trespass by groundwater and soil contamination, the court now erroneously concluded that Navarro had abandoned those claims and was pursuing a trespass claim based *solely* on "soil vapor" intrusion into the home. 1-ER-53. The court concluded that soil vapors are "intangible" and therefore cannot support a trespass claim absent physical property damage or deposit of particulate matter. 1-ER-52-53.

The court further reasoned that the "unique property interests implicated" by trespass claims defeat commonality. 1-ER-45. The court then prematurely evaluated the merits, concluding that the community was not harmed by the Refinery's subsurface pollution. 1-ER-54-55.

The court decertified the Air Subclass based on similar reasoning, stating that nuisance claims "inherently raise individualized issues" due, in part, to the "'fundamental maxim that each parcel of land is unique.'" 1-ER-47. The court also incorrectly concluded that the Refinery's air pollution caused no "actual harm," misconstruing Clark's report as stating that harm would only occur if one "resided in the community for 30 years," despite the report's statements that the risk of cancer and disease is cumulative over

17

time and particularly harmful if the exposure occurs in utero or early in life, and his testimony that community members exposed to the air emissions are at a greater risk of developing cancer. 1-ER-50-5; 17-ER-4666; 18-ER-5053-55; 26-ER-7512-13; 27-ER-7775.

### E. Judgment on the pleadings on Navarro's trespass claim.

After decertification, Defendants moved for judgment on the pleadings on Navarro's individual claims. 16-ER-4384.

The court granted the motion as to Navarro's trespass claim without leave to amend. 1-ER-25. As in its decertification order, the court again incorrectly concluded that Navarro had abandoned trespass allegations based on soil and groundwater contamination, despite Navarro's explanation that he was asserting the same claims as the prior class representative. 1-ER-23.

The court also concluded Navarro could not state a claim for trespass because "vapors like benzene may be measurable but they are intangible substances, not particulate matter," and the court read California law to require property damage or the deposit of particulate matter to support a trespass claim based on an "intangible" intrusion. 1- ER-24-25. The court implied that a trespass claim based on vapor intrusion is more properly considered under a nuisance framework. 1-ER-22-25, 83.

18

The court found that Navarro did not "allege an immediate or future health injury" sufficient for a nuisance claim and granted Navarro leave to amend that claim in conformity with its order. 1-ER-21, 25.

Navarro then filed a Fourth Amended Complaint ("FAC"), which clarified that his individual claims for public and private nuisance were based on not just air pollution but also on all of his allegations regarding the Refinery's subsurface contamination. 16-ER-4310.

## F. Summary judgment on Navarro's nuisance claims.

The court granted TORC's motion for summary judgment on Navarro's nuisance claims. 1-ER-1. While acknowledging that whether an alleged nuisance "substantially" interferes with a plaintiff's interests in the use and enjoyment of their life or property is a question of fact for the jury, the court nonetheless resolved this disputed factual issue by finding no "substantial" interference with Navarro's interests. 1-ER-5, 7-12.

In doing so, the court discounted each source of evidence Navarro presented. The court ignored evidence of the substantial health risk posed by the *subsurface* contamination of Navarro's property and discussed only the lesser risks caused by air pollution, even though the evidence demonstrated that exposures and increased risk of cancer from subsurface contamination ranged from 34.7 in one million to 2,666 in one million – well

above the 100 in one million standard for "significant" risk the court itself adopted.  1-ER-9; 3-ER-413, 415-16, 422-23, 487-89; 5-ER-1206,1212, 1214, 1218; 8-ER-2001-13; 11-ER-2814-15.

The court also discounted expert testimony that indicated the plumes of groundwater and air emissions combined posed a substantial cancer risk and described the additional, non-cancer health hazards posed by the contaminant plumes.  1-ER-5; 3-ER-503.

Although the court recognized that regulatory compliance does not preclude nuisance actions, it still deferred to the SCAQMD's definition of "significant risk" as a cancer risk of 100 in one million on the ground that the SCAQMD is the Refinery's primary regulator—even though the SCAQMD only has jurisdiction over airborne emissions, again ignoring the substantially greater risks caused by subsurface contamination (and the Refinery's failure to comply with multiple regulatory standards).  1-ER-8-9.

The court also discounted Navarro's personal testimony about the harmful impacts of the Refinery on his use and enjoyment of his property, erroneously reasoning that contamination from other sources (including freeways and an airport) and Navarro's history as a cigarette smoker defeated his nuisance claims.  1-ER-10-12.

The court entered a final judgment. 1-ER-12. Navarro appealed. 41-ER-11900.

## SUMMARY OF THE ARGUMENT

**I.**     The  order granting judgment on the pleadings against Navarro's trespass claim.  Navarro stated a trespass claim based on petroleum product contamination of his soil and groundwater, resulting in soil vapors that further intruded into his home jeopardizing his health. Courts have repeatedly held such allegations constitute actionable trespass under California law.

 The court erred in concluding that Navarro had abandoned his trespass claim based on anything other than "soil vapor" intrusions into his home.  The court relied on a single sentence in a class-certification-related reply brief filed before Navarro joined the case and filed the (corrected) TAC stating his trespass claim.  That reply brief did not change or narrow Navarro's trespass claim.

Even if he were limited to "soil vapor" intrusions, Navarro still stated an actionable trespass claim.  The court erred by concluding soil vapors cannot support a claim for trespass because they are "intangible" like noise and electromagnetic fields.  To the contrary, benzene (and other chemical contaminants) are physical, tangible substances.  The intrusion of hazardous

21

chemical vapors into another's soil constitutes a tangible intrusion into the property. After all, the remedy is *to remove* the physical substance that is embedded in the soil.

**II**. The order granting summary judgment against Navarro's nuisance claims must also be reversed. Navarro presented evidence sufficient to raise a material factual dispute as to whether the Refinery's air and ground emissions exposed him to hazardous substances such that he could not reside on his property without experiencing a substantial increased cancer risk.

The court accepted that a cancer risk of 100 in one million *would* be "substantial," yet the court ignored evidence that the cancer risk posed by the Refinery's ground contamination far exceeded that threshold, at 34.7 in one million to *2,666* in one million. Instead, the court focused on *only* the lesser risk posed by the air emissions. That failure to view the evidence in the light most favorable to Navarro alone requires reversal.

The court further erred by discounting Navarro's other evidence supporting an inference of substantial harm, including expert opinions that cancer risk caused by the Refinery's air emissions alone exceeded 10 in one million, which on its own poses an unacceptable health risk. The Refinery's emissions caused other health risks in addition to cancer risk and the

Refinery's own maps and reports indicated its emissions substantially increased the cancer risk.

The court also erroneously reasoned that Navarro's nuisance claim was undermined by the proximity of an airport and freeways; and that Navarro was not sufficiently personally concerned about any harm despite his testimony that he retreated indoors, closed his windows and kept his children and grandchildren indoors due to the contamination, and he was also concerned about his health and his families' health. Each of these legal errors in the court's evaluation of the evidence requires reversal.

**III**. After the court initially correctly found that this single-source contamination case was appropriate for class treatment, it committed a series of legal errors when it later *sua sponte* decertified the class.

The court's holding that the Ground and Air Subclasses could not satisfy Rule 23(a)(2)'s commonality requirement rested on the court's incorrect conclusion that a class of property owners can *never* be certified to pursue trespass or nuisance claims, based on the maxim that "each parcel of land is unique." Expert evidence showed that exposure at all properties in specific zones caused increased cancer risk. The Refinery's own modeling of health risk demonstrated the same point. The court's commonality

23

conclusion was further infected by the same merits errors that require reversal of the judgment on the pleadings and summary judgment orders.

The court further erred in holding that Rule 23(b)(2) was not satisfied for the Air Subclass's nuisance claims, because no common injunction could provide relief. Plaintiff sought injunctive relief targeting the Refinery's emissions, and reduction of those air emissions would reduce cancer risk for all class members.

The court erroneously determined that Rule 23(b)(3)'s predominance and superiority requirements were not satisfied as to the Ground Subclass's trespass claims, because the court questioned whether Laton's map delineating the soil contamination could be used as common proof. But there was no dispute that the evidence of contamination is common across the class. Any doubts as whether that evidence was sufficient to prove the trespass claims went to its weight, not its classwide character.

**IV.** The court made more legal errors in finding that Navarro's claims were not typical and not an inadequate class representative, by disregarding supporting evidence refuting the court's findings and by applying incorrect legal standards. The court also erred in reversing its prior finding that Plaintiff's counsel was adequate. Even if the court's typicality or adequacy findings had been supported, the correct response would have

24

been to allow Plaintiff to seek to substitute in a different class representative, not to *sua sponte* decertify the class.

## STANDARD OF REVIEW

Review of the order granting judgment on the pleadings on Navarro's trespass claim is de novo. *Harris v. County of Orange,* 682 F.3d 1126, 1131 (9th Cir. 2012). Judgment on the pleadings is not proper where the pleadings contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible" on its face. *Id.*

Review of the order granting summary judgment on Navarro's nuisance claims is also de novo. *Jones v. Royal Admin. Services, Inc.,* 887 F.3d 443, 447 (9th Cir. 2018). The order must be reversed if, "viewing the evidence in the light most favorable to" Navarro, "there are any genuine issues of material fact" or the court did not "correctly appl[y] the relevant substantive law." *Ventura Packers, Inc. v. F/V Jeanine Kathleen,* 305 F.3d 913, 916 (9th Cir. 2002).

The Court reviews the decertification order for an abuse of discretion. *Marlo v. United Parcel Service, Inc.,* 639 F.3d 942, 946 (9th Cir. 2011). If the court's decertification determination was premised on a legal error, then it is "a per se abuse of discretion." *Id.*

**ARGUMENT**

## I. THE ORDER GRANTING JUDGMENT ON THE PLEADINGS ON NAVARRO'S TRESPASS CLAIM RESTS ON MULTIPLE LEGAL ERRORS, EACH OF WHICH INDEPENDENTLY REQUIRES REVERSAL.

"The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another.' [Citation.]" *Miller v. National Broadcasting Co.,* 187 Cal.App.3d 1463, 1480 (1986). Plaintiff states a claim for trespass by alleging that the defendant caused an unauthorized and tangible entry on or into the plaintiff's land. *Wilson v. Interlake Steel Co.,* 32 Cal.3d 229, 233 (1982); *Capogeannis v. Superior Court,* 12 Cal.App.4th 668, 674 (1993). Because trespass is an injury to possessory rights to exclude intrusions, nominal damages are available; damages related to contamination of property (including remediation) are also available. *Starrh & Starrh Cotton Growers v. Aera Energy LLC,* 153 Cal.App.4th 583, 599 (2007); Cal. Civ. Code § 3334.

Navarro stated a claim for trespass by alleging that the Refinery leaked liquid petroleum products resulting in a plume that intruded into the soil of his property, causing soil vapors to enter his home, jeopardizing his health. 19-ER-5214-15, 5224-26.

The court reasoned that Navarro failed to state a claim because (1) the claim rested solely on allegations that the Refinery's activities resulted in

"soil vapor intrusions" into his home and Navarro had abandoned claims based on contamination of the soil and groundwater; (2) "soil vapors" constitute an "intangible" intrusion; and (3) the soil vapors did not "deposit particulate matter" on the property or cause property damage. 1-ER-22-25. Each component of the court's rationale was error.

### A. Navarro did not abandon trespass claims based on physical intrusion of pollutants into the soil and groundwater of his property.

First, the court erred by ignoring the corrected TAC's allegations that the Refinery caused a subsurface plume of toxic substances to intrude into the soil and groundwater on Navarro's property. 1-ER-23-25. In petroleum contamination cases such as this one, benzene and other contaminants enter the groundwater and flow to neighboring properties, the contaminants then volatize forming a soil vapor plume above the groundwater, and the vapors can intrude into homes and other surface structures threatening human health. Cal. Code Regs. Tit. 23, § 2923; *Watson Land Co. v. Shell Oil Co.,* 130 Cal.App.4th 69, 74 (2005) ("The gasoline slowly dissolves into the groundwater, becomes a plume, and moves in the direction of the groundwater flow."); *Tesoro Refining & Marketing Co. LLC v. Los Angeles Regional Water Quality Control Bd.,* 42 Cal.App.5th 453, 468 (2019) (describing pattern of benzene contamination in the soil and soil vapor).

27

It is well-established that soil and groundwater contamination based on migration of petroleum products can establish a trespass claim under California law. *KFC Western, Inc. v. Meghrig*, 23 Cal.App.4th 1167, 1171 (1994) (plaintiff was "entitled to amend to plead a continuing trespass based on the alleged soil contamination of the property" where the soil "ha[d] been contaminated by the release of refined petroleum products from the operation of a gasoline station and/or leakage from underground storage tanks on the site," and the leakage resulted in "elevated levels of … benzene in the soil"); *Watson Land Co.*, 130 Cal.App.4th at 71 (plaintiff entitled to damages for trespass claim based on "groundwater and soil contamination under its land"); *Shamsian v. Atlantic Richfield Co.,* 107 Cal.App.4th 967, 972-73, 984 (2003) (trespass claim based on leaking "hydrocarbons," i.e., gasoline, "in the subsurface soil and groundwater"); *Capogeannis*, 12 Cal.App.4th at 672 (trespass claim based on leaked fuel which contaminated soil and groundwater with petroleum); *Greenfield MHP Assocs., L.P. v. Ametek, Inc.*, 145 F.Supp.3d 1000, 1008-1009 (S.D. Cal. 2015) (trespass claim regarding toxic plume contaminating water and soil); *Schaeffer v. Gregory Village Partners, L.P.,* 105 F.Supp.3d 951, 967 (N.D. Cal. 2015) (granting plaintiff's trespass claim based on soil and groundwater contamination); *People of California v. Kinder Morgan Energy Partners,*

*L.P.*, 569 F.Supp.2d 1073 (S.D. Cal. 2008) ("*Kinder Morgan*") (trespass claim for petroleum contamination of groundwater); *Bonds v. Nicoletti Oil Inc.,* No. CV-F-07-1600OWW/DLB, 2008 WL 281532, at *1 (E.D. Cal. Jan. 30, 2008) (same).

The corrected TAC alleged trespassory intrusions typical of petroleum pollution cases: (1) groundwater and soil contamination by a liquid; (2) soil contamination due to the presence of subsurface "soil vapors"; and (3) vapor intrusions into the home. 19-ER-5214-15, 5224-26. Specifically, the complaint alleges that (1) the Refinery's operations caused numerous leaks of dangerous pollutants, including petroleum products (19-ER-5214, 5216-17, 5219-20); (2) Exxon's own tests established that "contaminants from the Refinery had entered the *groundwater* and extended out in a 'plume' into the neighboring community" and that the "*soil and groundwater contamination remains today*," (19-ER-5214-15 (emphasis added)); (3) the plumes are composed of dissolved "benzene and other volatile organic compounds, and petroleum products," (19-ER-5214); and (4) the Refinery "has occupied and used the properties of plaintiff for the storage of materials including toxic substances." 19-ER-5215.

The corrected TAC attaches and incorporates contour maps created by the Refinery showing the "[d]istribution of dissolved-phase benzene" and

"free-phase hydrogen product" in the aquifer that extends well beyond the Refinery's property and underneath homes and businesses in the surrounding community, including Navarro's property. 19-ER-5214, 5229-34. The complaint further alleges that the Refinery's map minimizes the extent of the benzene plume and the high levels at which benzene was detected in sampled wells. 19-ER-5224-26. It also alleges that the "contamination of the soil and groundwater" caused by the Refinery included volatile chemicals which, present in the ground as soil gas (or soil vapor), were trapped in the land itself. 19-ER-5214-15, 5219-20.

These allegations are more than sufficient to state a standard petroleum-product trespass claim under California law. Indeed, the court acknowledged Plaintiff's allegations of soil and groundwater contamination when it initially certified a "Soil and Groundwater Subclass" pursuing trespass claims. 1-ER-76. In that order, the court stated that Plaintiffs alleged that the Refinery's operation resulted in "pollution of the land" and that "plaintiffs ha[d] submitted evidence that the extent of *the soil and groundwater contamination* can be proved on a class wide basis using models prepared by their expert Laton." 1-ER-75, 89-90 (emphasis added). The court also found that Plaintiffs' allegation that "Defendant failed to

exercise due care to prevent *groundwater contamination*" posed a common question. 1-ER-79.

In granting judgment on the pleadings, however, the court discussed only "soil vapor intrusion" into Navarro's home, without discussing the groundwater and soil contamination allegations. 1-ER-22-25. The court explained its exclusive focus on "soil vapor" intrusion into the indoor air by relying on what it considered a "judicial admission" in a sentence in Navarro's reply brief in support of his motion to be appointed as class representative, in which he stated that the trespass claim "is premised on evidence that subsurface contamination from the Refinery poses a vapor intrusion risk to the structures in the class area." 1-ER-23. The court construed that sentence as an abandonment of trespass claims based on groundwater and soil contamination. *Id.*

The court's interpretation was erroneous for several reasons. First, "[f]or a statement to qualify as a judicial admission, it must be deliberate, clear, and unequivocal." *Docmagic, Inc. v. Ellie Mae, Inc.*, 2011 WL 871480, at *7 (N.D. Cal. 2011). Plaintiff never unequivocally abandoned trespass claims based on soil and groundwater contamination. Indeed, the sentence the court quoted expressly states that the trespass claim "is premised on evidence [of] subsurface contamination from the Refinery."

17-ER-4761. Such subsurface intrusion of pollutants into the land and groundwater constitutes actionable trespass. *See supra,* at pp. 28-29; *see also* 16-ER-4370-74. In the immediately preceding sentence, Navarro also stated, "The trespass claims asserted on behalf of the Ground Subclass *remain unchanged*." 17-ER-4761.

Plaintiff had represented to the court that the TAC "would be limited to adding Navarro… [who] lived only a few doors down the street" from the prior plaintiff and who "had the same claims." 1-ER-30. The court permitted the amendment because the "substitution would not 'alter the claims in the case [.]'" 1-ER-30. Consistent with that understanding, in his motion requesting substitution, Navarro continued to "assert… a claim of trespass on behalf of himself and the Ground Subclass based upon subsurface contamination from the Refinery," citing evidence that the contaminant plume migrated *through* his property. 18-ER-4993-94.

At the hearing regarding his substitution, Navarro's counsel explained that his trespass claim addressed "subsurface contamination" (17-ER-4643-44), that "Mr. Navarro owns and resides at a property that is contaminated" (17-ER-4645), and assured the court "the claims by the class that we are asserting here haven't changed since the Court certified the class" (17-ER-4649). The Refinery recognized the scope of Navarro's trespass claim,

stating that to defend against that claim it intended to analyze *soil collected from the backyards for contamination.* 21-ER-5821-25.

Second, even if counsel had advocated for a narrower theory of liability *in the context of class certification*, that would not justify precluding Navarro from pursuing broader theories on his individual claim following decertification. The judicial admission doctrine is narrow and applies to statements regarding a "fact." It is not a basis for a court to find abandonment of legal theories. *Singer v. State Farm Mut. Auto. Ins. Co.,* 116 F.3d 373, 376 (9th Cir. 1997) ("a judicial admission of a fact is not the same thing as a waiver or a stipulation."); *MacDonald v. General Motors Corp.,* 110 F.3d 337, 340 (6th Cir. 1997) (counsel's opinions about the legal theories in the case are not judicial admissions regarding facts).

The corrected TAC alleges trespass based on groundwater and soil contamination. 19-ER-5214-20, 5224-34. This Court should reverse on this basis alone.

**B.    The soil vapor physically intruding into Navarro's property is not "intangible."**

Even if Navarro's trespass claim was based solely on allegations of "soil vapor" intrusion through the soil into his home (and not contamination of the soil and groundwater of his property), reversal would still be necessary. Quoting from a California Supreme Court decision addressing

claims based on *noise* from nearby construction, the court stated that "[a]ll *intangible* intrusions, such as noise, odor, or light alone, are dealt with as nuisance cases, not trespass." 1-ER-23 (quoting *Wilson*, 32 Cal.3d at 233, and *San Diego Gas & Electric Co. v. Superior Court*, 13 Cal.4th 893, 937 (1996) (addressing claims based on electric and magnetic fields arising from nearby powerlines)).

The court then reasoned that "[c]hemical vapors like benzene may be measurable but they are intangible substances, not particulate matter," and thus cannot form the basis for a trespass claim unless they satisfy the heightened standard for a trespass based on "intangible" intrusions, which requires a demonstration of property damage or a "deposit of particulate matter." 1-ER-24-25. The court's framing of benzene and other hydrocarbons as "intangible" is flawed.

Benzene is a tangible substance. At room temperature, it is a "colorless liquid with a sweet odor" and "evaporates into air very quickly and dissolves slightly in water." MJN, Ex. B, p. 1. It "is highly flammable." *Id*. When leaked into the soil and groundwater from underground storage tanks, it "can pass into air." *Id*. at 2. In air, water, and soil, benzene remains tangible – it is a physical substance, unlike noise or electric and magnetic fields. *Pac. Gas & Elec. Co. v. Zuckerman,* 189 Cal.App.3d 1113, 1138–

1139 (1987) (if owner of natural gas allows it to escape it may be liable in trespass); *MDR Hotels, LLC v. Dow Chem. Co.,* No. 220CV08008FLAJPRX, 2024 WL 650406 at *7–8 (C.D. Cal. Jan. 5, 2024) (denying defendant's motion for judgment on trespass claim where methane and other gases were migrating to surface of property).

Unsurprisingly, courts have repeatedly held that the intrusion of "soil vapor" can contaminate soil, supporting the assertion that vapors of benzene and other toxins are tangible. *Greenfield,* 145 F.Supp.3d at 1008–1009 (plaintiff plausibly alleged "contamination of the sub-surface soil" based on waste plume that emitted "toxic vapors"); *Barclay Hollander Corp. v. California Regional Water Quality Control Bd.,* 38 Cal.App.5th 479, 490 (2019) (regional water board found petroleum leak resulted in soil, *soil vapor*, and groundwater contamination); *United Alloys, Inc. v. Baker,* 797 F.Supp.2d 974, 992 (C.D. Cal. 2011) (discussing soil and soil vapor contamination); *Mission Linen Supply v. City of Visalia,* 2019 WL 446358, at *12 (E.D. Cal., Feb. 5, 2019, No. 1:15-CV-0672 AWI EPG), aff'd (9th Cir. 2020) 817 Fed.Appx. 336, and enforcement granted (E.D. Cal., Oct. 2, 2020, No. 1:15-CV-0672 AWI EPG) 2020 WL 5878275 (discussing "PCE soil vapor contamination"); *Limo Co. v. Chem. Milling Int'l Corp.*, Case No. 217CV02345SVWRAO, 2017 WL 4358423, at *6 (C.D. Cal. Sept. 28,

2017) (presence of "soil gas" contamination supported trespass). One of the primary remedies for soil vapor contamination is "soil vapor extraction"— i.e., the *removal* of these tangible contaminants from the land. *Shamsian,* 107 Cal.App.4th at 980; *Capogeannis,* 12 Cal.App.4th at 680; *Bonds,* 2008 WL 281532, at *2.

Due to the advance of science, the meaning of "tangible has been relaxed almost to the point of being discarded," with courts holding "microscopic particles" can give rise to trespass. *Thrifty-Tel, Inc. v. Bezenek,* 46 Cal.App.4th 1559, 1567, n. 7 (1996); *Elton v. Anheuser-Busch Beverage Group, Inc.,* 50 Cal.App.4th 1301, 1306-1307 (1996) (trespass by "invisible particles of fluoride compounds").[8]

In concluding that Navarro's trespass claim failed because it was premised on "intangible" intrusions, the court incorrectly relied on dicta in *Wilson,* 32 Cal.3d 229, and *San Diego Gas & Electric Co.,* 13 Cal.4th 893. 1-ER-23. Those cases each addressed intrusions by truly intangible

---

[8] Other states agree. *See, e.g., Martin v. Reynolds Metals Co.,* 221 Or. 86, 89. 93 (1959) (scientific inquiry into "molecular and atomic world of small particles" revealed tremendous damage "atoms" "can do to a man's property if it is released," and deposit of "individual particulates which form these chemical compounds … not visible to the naked eye" can constitute trespass).

phenomena—noise in *Wilson* and electric and magnetic fields in *San Diego Gas & Electric Co.* 1-ER-23-24.

Addressing allegations of noise from nearby property, *Wilson* held that "actionable trespass may not be predicated upon nondamaging noise, odor, or light intrusion," which were better suited to nuisance claims. 32 Cal.3d at 233. Citing prior cases that involved viable trespass claims, the Court noted that "gas emissions" could be actionable under trespass if they deposited "particulate matter" on the land or caused property damage. *Id.* at 232-233. The Court did not evaluate the contours of a trespass claim involving "gas emissions" or what was meant by "particulate matter," because the allegations at issue involved only noise, and the parties had stipulated that the case involved no deposit of "particulate matter" on plaintiffs' property. *Id.* at 231-232.[9]

The court relied on *Wilson* and two unreported federal decisions to erroneously conclude that chemical contaminants should be considered

---

[9] In the only "gas emission" case *Wilson* cited, the Court held that allegations that a ginning plant released "fumes" as well as "vapors, dust, dirt, sediment, lint and waste materials" that penetrated into homes and structures supported a trespass claim. *Kornoff v. Kingsburg Cotton Oil Co.,* 45 Cal.2d 265, 266, 275 (1955). The California Supreme Court has never held, or cited a case that held, that a trespass claim cannot be supported by allegations of intrusion *into the plaintiff's land* by contaminants in a gaseous state.

"intangibles" like light and sound for purposes of California trespass law. 1-ER-23-24 (citing *Palmisano v. Olin Corp.,* C-03-01607 RMW, 2005 WL 6777560 (N.D. Cal. June 24, 2005) and *Konkol v. Oakwood Worldwide Loc., LLC*, No. 2:14-CV-06596-ODW, 2015 WL 46177 (C.D. Cal. Jan. 2, 2015)). Quoting *Palmisano*, the court stated that "[t]aken together, *Wilson* and *San Diego Gas & Electric Co.* suggest that *imperceptible substances* must either (1) deposit particulate matter upon the plaintiff's property or (2) cause actual physical damage thereto to constitute trespass." 1-ER-24 (emphasis added). That is a misstatement of California law.

As explained above, *Wilson* and *San Diego Gas & Electric Co.* addressed *intangible* intrusions like noise, light, and electromagnetic fields, not "imperceptible substances." Courts recognize that intrusion of "imperceptible substances" like liquid and gaseous chemical pollutants *do* constitute trespass because they involve physical, tangible intrusion onto or into the property, without the need to separately establish that the intrusion causes a "deposit" of "particulate matter" upon the property or physical damage to the property. *See supra,* at pp. 28-29, 34-36.

C.   **The complaint alleges that the Refinery's contamination resulted in the deposit of particulate matter in Navarro's soil, groundwater, and home.**

Even if the corrected TAC had alleged only intrusion into the home by an intangible "soil vapor" (despite the contaminants at issue being physical, tangible substances), it would still state a claim for trespass because the alleged intrusion accompanied the "deposit ...[of] particulate matter upon the plaintiffs' property" or resulted in "physical property damage."  1-ER-24 (quoting *Wilson*, 32 Cal.3d at 233).

The court stated that "Navarro does not allege soil vapor intrusion constituted the deposit of a particulate matter" and that "Navarro cannot plausibly make these allegations [because…] [c]hemical vapors like benzene may be measurable but they are intangible substances, not particulate matter."  1-ER-24.

The court was incorrect.  While the corrected TAC does not use the magic words "deposit of particulate matter," it alleges that "contamination of the soil and groundwater" caused by the Refinery includes volatile chemicals that have contaminated the land itself, and those "gases and vapors" are substances that intruded into Navarro's home.  19-ER-5214-15, 5219-20.  By alleging harmful health effects and requesting remediation of the contamination of his land, the complaint also effectively alleged that the

contamination damaged Navarro's property. *Bonds*, 2008 WL 281532, at *2 (plaintiffs "suffered physical damage to their respective property" because the contaminants make "the property less suitable for habitation"); *United Alloys, Inc.*, 2011 WL 2749641, at *17 ("based on the chemical and soil gas VOC concentrations, soil remediation is necessary"); *Save Livermore Downtown v. City of Livermore,* 87 Cal.App.5th 1116, 1132–1133 (2022) (presence of soil gas required remediation).

Other state courts have recognized that "particulate matter" is a term synonymous with tangible physical substance, regardless of whether that substance is immediately perceptible. *Bradley v. Am. Smelting & Ref. Co.,* 104 Wash.2d 677, 680 (1985) ("Particulate matter is composed of distinct particles of matter other than water, which cannot be detected by the human senses."). Accordingly, matter in a gaseous state within the soil is particulate matter and intrusion by gaseous contamination is a physical, tangible intrusion, fundamentally different from the intangible intrusions of light and electromagnetic fields at issue in *Wilson* and *San Diego Gas & Electric Co.* For these reasons, the order granting judgment on the pleadings on Navarro's trespass claim must be reversed.

## II.   MATERIAL DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT ON NAVARRO'S NUISANCE CLAIMS, REQUIRING REVERSAL.

California law defines nuisance as "[a]nything which is injurious to health … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property."  Cal. Civ. Code § 3479.  "[T]he risk of harmful health effects due to the release of hazardous chemicals in their immediate environment" and "damage to [residential properties] as a result of soil, soil vapor, and groundwater contamination" "are the types of injuries that California nuisance statutes … were designed to prevent."  *Schaeffer,* 105 F.Supp.3d at 965 (emphasis added); *Newhall Land & Farming Co. v. Superior Court,* 19 Cal.App.4th 334, 341, 345 (1993) (contamination constitutes nuisance); *Limo Co.,* 2017 WL 4358423, at *5 (same); *Sisters of Notre Dame de Namur v. Garnett-Murray* (N.D. Cal., June 6, 2012, No. C10-01807 HRL) 2012 WL 2050377, at *6 (same); *Olson v. Beck,* 2011 WL 4634026, at *5 (N.D. Cal., Oct. 5, 2011, No. C-06-07487 JCS) (nuisance claim based on groundwater contaminants "several orders of magnitude higher than the maximum contaminant levels"); *Barclay Hollander Corp.,* 38 Cal.App.5th 479, 494–495 (2019) (same).

To prove nuisance, the plaintiff must demonstrate interference with his enjoyment of life or property that is "substantial" and "unreasonable." *Chase v. Wizmann,* 71 Cal.App.5th 244, 253 (2021); *Birke v. Oakwood Worldwide,* 169 Cal.App.4th 1540, 1547 (2009). The "substantial" interference standard is "a relatively broad one, requiring only that the contribution of the individual cause [to the plaintiff's harm] be more than negligible or theoretical." *People v. ConAgra Grocery Prod. Co.,* 17 Cal.App.5th 51, 102 (2017). "Thus, a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor … but a very minor force that does cause harm is a substantial factor." *Id*. at 102.

A nuisance plaintiff need not suffer physical injury but can recover based on "discomfort," "annoyance" and "mental suffering" "occasioned by fear for the safety of himself and family." *Birke,* 169 Cal.App.4th at 1551; *Wilson v. S. California Edison Co.,* 21 Cal.App.5th 786, 804-805 (2018) ("mere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property").

To determine whether the interference is substantial, "[t]he degree of harm is to be judged by an objective standard .… 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation,

then the invasion is not a significant one, even though the idiosyncrasies of the particular plaintiff may make it unendurable to him.' … This is, of course, *a question of fact* that turns on the circumstances of each case." *Id*. at 802 (quoting *San Diego Gas & Electric Co.,* 13 Cal.4th at 938 (emphasis added)); *Birke*, 169 Cal.App.4th at 1551 (seriousness of harm is factual issue for trier or fact, not a question of law for a judge); *Wilson*, 21 Cal.App.5th 805 (same).

The court acknowledged that the question of substantiality is a jury question (1-ER-5), but held that "[n]o reasonable juror could find by a preponderance of the evidence that the alleged nuisance is substantial." 1-ER-5. The court's conclusions rest on at least four legal errors, each of which independently requires reversal: (1) the court focused exclusively on evidence of increased health risks from *air* emissions, ignoring evidence of substantial harm caused by the Refinery's *subsurface* contamination; (2) the court improperly discounted expert testimony regarding the harmful effects of the Refinery's contamination by relying on only one of several relevant regulatory standards, rather than drawing all inferences in favor of Navarro; (3) the court improperly deferred to the SCAQMD's Rule 1402 threshold for significant harm when other standards apply to the Refinery's emissions;

and (4) the court applied incorrect legal principles to discount evidence from Navarro and his neighbors about the harms they suffered. 1-ER-4-5, 7-12.

**A.** **The court improperly ignored evidence demonstrating harm caused by the Refinery's *subsurface* contamination.**

The court focused *exclusively* on evidence regarding the Refinery's *air* emissions and disregarded evidence about the more substantial harm posed by the Refinery's *subsurface* contamination. 1-ER-1, 7 , 9. The court asserted that "Navarro contends that he has an elevated cancer risk of more than 10 in 1,000,000 … and that the risk may be as high as 29.8 in 1,000,000 in 2020." 1-ER-7. The court reasoned that a 10 in 1,000,000 elevated risk of cancer "is not a substantial nuisance," in significant part because a rule from the SCAQMD defines a "significant risk" as 100 in 1,000,000. 1-ER-9. The court asserted that this is "ten times the alleged risk Navarro faces" and "[i]t is not alleged that the emissions from the Refinery ever reached this level." 1-ER-9. That is fundamentally inaccurate.

Navarro presented evidence from which a jury could find that the additive effects of the Refinery's air and subsurface contamination caused Navarro to suffer a risk greater than *2,666* in 1,000,000, far greater than the risk the court itself recognized as "significant." 3-ER-413, 415-16, 422-23; 11-ER-2814-15; 5-ER-1206, 1212, 1214, 1218; 8-ER-2001-13. Concentrations of benzene groundwater contamination in the vicinity of

Navarro's home indicated an increased cancer risk that ranged from 1,800 to 2,666 in one million. 3-ER-487-89; 8-ER-2008; 11-ER-2814-15.

The cancer risk indicated by the indoor air contamination was 34.7 in one million, and soil vapor testing revealed a cancer risk as high as 170 in one million. 5-ER-1206, 1212, 1218. Clark testified that Navarro's health would be at risk from "vapors emanating from the subsurface" "[u]ntil the source of volatile organic compounds in the subsurface" are abated. 3-ER-490, 503; 11-ER-2814-15.

Laton similarly testified that tests "within the Ground Class Area confirm that there are unhealthy concentrations of multiple COCs at the sampled residences along Del Amo Boulevard. The sampling results indicate that [contaminants]… from the Torrance Refinery are present levels that pose health risks to humans present in the private residences from which the samples were taken[.]" 5-ER-1281.

The Refinery's report to the SCAQMD showed *air* emissions increased Navarro's risk of developing cancer to as high as 29.8 in 1 million. 3-ER-496-97; 4-ER-873, 952; 8-ER-2002.[10] Taken together with evidence

_____

[10] Clark testified that an *air* plume of diesel emissions, a plume of volatile organic compounds (VOCs), and a plume of toxic metals blanket the community around the Refinery. "All of these plumes put the community at risk. In combination, these plumes create a health risk to the community that is unacceptable." 3-ER-521-22 (emphasis add

about the *subsurface* contamination, and viewed in the light most favorable

to Navarro, the Refinery exposed Navarro to a cancer risk of 34.7 in one

million to *2,666* in one million from subsurface contamination, *plus* an

*additional* risk of 29.8 in one million from the air emissions. 3-ER-485-86,

489, 564 ("In the risk assessment methodology adopted by U.S. EPA and

SCAQMD, cancer risk is assumed to be at least additive."); 11-ER-2815-

16.[11]

    The court's failure to consider critical evidence regarding the

increased risks to Navarro's health from subsurface contamination, including

its failure to adopt all inferences from the evidence in Navarro's favor,

constitutes reversible error. *Carson Harbor Village, Ltd. v. Unocal Corp.,*

270 F.3d 863, 874 (9th Cir. 2000) (district court erred when it disregarded

evidence supporting "basis for [plaintiff's] expert opinion about whether the

contamination posed a threat to public health or the environment….").

    The court did not explain its failure to consider evidence of harm from

the Refinery's subsurface contamination, and this omission is at odds with

the court's own reasoning in its order granting judgment on the pleadings

---

[11] The court also failed to acknowledge that Navarro presented evidence that
his exposure to benzene threatened his health in ways beyond increasing his
cancer risk.  Exposure to benzene is also associated with increased
likelihood of developing anemia, immune suppression, asthma, arrhythmias,
and peripheral neuropathy.  3-ER-480.

against the trespass claim, where it reasoned that the ground contamination allegations would be more appropriately addressed as part of a nuisance claim and permitted Navarro to amend the complaint. 1-ER-22-24. Navarro amended the complaint to clarify that his nuisance claims relied on both air emissions and subsurface contamination. 16-ER-4310-13, 4316-17. The court erred by failing to consider those allegations and the supporting evidence in granting summary judgment on the nuisance claims.

**B.** **The district court erred in discounting expert testimony demonstrating the substantial impact the Refinery's air emissions alone had on Navarro's health.**

Even if the court did not err in ignoring the health risks posed by the Refinery's subsurface contamination, the court usurped the role of the jury in deciding which regulatory standards would be dispositive of Navarro's nuisance claims and finding that the risk posed by air emissions alone did not create a disputed factual issue.

The court dismissed Clark's opinion that the Refinery's air emissions posed an unacceptable and therefore substantial and unreasonable threat of harm to Navarro and the surrounding community. Clark testified that the Refinery emitted DPM and hexavalent chromium ("chromium") into the air, which are classified as carcinogens and can "contribute to an increase in mortality or an increase in serious illness." 3-ER-490-92, 526-29. "Even

brief exposures to [these substances] could lead to the development of adverse health impacts over the life of an individual." 3-ER-491. The "level of diesel exhaust exposure below which no carcinogenic effects are anticipated has not been identified." 3-ER-491-92.

Despite his qualifications and the depth of his analysis, the court found that Clark's expert testimony could not support a jury's finding that the harms caused by the Refinery were "substantial." 1-ER-7. The court determined that the regulatory screening levels cited in his report to describe a threshold of acceptability were "not persuasive reference points." *Id.* Specifically, the court took issue with Clark's reliance on California Health and Safety Code Section 25249.5 et seq. and 22 California Code of Regulations Section 12703(b)[12] for the proposition that elevated cancer risks above 10 in 1,000,000 are unacceptable, and therefore substantial. *Id.*

The court ignored Clark's expertise and rejected the use of these standards, even while acknowledging that Section 12703(b) "establishes the basic principles and assumptions used in quantitative risk assessments, which the state uses to determine when exposure to a substance no longer poses a 'significant risk' to the population." *Id.* (citing 22 Cal. Code. Regs. § 12703(a)).

---

[12] Renumbered as Cal. Code Regs., Tit. 27, § 25703.

The court's discounting of Clark's expert opinion due to his choice of exposure thresholds is problematic for several reasons. First, Clark did not rely *exclusively* on regulatory guidelines to support his expert opinion that the harms caused by the Refinery were substantial. He also relied on his experience in toxicological research at the University of California at Los Angeles, Department of Medicine, and his 30-year experience as an environmental consultant that has entailed evaluation of the toxicological impacts of contaminants (including those emitted from refineries) on human health, coordination of regional air pollution studies, performance of exposure assessments and numeric risk assessments, supervision of remedial investigations and removal actions, and scientific studies. 3-ER-477-78, 499-01, 502-04, 505; 11-ER-3088. Clark's selection of regulatory guidelines was informed by this experience and reflects his assessment that the selected guidelines provide the best reference point for health risk analysis. 3-ER-502-04.

Second, the court improperly discounted the regulatory guidelines Clark cited based on its erroneous conclusion that harm would only accrue *after* a lifetime of exposure. 1-ER-7-8. Clark testified that risk analysis "for carcinogens" assumes "that there is no threshold dose below which carcinogenic effects do not occur" and while "the magnitude of risk declines

with decreasing exposure, the risks are believed to be zero only at zero exposure." 11-ER-2801. He further testified that "[e]ven brief exposures to the [substances] could lead to the development of adverse health impacts over the life of an individual." 3-ER-491.

Third, the court erroneously reasoned that Navarro had only been exposed to levels of toxic contaminants for a "fraction of a lifetime" (1-ER-8), but Navarro has lived next to the Refinery for nearly 25 years. 1-ER-11.

Rather than allowing a jury to evaluate the record evidence of the harm the Refinery caused, the court relied on the SCAQMD's Rule 1402, which sets standards regulating air emissions, to conclude that Navarro's evidence did not support a finding of substantial harm. 1-ER-9-10. This too was error. Rule 1402 recommends action plans for facilities whose emissions risk result in cancer risk in excess of 10 in one million. 3-ER-483. Those facilities are subject to "risk reduction programs" with the "goal of risk reduction" to 1 in one million. 3-ER-483. TORC received notice that it had exceeded the 10 in one million threshold and prepared a VRRP, essentially conceding its emissions pose an unacceptable risk. 3-ER-494-95; 4-ER-789.

The evidence in TORC's own VRRP analysis shows that the maximum individual cancer risk ("MICR") due to airborne emissions from

the Refinery is located precisely on Navarro's street near his home. 3-ER-495-97. Based on TORC's subsequent VRRPs, the cancer risk *increased* from 21.6 in one million to 29.8 in one million. 3-ER-496; 4-ER-873, 952.

The VRRP also delineates a contour line that places Navarro's home in a zone subject to a baseline cancer risk of between 10 and 25 in one million. 3-ER-497. Under Rule 1402, when exceedances surpass the 25 in one million threshold, emissions are considered to be at an "action risk level" and a "risk reduction plan" is required, not optional. 14-ER-3725, 3731-32. The Refinery's own expert conceded that "the level of risk that triggers the need for risk reduction under SCAQMD rules is 25 in 1 million[.]" 26-ER-7579. Clark testified that the Refinery's emissions of chromium were already in excess of action levels and increased fourfold from 2016 to 2019. 3-ER-502. He further testified that based on his review of the Refinery's reported emissions, "it is clear the facility has failed to maintain emissions of the contaminants of concern to their targeted VRRP levels." 3-ER-502.

The court disregarded all this evidence because, for purposes of Rule 1402, the SCAQMD defines a "significant risk level" as a cancer risk greater than 100 in one million. 1-ER-9; 14-ER-3728. As Clark demonstrated, the applicable standard is disputed. Clark testified that the SCAQMD's

51

"significant, action, and risk levels are not "generally accepted toxicological classification system[s]"—that is they were not designed to establish a threshold for injury to human health. Rather, they "are designed to provide a prioritization methodology for regulators and permit holders." 3-ER-498-99; 9-ER-2428-30.

The court assumed the role of the jury when it chose the less protective Rule 1402 threshold of 100 in one million cancer risk over a more protective threshold of 10 in one million. 1-ER-9; *Sisters of Notre Dame de Namur,* 2012 WL 2050377, at *6 (granting summary judgment *in plaintiffs' favor* on trespass and nuisance claims where pollutant migrated onto the property and its concentration exceeded "the residential ESL levels by a factor of 15"); Cal. Code Regs., Tit. 22, Div. 4.5, Ch. 51, App. I to Section 69021; *Schaeffer*, 105 F.Supp.3d at 956 (explaining relevance of ESLs in determining human health risk and need for remediation in nuisance action); 3-ER-569; 9-ER-2207, 2010-12, 2322-23, 2384-85.

*Birke* is instructive. The plaintiff, an apartment complex resident, alleged nuisance due to the property's failure to limit her exposure to secondhand smoke. 169 Cal.App.4th at 1543. The court of appeal held that an allegation of "a substantially increased risk of developing heart disease

and lung cancer" due to exposure to a toxic air contaminant can establish a cognizable nuisance claim. *Id*. at 1551.

Like here, the plaintiff relied on regulatory authority and the toxic nature of cigarette smoke to establish that her fear of future injury was well-founded. Her complaint stated that the California Air Resources Board had found that secondhand smoke is "an airborne toxic substance that may cause and/or contribute to death or serious illness." *Id*. at 1540, n. 3.

The pleading also cited to the Office of the Surgeon General's caution that "exposure to secondhand smoke...increase[d] the[…] risk of developing heart disease by 25 to 30 percent and lung cancer by 20 to 30 percent." *Id*. In other words, the exposure presented plaintiff with a 1.2-fold to 1.3-fold increase in her risk of cancer. Here, Navarro's risk of cancer is increased by over 10-fold from air emissions and from 34.7 up to 2,666 fold from subsurface emissions.

The district court discounted *Birke* because the plaintiff in that case was physically injured by the secondhand smoke—the smoke aggravated her allergies and asthma. 1-ER-6, n. 4. But *Birke* rejected that reasoning, holding that current "physical injury" is *not* required to establish a nuisance claim; exposure to increased risks to the safety of oneself or family is

sufficient. 169 Cal.App.4th at 1551 (quoting *Acadia California Ltd. v. Herbert,* 54 Cal.2d 328, 337 (1960)).

**C.** **The district court incorrectly found that policy concerns favored dismissal of Navarro's nuisance claims even though it is well-established that compliance with regulatory standards does not preclude such claims.**

The court expressed a policy concern that the extension of nuisance law to pollution from a regulated entity such as an oil refinery might supplant the role of regulators and the legislature. 1-ER-6. This was error.

First, as the court acknowledged, under California law, compliance with regulatory standards does not preclude nuisance actions. 1-ER-10 (citing *Venuto v. Owens-Corning Fiberglas Corp.,* 22 Cal.App.3d 116, 129 (1971) (permit to emit pollutants within standard of permissible district limitations does not insulate entity from nuisance claim. It is well-settled that while agencies have broad "administrative authority," this "does not displace the court's own substantial jurisdiction to declare nuisances and grant damages to injured property owners.")).

Second, the Refinery's subsurface contamination was subject to a long history of clean up orders with "no end in sight" and the VRRP for airborne emissions showed exceedances (cancer risk greater than 25 in one million) mandating a plan to reduce emissions. 5-ER-1278; 9-ER-2328, 2330, 2342. In the 2017 VRRP, TORC stated it would cut emissions so there was no

54

longer a plume extending into the community by 2019, but its 2020 plan showed it had *increased* emissions by 38%. 3-ER-530; 4-ER-873, 952. Given the inadequacy of the Refinery's efforts to remediate contamination on Navarro's property, he is entitled to seek redress through tort actions. *Kinder Morgan*, 569 F.Supp.2d at 1082 (where agency supervision of petroleum product remediation was inadequate, plaintiff was entitled to bring claim for nuisance).

Third, it is well-established that if a regulated entity can operate without posing a nuisance, it must. *City of Norwalk v. City of* Cerritos, 99 Cal.App.5th 977, 988 (2024) (nuisance must be abated where activity "does not inexorably and inescapably flow" from authorized act); *Venuto,* 22 Cal.App.3d at 128-129 (compliance with air pollution control district's regulations did not preclude nuisance claim); *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.,* 190 Cal.App.4th 1502, 1531-1532 (2010). The Refinery could operate without leaking benzene and other harmful chemicals into the groundwater and air jeopardizing Navarro's health. 4-ER-794-801, 874-80, 953-65.

Fourth, because the court ignored the Refinery's subsurface contamination, it focused on only air emissions standards for which the SCAQMD is the "primary regulator" and stated that the agency would find a

55

"significant risk" to human health only where the air emissions resulted in a cancer risk of greater than 100 in one million. 1-ER-10. But Navarro's property was impacted from the *ground* contamination, which was under the Regional Board's purview. 5-ER-1277; 27-ER-7637-38. There was no "primary regulator" to defer to.

The court acknowledged that the Department of Toxic Substances Control's ("DTSC") guidelines had different thresholds than the SCAQMD. 1-ER-9. The DTSC relies on "toxicity criteria specified in California Code of Regulations, title 22, section 69021" to "attain the human health protection." Those standards describe a one in one million risk as a level below which there are no harmful health effects – suggesting that a higher risk level *does* indicate harm to health. Cal. Code Regs., Tit. 22, Div. 4.5, Ch. 51, App. § 69021; 1-ER-8-9. While the DTSC does not set forth "significant risk" thresholds like the SCAQMD, it remains a question for the jury whether the exceedances here along with the other evidence established that Navarro was exposed to risk of harm that "substantially" interfered with his interests. Whether the regulatory guidelines Clark cited are "persuasive reference points" for evaluating the substantiality of the harms caused by the Refinery is a factual question for the jury to resolve.

### D. The court improperly resolved disputed facts in concluding that a normal person in Navarro's community would not be substantially annoyed or disturbed by the Refinery's contamination.

The court also erred by reasoning that there was "no evidence in the record that a normal person in Navarro's community would be substantially annoyed or disturbed by" the Refinery's air emissions. 1-ER-10.

Preliminarily, because the court did not consider the Refinery's subsurface pollution, *supra,* at p. 43-44, it did not consider whether the community would be "substantially annoyed or disturbed by" the Refinery's ground contamination that migrated under residential and commercial properties, volatized, and contaminated the soil and indoor air. 1-ER-10. This error mandates reversal.

The court also committed several errors in its analysis of community annoyance from the air emissions alone.

### 1. The court improperly discounted evidence of community concern regarding the Refinery's emissions.

The court reasoned that there was no evidence of community disturbance from the Refinery's emissions because there are other sources of air contaminants in Torrance and Long Beach, including freeways, the Los Angeles International Airport, and local ports.

57

The court applied an incorrect legal test. Environmental contamination from sources other than the Refinery cannot defeat Navarro's nuisance claim. "'The fact that other sources of possible discomfort to plaintiff existed in the neighborhood of his property is no defense to an action of this kind.'" *Vowinckel v. N. Clark & Sons,* 216 Cal. 156, 164 (1932); *Wade v. Campbell,* 200 Cal.App.2d 54, 61 (1962) (same).

In *Vowinckel*, the plaintiff asserted a claim for nuisance against a manufacturing facility due to soot, smoke, harmful gases, vibrations, and noise. *Id.* at 158-159. Similar interference caused by an airport and railroad crossing on the border of plaintiff's property did not insulate the defendant from a nuisance claim. *Id*. at 164. So too here, the court's discounting of Navarro's harms based on the existence of pollution from other sources

The court was also wrong on the facts. The court cited no evidence for its assertion that the contamination generated by freeways and ports is "regularly tolerated by the people of Los Angeles and Torrance." 1-ER-10. The court's reasoning rests on the troubling presumption that people who continue to live near sources of noxious pollution must not be annoyed or harmed by additional exposure to similar kinds of pollution from other sources.

On summary judgment, the court was required to adopt the contrary inference, given that the record evidence showed that Navarro and at least seven members of the community who live or work near the Refinery submitted declarations expressing their concern that "the Torrance Refinery's operations and emissions will cause [them] to suffer from health problems in the future." 40-ER-11619, 11622, 11628, 11633, 11641, 11646, 11648-49. The court's discounting community harms based on other sources of pollution requires reversal.[13]

### 2. The court applied incorrect legal principles when it discounted Navarro's own perception of substantial harm.

The court erred yet again when it weighed and discounted evidence of Navarro's own perception that he suffered substantial harm. Navarro testified that he would go indoors and close all the windows in his home when he noticed bad odors or flaring events at the Refinery that might threaten his health; that plants would not grow on his property bordering the Refinery and that a peach tree he planted near the fence line produced rotten fruit; and that he no longer eats lemons from the lemon tree due to his

---

[13] The court also incorrectly found that the contamination levels at Navarro's home were similar to concentrations in Long Beach. 1-ER-10. The concentration of benzene in Navarro's home is above the ambient levels recorded at monitoring stations in Long Beach and West Long Beach. 3-ER-493-94.

concern about health risks. 15-ER-4015-16, 4023-24, 4033-34.[14] Navarro also testified that he tries to keep his family, including his children and grandchildren when they visit, inside "most of the time" because he does not "want them to get sick from being outside" due to the "ground pollution and air pollution." 15-ER-4020-21.

The court decided that "[t]he only reason [Navarro] believes his health is at risk is because his lawyers and the experts told him so." 1-ER-11. Navarro's own testimony directly refutes the court's conclusion. When asked whether the opinion of his own experts caused him concern and impacted the use of his property, Navarro replied: "No. The concern, it's been there before. It did not start now." 15-ER-4027.

Navarro further testified that he had been concerned about the health risks associated with the Refinery for a long time. 15-ER-4028-29. That Navarro's concerns were validated when he learned during the pendency of this litigation just how contaminated his property was in no way undermines his nuisance claims. The court's reasoning would absolve polluters from

---

[14] The court stated that Navarro still gives the lemons to his children and the community (1-ER-12) but Navarro said that he "gave" lemons (past tense) to the community and his children, not that he continues to do so. 15-ER-4023. Regardless, the relative import of arguably conflicting evidence regarding Navarro's perceptions of the substantiality of the harm he suffered is something for the jury to weigh, not for the court to resolve on summary judgment. *San Diego Gas & Elec. Co.,* 13 Cal.4th at 938.

liability for the release of toxic contamination so long as the individuals exposed to the contamination were unaware of the magnitude of the exposure and lacked financial resources to investigate it.

The court also erred by reasoning that Navarro's past cigarette use demonstrates that the interference with his enjoyment of property caused by his exposure to the Refinery's toxic chemicals is not substantial. 1-ER-11. The court compared Navarro's exposure to benzene from the Refinery to the amount of benzene contained in a cigarette, since he smoked from 1998 to 2014. 1-ER-11. The suggestion that Navarro's past cigarette use precludes him from finding the Refinery's emissions offensive, annoying, or intolerable, is incorrect and troubling for several reasons.

First, Navarro's nuisance claim is based on a future health risk for himself *and his family*. *Birke,* 169 Cal.App.4th at 1551. Second, Navarro stopped smoking cigarettes ten years ago. 1-ER-11. The logical inference is that he quit smoking because he *is* concerned for his health, not that the Refinery's contamination of his property causes him no substantial harm. Third, the court's reasoning promotes the unsettling suggestion that people formerly addicted to nicotine are not entitled to breathe healthy air. That is not the law. *Soto v. United States,* No. 2:22-CV-03607-AB-RAO, 2024 WL

51193 at *12 (C.D. Cal. Jan. 4, 2024) ("The tortfeasor takes the person he injures as he finds him.").

In sum, the court applied incorrect legal principles when it determined Navarro did not personally find the emissions to constitute a substantial harm.

## III. THE DISTRICT COURT ERRED IN *SUA SPONTE* DECERTIFYING THE CLASS

The court's *sua sponte* decertification of the Air and Ground Subclasses should be reversed because it rested on the same legal errors on the merits discussed above, as well as additional errors in the application of Rule 23.

Class members own or occupy property in a delineated area defined by ground and air contamination caused by the Refinery's pollutants. 21-ER-5943-44; 25-ER-7164; 26-ER-7512; 30-ER-8607, 8614-17, 8700. The pollution exposes residents and workers in this common area to an increased risk of adverse health effects. 18-ER-5058.

In its order granting class certification, the court correctly found that whether defendants failed to exercise due care to prevent contamination and whether "the Refinery's emissions are harmful to health or offensive to the senses, are all questions capable of resolution for the entire class 'in one stroke.'" 1-ER-79. The same is true for the question of whether the

Refinery's contamination of the soil and groundwater of class members' properties resulted in harmful soil vapor intrusion into class members' homes and businesses. Since the original certification order, neither Plaintiff's allegations nor the common evidence supporting Plaintiff's claims has changed. The court erred when it *sua sponte* reversed itself.

### A. The district court's decertification of the Air Subclass relied on legal errors and prematurely decided the merits of Plaintiff's nuisance claims based on air pollution.

#### 1. The district court's holding that Plaintiff's nuisance claims lacked commonality was based on errors of law.

The court's decertification order effectively held that, as a matter of law, California nuisance claims can never be certified, because "they inherently raise individualized issues" such as "each individual's unique property interest." 1-ER-47 (citing "the fundamental maxim that each parcel of land is unique"). That statement is incorrect.

The court relied heavily on *City of San Jose v. Superior Ct.,* 12 Cal. 3d 447 (1974), 1-ER-48-49, but in that case, unlike here, plaintiffs failed to present a common *method* to establish liability. *Id.* at 460. Addressing alleged noise disturbances, the court reasoned that "noise created by airport traffic may cause no actionable interference with land … used for a noisy industrial use" but may establish liability for a single family residence. *Id.* The plaintiff presented no common evidence, such as modeling of where and

when the noise crossed certain thresholds, to establish that noise from the airport created a nuisance for all class members.

In contrast, here, Plaintiffs presented exactly this kind of common evidence. Expert modeling demonstrates that all class members' properties have been exposed to threshold levels of cancer risk from the Refinery, and thus all class members have suffered interference with their ability to comfortably enjoy their property without exposure to unacceptable health risks. 21-ER-5943-44; 25-ER-7164. The Refinery itself used similar common evidence (plume modeling) to determine risk to the surrounding community. 4-ER-794-95.

The court also wrongly concluded that nuisance claims can only be certified when class members each have an ownership or occupancy interest in a shared common area that is contaminated—e.g., the shared courtyard of an apartment complex—but not when they own separate parcels of land and thus have "no common injury." 1-ER-49. This reasoning erroneously conflates injury with damages.

All class members suffered injury through air contamination; any potential differences in *damages* resulting from that injury from a common source do not defeat certification, even where *thousands* of individual parcels are affected. *See, e.g.*, *Andrews v. Plains All Am. Pipeline, L.P.,* No.

64

CV154113PSGJEMX, 2018 WL 2717833, at *10 (C.D. Cal. Apr. 17, 2018) (numerous properties abutting 165 miles of coastal land); *Hart v. J.H. Baxter & Co.,* No. 6:21-CV-00663-MK, 2023 WL 2918632, at *2 (D. Or. Mar. 14, 2023), report and recommendation adopted, No. 6:21 CV 00663-MK, 2023 WL 2914799 (D. Or. Apr. 12, 2023) at *3 (5,860 residences in the class area).[15]

The circumstances here are analogous to *Andrews*, where the court certified a class that included nuisance claims based on contamination of property resulting from an oil spill. 2018 WL 2717833 at *10, 12. In *Andrews*, the court found that common questions could be resolved based on modeling by plaintiff's expert that would show the dispersion of oil, in location and quantity, across class member properties. *Id.* at *4-5, 9. "*Where* the oil was distributed, and *how much* oil invaded the properties, are

---

[15] The district court cited *Lautemann v. Bird Rides, Inc.,* 2019 WL 3037934 (C.D. Cal., May 31, 2019, No. CV1810049PARAOX) but that e-scooter case is distinguishable. 1-ER-48. In *Lautemann*, the plaintiff alleged that Bird Rides' placement of scooter "nests" and users' abandonment of scooters in the neighborhood constituted a trespass and a nuisance. 2019 WL 3037934, at *2. Those claims did not satisfy commonality because each class member's claims depended on both whether they had a possessory interest in the particular land the scooters occupied and the proximity of the scooters (deposited by users) to the class members' property, which varied significantly. *Id.* at *6. Here, the Refinery's air emissions affected *all class members' properties.* 21-ER-5943-44; 25-ER-7164.

questions that are subject to common proof." *Id*. at *2 (emphasis in original). The same basic reasoning applies here.

The court attempted to distinguish *Andrews* on the grounds that "class members [there] were property owners who either owned or rented residential property located on or with deeded access to a common, oil-impacted coastline." 1-ER-49. That is a distinction without a difference. If anything, coastal properties affected by a plume from an oil spill are analogous to properties contaminated by a contiguous plume of airborne contamination from the Refinery.

In environmental contamination cases, common questions arise where "each class member traces his injury directly to the same genesis." *Andrews,* 2018 WL 2717833 at *9, n. 2 (quoting *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010,* 910 F.Supp.2d 891, 923 (E.D. La. 2012). Here, all injuries are traceable to the same plumes of airborne contamination emanating from the Refinery. Indeed, TORC's own reports demonstrated that its air emission plume increased the risk of cancer for the community. 4-ER-794-95.

The court also stated that class actions are not "conducive" to determining whether the activity is of a "duration" and "nature" sufficient to constitute an "unreasonable interference with the use and enjoyment" of

land. 1-ER-49. Not so. "[F]ederal courts have affirmed class certification in tort actions brought by neighboring property owners over pollution to avoid the 'duplicative litigation' of individual lawsuits." *Freeman v. Grain Processing Corp.,* 895 N.W.2d 105, 126 (Iowa 2017) (collecting federal cases). Courts in the Ninth Circuit "ha[ve] repeatedly held that variability in injury and damages of the sort implicated by … dissimilarities [such as those in contamination cases] need not preclude class certification." *Andrews*, 2018 WL 2717833, at *10 (citing *Torres v. Mercer Canyons Inc.,* 835 F.3d 1125, 1136 (9th Cir. 2016)); *Vaquero v. Ashley Furniture Indus., Inc.,* 824 F.3d 1150, 1155 (9th Cir. 2016) ("The [Supreme] Court held that class certification was appropriate even though class members might have to prove liability and damages individually.") Regardless, Plaintiffs sought to prove liability with common evidence and sought a common remedy by reduction of air emissions at the source (abatement).

Finally, the court erroneously concluded that the public nuisance claims "raise further certifiability concerns because they necessarily require proof of special injury" and Navarro had not shown he was specially injured. 1-ER-47, 50, n. 10. Under California law, Navarro's allegation of private nuisance, i.e., the interference with the use and enjoyment of his property posed by the toxic plumes of contamination emanating from the Refinery, is

67

sufficient to support his claim for public nuisance. *Lind v. City of San Luis Obispo,* 109 Cal. 340, 344 (1895) ("injury which may entitle a private person to maintain an action to abate a public nuisance must be an injury to plaintiff's private property, or to a private right incidental to such private property"); *Gutierrez v. C&H Sugar, Inc*., No. 23-CV-03192-SI, 2023 WL 7927771 at *6 (N.D. Cal. Nov. 15, 2023) (private nuisance allegations of injury to private property sufficient to support public nuisance claim); *Venuto*, 22 Cal.App.3d at 124-125.

The court's determination that Navarro lacked standing to bring a claim for public nuisance based on his allegations of private nuisance are erroneous and contravene California law. The court admitted as much in its decision on TORC's motion for judgment on the pleadings, when it recognized that "Navarro's public nuisance claim need not allege a harm different in kind from that suffered by the general public." 1-ER-22 (citing *Venuto*, 22 Cal.App.3d at 125-28; *Kahn v. Price,* 69 Cal.App.5th 223, 237, n. 14 (2021); and *Birke*, 169 Cal.App.4th at 1550).

### 2. The district court decertified the nuisance claim based on an improper merits analysis.

The court also erred when it based its decertification order on its holding that contamination from the Refinery and threat of future harm do not amount to an "interference with use and enjoyment of property rights" as

a matter of law, and that only "actual harm" would suffice to support a nuisance claim. 1-ER-50. As the court correctly acknowledged in its initial certification order, an increased risk of harm, such as the increased risk of developing cancer or other ailments caused by the Refinery's emissions of toxic contaminants, is sufficient to constitute an "interference" with use and enjoyment of property under California nuisance law. 1-ER-79; *Birke,* 169 Cal.App.4th at 1548; *Schaeffer,* 105 F.Supp.3d at 965; *San Diego Unified Port Dist. v. Monsanto Co*., 612 F.Supp.3d 1028, 1049 (S.D. Cal. 2020).

The court's determination that there is no evidence of harm with regard to occupants of commercial properties is contrary to the record. Clark testified that persons "who reside *or work* in Zones A and B for extended periods of time are at elevated risks of experiencing adverse health effects." 27-ER-7775 (emphasis added).

The court also erroneously concluded that class members could only suffer harm if they had lived or worked in the area for 30 years. 1-ER-50-55. The court misunderstood Clark's testimony, suggesting that harm to class members' health would only accrue after a 30-year exposure period. 1-ER-56. That is not the case. Clark's health risk model based on a 30-year exposure assumption is a methodology used to quantify health risk. The model does not suggest that *only* those residents who have been exposed to

toxic air contaminants for 30 years suffer health risks. 17-ER-4666; 18-ER-5053-55; 26-ER-7512-13; 27-ER-7775. Clark consistently testified that risk of harm increases over time. *See supra,* at p. 49; 27-ER-7775. He opined that the Refinery poses "unacceptable health risks" to *all* putative class members within the delineated zones of exposure, not only to those who have lived or worked there for a minimum of 30 years. 21-ER-5921; 26-ER-7512-13 (stating with "scientific certainty that individuals who live [and work] in this community … are at greater risk for developing cancer" due to air emissions); 30-ER-8733-35, 8756.

Clark also testified that the risks from each chemical emanating from the Refinery are considered additive and that the sum of the risks posed by the Refinery's emissions of hexavalent chromium, DPM, and benzene, among other contaminants, will pose a threat of harm that is greater than the constituent parts crossing the threshold into a range of unacceptable risk. 27-ER-7755, 7775.

The court also misconstrued Clark's testimony to find "actual exposure to contaminants of concern …will vary for every property in the Air Subclass." 1-ER-51. While the concentration of contaminants may fluctuate based on duration of exposure and distance from the source, Clark mapped the areas subject to the highest concentrations of contaminants

requiring remediation.  21-ER-5943-44; 25-ER-7164; 26-ER-7512.  The Refinery prepared a similar model demonstrating its emissions resulted in substantial cancer risk to the surrounding community.  4-ER-794-95.

The court's misreading of Clark's testimony was compounded by its reliance on *Gates v. Rohm & Haas Co.,* 655 F.3d 255, 265 (3d Cir. 2011) for the proposition that Clark's modeling was insufficient to provide common proof, and that individualized exposure analysis was necessary to establish liability.  1-ER-51.  As a medical monitoring case under Pennsylvania law, *Gates* is distinguishable and inapposite. Medical monitoring law is not rooted in property rights and hinges on the medical condition of each individual plaintiff.  655 F.3d at 264-265.   Here, the claim is risk of harm based on interference with property rights.  The entire point of this claim is to eliminate a dangerous nuisance condition *before* it results in the development of a diagnosable condition.

Clark's model and the Refinery's own reports show that the Refinery's air emissions resulted in cancer risk in delineated zones.  There is no need to assess risk to each person.  The remedy Navarro seeks— emissions reductions—would provide relief to all those harmed, a fact the Refinery's reports confirmed. 4-ER-799-01.

### 3. The district court erred in holding that the Air Subclass did not satisfy Rule 23(b)(2).

The court held that certification of the Air Subclass's nuisance claims was "inappropriate" under Rule 23(b)(2) because the "alleged injury – interference with property rights – is inherently individual." 1-ER-66. This was error as a matter of law, for all the reasons explained *supra* at pp. 63-66. Rule 23(b)(2) certification applies where, as here, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 345-346 (2011).

The Refinery has caused emissions that affect all occupants of property in the zones identified in Clark's reports. 21-ER-5943-44; 25-ER-7164; 26-ER-7512. The Refinery's own maps show its emissions increased cancer risk in similar zones. 3-ER-528-43; 4-ER-786, 864, 944; 10-ER-2628; 24-ER-6879. The court reasoned that the Air Subclass might include members who have suffered different levels of increased health risks from the Refinery's contamination, or perhaps some who "have not suffered an interference with any property right" (1-ER-68), but this Court has made clear that "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class

72

from meeting the requirements of Rule 23(b)(2)." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). What matters for purposes of Rule 23(b)(2) is that plaintiffs challenge a cohesive common practice by the *Defendant* – here, the Refinery's contamination of the surrounding air.

The court also stated that Plaintiffs had not identified an injunction that would provide sufficient relief to the class under Rule 23(b)(2). 1-ER-68. This is incorrect and ignores the prayer for relief, which seeks a class-wide remedy in the form of a declaratory judgment and injunctive relief. 19-ER-5226-27. Navarro's expert described common injunctive relief that would abate the contamination for all class members. 18-ER-5055-57. Moreover, the Refinery's own analysis in the 2020 VRRP discussed measures it could take to drastically reduce the 29.8 in one million cancer risk posed by Refinery operations. 4-ER-953-63.[16] The nuisance claims do not seek individualized relief.

---

[16] The 2020 VRRP states the Refinery's reduction of coke drum emissions would "realize a 13 in one million MICR risk reduction"; (2) reduction of DPM and welding Chromium emissions would realize "an approximate 6 in one million MICR risk reduction"; and (3) reduction of vacuum truck emissions would realize a "1 in one million MICR risk reduction." 4-ER-953-63.

**B. The district court's decertification of the Ground Subclass relied on errors of law and prematurely reached the merits of Plaintiff's trespass claim based on groundwater and soil pollution.**

**1. The court's holding that Navarro's trespass claims lacked commonality was based on errors of law.**

The court held that Navarro's trespass claims lacked commonality because he purportedly "narrowed [his] theory from alleging soil vapor constituted trespass to alleging soil vapor *intrusion* into their residences and commercial buildings constitutes the trespass," and "soil vapor intrusion" is not "appropriately adjudicated as a trespass claim." 1-ER-53-54. The court was wrong on both points. As explained *supra* at pp. 31-33, Plaintiff did not "narrow" the class claims and soil vapor intrusion *can* support a claim for trespass.

The court compounded these errors by finding (as with the nuisance claims) that "individual, property-specific issues," "such as each class members' property interest, location, and use" render trespass subject to individual, not common questions. 1-ER-54. Yet courts have routinely certified trespass claims where, as here, a common source contaminates proposed class members' properties. *In re Delta Air Lines, Inc.,* 2023 WL 2347074, at *2, 3 and 10 (C.D. Cal., Feb. 8, 2023, No. LACV2000786JAKSKX) (certifying trespass class action encompassing

thirty-six thousand individual properties based on jet fuel contamination.);
*Andrews,* 2018 WL 2717833, at *10 (certifying trespass class action based
on contamination from oil spill).

### 2. The district court decertified the trespass claim based on an improper merits analysis.

The court also erred by basing its decertification of Navarro's trespass
claims on a premature and incorrect resolution of the merits. The court was
"not persuaded that members of the Ground Subclass suffer a common
injury, if any," because, according to the court, Navarro had "not adequately
supported an opinion that soil vapor or indoor air concentrations of
contaminants of concern pose a vapor intrusion risk…." 1-ER-54.

Whether the Refinery's contamination harmed class members is a
merits determination that can be made on a class-wide basis. *See infra,* at
76-78. Decertifying the class based on the court's assessment of Navarro's
evidence of harm was improper. *Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107, 1112 (9th Cir. 2014) ("[W]hether class members could
actually prevail on the merits of their claims" is not the proper inquiry in
determining "whether common questions exist.").

Although this Court need not reach the issue to reverse the
decertification order, the district court's analysis of the merits of Navarro's
trespass claims was also mistaken. First, the court focused solely on injury

to class members' health resulting from vapor intrusion, ignoring the common impact of the Refinery's contamination on class members' *land*, which requires remediation. 1-ER-53; *see supra,* at pp. 6-10.

"Several courts have found that these types of pollution constitute compensable harms which can be redressed with recovery costs to abate and clean up contaminated groundwater and soil." *Greenfield*, 145 F.Supp.3d at 1008–1009; *California Dept. of Toxic Substances Control v. Payless Cleaners, College Cleaners,* 368 F.Supp.2d 1069, 1084 (E.D. Cal. 2005) ("there is cognizable physical damage to their property because the substance contaminated the property."); *San Francisco Unified School Dist. v. W.R. Grace & Co.,* 37 Cal.App.4th 1318, 1327(1995) (injury is the contamination of buildings endangering occupant's lives and health). Plaintiff's trespass claims encompassed allegations that soil contamination itself constituted trespass. *See supra,* at pp. 29-31.

Second, the court's discounting of the health risks class members faced from soil vapor intrusion through their land was also incorrect. The court cited the Refinery's 2008 testing and the DTSC's determination of no risk to human health. 1-ER-54-55. But substantial other evidence demonstrated that class members were harmed by the Refinery's contamination. Indoor air concentrations of benzene in 2008 alone were as

high as 5.7 µg/m³. 27-ER-7639. Laton explained that the determination of no risk made by the DTSC in 2008 does not establish absence of harm today because those results were based on outdated ESLs. 26-ER-7453-56. Application of the current cancer risk thresholds establishes that the 2008 levels demonstrated a cancer risk of 58 in one million.[17]

Similarly, testing of current concentrations showed benzene and eight other injurious chemicals present in "indoor air" in class members' homes and businesses at levels "substantially higher than the published ESLs." 30-ER-8612, 8713. The concentration of benzene and other contaminants exceeded harm thresholds by a range of fivefold to over tenfold, and Navarro's expert opined that "[t]hese exceedances pose an immediate unsafe condition that presents a health risk to persons within the private residences." 30-ER-8416.[18]

The court appeared to find that no vapor intrusion existed, because the indoor levels of benzene were less than outdoor levels. 1-ER-55. That was incorrect. Half of the outdoor testing registered non-detects—that is, indoor

---

[17] The ESL for benzene in indoor air is 0.097 µg/m³. 30-ER-8612.

[18] Data collected in 2019 demonstrates that "all private residences sampled for indoor air quality" had "exceedances" of applicable ESLs for multiple contaminants, and "these exceedances pose an immediate unsafe condition that presents a health risk to persons within the private residences." 30-ER-8416.

concentrations of contaminants were in fact higher compared to outdoor air levels. 26-ER-7455. Also, the Refinery is "emitting VOCs directly into the atmosphere" and polluting the outdoor air, so lower indoor levels do not demonstrate an absence of soil vapor intrusion. 26-ER-7454.

In effect, the court held that class members' trespass claims would not succeed on the merits. But that is not a permissible reason to decertify a class. *Stockwell,* 749 F.3d at 1112. The question for certification purposes is whether the claims can be resolved using classwide evidence – as here they can – not whether they will ultimately succeed

### 3. The district court erred in holding that the Ground Subclass did not satisfy Rule 23(b)(3).

When initially certifying the Ground Subclass, the court correctly held that "common questions … predominate" on Plaintiffs' trespass claim, because "whether Defendants were negligent and whether Defendants were engaged in an ultrahazardous activity are common questions," and "Plaintiffs have submitted evidence that the extent of the soil and groundwater contamination can be proved on a class-wide basis using models prepared by their expert Laton." 1-ER-89-90.

That "same evidence will suffice for each class member to make a prima facie showing" that contamination from the Refinery entered their properties. *Id.* at 17; *Andrews,* 2018 WL 2717833, at *10 (predominance

established because the invasion can be demonstrated with expert's model of oil migration); *Delta,* 2023 WL 2347074, at *14 (predominance where expert analysis showed where liquid jet fuel entered properties.); *Hart*, 2023 WL 2918632, at *4 (common questions of law and fact predominate in contamination case).[19]

The court also correctly reasoned that because nominal damages are available without showing that the unauthorized entry interfered with Navarro's use or enjoyment of property or that the Refinery's conduct was a substantial factor in causing that interference, the need to resolve individualized damages issues does not defeat predominance. 1-ER-90.[20]

---

[19] Trespass liability can be established by showing: (1) Plaintiff's ownership or control of the property; (2) Defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for the entry; (4) resulting harm; and (5) Defendant's conduct was a substantial factor in causing the harm. *Ralphs Grocery Co. v. Victory Consultants, Inc.,* 17 Cal.App.5th 245, 262 (2017). Each element, other than class members' ownership or control of their property, can be established by common evidence, and the identity of the property owners in the affected area, i.e., the class list, can easily be determined by public records.

[20] *See also, Olden v. LaFarge Corp.,* 383 F.3d 495, 496, 508 (6th Cir. 2004) (affirming certification of a class of 3,600 owners of polluted properties, because although "individual *damage* determinations might be necessary, [ ] the plaintiffs [ ] raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole") (emphasis in original); *Bell v. DuPont Dow Elastomers, LLC,* 640 F.Supp. 2d 890, 895 (W.D. Ky. 2009) (finding predominance where "some class members disagree about the significance of the discharges each has experienced" because "[t]he environmental impact from the odors,

The court *sua sponte* reversed certification of the trespass claims based on the erroneous contention that "Plaintiffs have shifted their trespass theory from focusing on the presence of soil vapor in deep and shallow soil to focusing on the intrusion of soil vapor into their real property structures," requiring the court to "evaluate anew" whether common questions predominate. 1-ER-69. For all the reasons previously explained, the court was wrong; Plaintiff had not abandoned or changed the scope of the trespass claims based on soil and groundwater contamination. *See supra,* at pp. 31-33.

Based on this error, the court focused its predominance analysis for trespass solely on soil vapor intrusion into buildings. Although this Court need not reach the issue to reverse, the district court's analysis was also erroneous. The court concluded that (a) common evidence did not definitively establish vapor intrusion as to *every* property; (b) Plaintiff had not "demonstrated that every putative class member" can "attribute the soil vapor detected at their properties to contamination emanating from the Refinery"; (c) differing levels of soil vapor impact each property; and (d) abatement/remediation will require individualized inquiries. 1-ER-69-70.

---

particulate and air contamination affected Plaintiffs and their properties in similar ways under the law").

The court also concluded that (e) a class action would not be superior to individual litigation. 1-ER-71-73. These conclusions are unsupported and erroneous and improperly resolve merits questions that are inappropriate grounds to deny certification.

### a. Laton's plume map is common evidence.

Whether Laton's plume map is capable of demonstrating contamination of all properties is a question that goes to the "weight and probativeness of the model" and does not negate the contour map's use as common proof. *Delta*, 2023 WL 2347074, at *14; *Andrews*, 2018 WL 2717833, at *9 ("Where the oil was distributed, and how much oil invaded the properties, are questions that are subject to common proof.").

The fact that Laton relied on only a sample of the contaminated properties in analyzing the Refinery's emissions is not fatal to certification. The entire point of mapping is to approximate the zone of impact.[21] *Andrews,* 2018 WL 2717833, at *5 (using an algorithm-based model in lieu of testing all properties on 165 mile coastline); *Delta*, 2023 WL 2347074, at *9 (determining trespass by oil using fuel jettison simulation software). Laton's methodology, using a plume delineation method and actual

---

[21] For example, the Refinery collected samples from 21 residences in 2008 to determine risk; not every single home in the community. 27-ER-7639, 7669. Laton sampled 16 properties in 2018 and 2019. 12-ER-3104-05.

sampling of the impacted zone to delineate areas in which properties were subject to intrusion risk, is more rigorous than the methodology used in *Delta* and *Andrews*. 30-ER-8607-17, 8700. A finder of fact could infer from Laton's analysis that every property in the area was contaminated with benzene soil vapor at concentrations that posed a health risk.

The Refinery's own maps show a benzene plume (smaller in scope to the one in Laton's map) and benzene groundwater contamination. 27-ER-7646, 7671, 7673. The Refinery's benzene groundwater map only delineated a contour line for contamination at levels above 100 µg/L, much higher than the EPA's threshold for vapor intrusion risk of 1.6 µg/L which Laton testified should have been used, and thus the Refinery's map grossly underreported the scope and associated risk of the contamination. 5-ER-1273. The Refinery's map establishes, though, that the existence of the plume was undisputed and the actual size of the plume posed a question that could be resolved by common evidence.

### b. Whether the Refinery was the source of ground contamination poses a common question.

Whether the trespassing pollutants came from the Refinery or another source is also a common question. The Refinery's own maps tracing a sizable benzene pool that exists under its storage tanks and continues underneath the impacted area, and the history of clean up abatement orders

both support a finding of causation. 5-ER-1277; 27-ER-7637-38, 7646, 7671, 7673. The court cited a statement from the Refinery's expert suggesting other sources may have *contributed* to the contamination of class members' property. 1-ER-69 (citing 27-ER-7645). But that just demonstrates that both parties' experts offered classwide evidence as to causation that can and should be resolved by the trier of fact once for the class. 5-ER-1276-78; 26-ER-7460.[22] The possibility that there may be other contributing sources of contamination does not undermine the common evidence that the Refinery's operations were a "substantial factor" in causing class members' harm.

> ### c. Common evidence demonstrated that the Refinery's ground emissions polluted the soil of all properties in the class.

Variation in the levels of soil vapor intrusion in class members' properties is not material. 1-ER-70; 26-ER-7459-60. While the

---

[22] The court cited *Fisher v. Ciba Specialty Chemicals Corp.,* 238 F.R.D. 273, 305, n. 70 (S.D. Ala. 2006) for the proposition that individual property investigations are warranted in property contamination cases. 1-ER-70. The plaintiffs in that case, though, did not provide evidence indicating that chemicals were present on property at the time of the lawsuit, or showing defendant was the source of contamination. By contrast, the Refinery's own maps and Laton's maps and testimony, along with other evidence, establish the presence of soil and groundwater contamination and that the Refinery is the source. 5-ER-1276-78; 27-ER-7646, 7650, 7670, 7672, 7674; 30-ER-8618-19.

concentrations varied within the class, all properties in the class had concentrations that posed a risk to human health; properties in Zone A had concentrations of benzene that posed a greater than 10 in one million cancer risk; for properties in Zone B the cancer risk was from 5 in one million cancer risk up to 10 in one million; and for properties in Zone C, the cancer risk was 1 in one million up to 5 in one million. 30-ER-8618-19. Indeed, the court excluded from the class definition properties in the area where the evidence showed soil vapor concentrations at levels below the harm threshold or for which data was lacking. 1-ER-82-83; 30-ER-8619.

### d. Plaintiff sought a common remedy for the classwide trespass claims.

The court also was wrong to conclude that Plaintiffs could not use common proof to establish how abatement or remediation could be performed for properties in the Ground Subclass. 1-ER-70.[23] As discussed above, Laton stated that remediation of the contamination could be accomplished by groundwater extraction wells and soil vapor extraction systems, and he provided detailed cost estimates for each, based on his

---

[23] The court's statement that Navarro's expert did not opine as to whether remediation was required is contradicted by Laton's report and testimony recommending remediation to address "the immediate threats to human health." 30-ER-8620.

experience. 30-ER-8620-23. He testified that these methods should be effective because the Refinery had already implemented such measures directly east of the impacted area and successfully reduced contamination in the locality of the extraction wells. 30-ER-8620-21. The same remediation systems could be extended towards the Del Amo neighborhood. *Id*.

### e. Class treatment was the superior method for adjudicating the trespass claim.

The court further erred in determining that class treatment was not the superior method for adjudicating the trespass claim, for all the same reasons discussed above. 1-ER-71-73. In addition to relying on its improper resolution of merits issues, the court stated that a class action was not superior due to Navarro's and unnamed class members' purported "lack of interest." *Id*. The record demonstrated, however, that Navarro and class members were concerned about the effects of the Refinery's emissions on their health and in any event their enthusiasm is not relevant to Rule 23(b)(3)'s superiority requirement. *See supra*, at p. 59.

The court also decided that the substantial cost of remediation—$155 million—rendered the class action device not superior, but did not cite any authority for the proposition that only cases involving "modest stakes" should be certified. 1-ER-72. While the relatively modest recovery of individual damages favors certification because it is unlikely each class

member will press their case in court, the potential high stakes of a *common* remedy does not preclude use of the class action device. *Zinser v. Accufix Rsch. Inst., Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001).

The fact that the class seeks common relief targeting the Refinery's plumes of contamination (including soil vapor extraction, groundwater extraction wells, soil and air quality testing, and monitoring of contaminant levels) weighs heavily in favor of class certification, because the expense of litigating individual claims to secure the same cost-intensive remedies would be radically inefficient and so cost prohibitive that it would effectively deny class members the ability to seek redress.

For all of the above reasons, the court's decertification order should be reversed.

## IV. THE DISTRICT COURT ERRED BY DENYING NAVARRO'S REQUEST TO SERVE AS CLASS REPRESENTATIVE.

In decertifying the class, the court also erroneously concluded that Navarro's claims were not typical and that he is not an adequate class representative. 1-ER-32. Had those conclusions been correct, the proper response would have been to allow Navarro to move to substitute a different class representative, not decertification. *Fishon v. Premier Nutrition Corp.,* No. 16-CV-06980-RS, 2022 WL 958378, at *2 (N.D. Cal. Mar. 30, 2022) ("[C]ourts have…expressed a preference for plaintiff's counsel to locate a

new class representative…rather than dismissing or decertifying a class.");

*Birmingham Steel Corp. v. Tennessee Valley Auth.,* 353 F.3d 1331, 1342

(11th Cir. 2003) (district court abused its discretion in decertifying a class

based on an inadequate class representative); *Sloan v. Gen. Motors LLC,* No.

16-CV-07244-EMC, 2020 WL 5517244, at *1 (N.D. Cal. Sept. 14, 2020).

In any event, those conclusions suffered from the same errors discussed

above.

### A. Navarro's claims are typical of the class.

"Under…[Rule 23(a)]'s permissive standards, representative claims

are 'typical' if they are reasonably co-extensive with those of absent class

members; they need not be substantially identical." *Hanlon v. Chrysler

Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998), overruled on other grounds by

*Dukes,* 564 U.S. 338.

The court ruled that typicality was lacking because Navarro did not

have the same or similar injury as the absent class members and his

testimony raised a unique defense that would jeopardize the other class

members' recovery. 1-ER-41. Neither assertion is correct.

Navarro alleges "the same or a similar injury" as the classes, resulting

from "a course of conduct that is not unique" and "follow[ing] from the

course of conduct at the center of the class claims." *Parsons v. Ryan,* 754

F.3d 657, 685 (9th Cir. 2014). Those injuries include the elevated risk to human health due to harmful contaminants from the Refinery. 18-ER-5054-55.

Navarro lives within the defined geographic area of the class, he brings the same claims and seeks the same remedies as the class—abatement and remediation (18-ER-5055-57, 5091-5105)—and he identified and expressed concern about the health risks posed by the Refinery. 17-ER-4807-08; 18-ER-5133-35, 5139-40; 19-ER-5226; 21-ER-5819.

Contrary to the court's assertion, Navarro did identify "real injury as a result of the purportedly serious harms at issue here." 1-ER-39. He described toxic exposure to invisible contaminants and emissions, changes in the use of his property, and concern for the health risk. 15-ER-91-92; 17-ER-4807-08, 4883-86, 4889-91; 18-ER-5131-32, 5134-35, 5139-40. Thus, the court's citation of *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 488 (E.D. Cal. 2006), for the principle that typicality may be lacking where the plaintiff "is subject to unique defenses" such as "lack of actionable harm" is unavailing.

While Navarro relied on his experts' opinions regarding the health risks from the Refinery's emissions (17-ER-4807-08), there is no requirement that the class representative be an expert in hydrogeology, air

dispersion modeling, or toxicology. The court's conclusion that Navarro's claims were not typical because Navarro has not agreed to sell his house is also fundamentally misguided, as explained below. 1-ER-66.

### B. The district court's conclusion that Navarro is not an adequate class representative rests on fundamental legal errors.

To determine whether a proposed class representative is adequate, courts "ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020.

While the district court acknowledged that "[t]he Ninth Circuit 'does not favor denial of class certification on the basis of speculative conflicts[,]'" that is exactly what the court did. *Cummings v. Connell,* 316 F.3d 886, 896 (9th Cir. 2003). The court concluded that Navarro would not make an adequate representative because he is not willing to sell his home, which purportedly created a conflict of interest with the other class members. 1-ER-33-35. The court further speculated that Navarro's reasons for allegedly not wanting to move "are *likely* not aligned with other residential property owners in the class" and therefore "moving is not a remedy he is motived to accept or consider." 1-ER-33 (emphasis added).

These findings are not supported by the record. Navarro stated he would put the interests of the class ahead of his own (18-ER-5138) and also stated, in the past, he was not content living in his home and actually looked into selling it but could not afford to move. 18-ER-5137, 5144-46. Significantly, Navarro was *not asked* if he would put the interests of the class ahead of his own if it meant selling his house.

Even if Navarro was reluctant to move, any conflict with the class was speculative. Defendants' forced purchase of class members' homes is not a remedy sought in the operative complaint. 19-ER-5226-27. And there is no evidence that Defendants made such an offer or that all class members would accept it.[24] Absent evidence that a substantial number of class members desired a remedy that included the purchase of their properties, the court's conclusion about a conflict with the class is entirely speculative.[25] *Soc. Servs. Union, Local 535 v. County of Santa Clara,* 609 F.2d 944, 948 (9th Cir.1979) ("Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification.")

---

[24] The court cited a Price Protection Program from over 16 years ago pertaining to a different case. 34-ER-9973.

[25] To the extent an insubstantial number of class members would choose home sale as a remedy, the class action mechanism would allow for them to opt out. *Lane v. Facebook, Inc.,* 696 F.3d 811, 824 (9th Cir. 2012).

The court also erroneously concluded that Navarro is inadequate because his interests allegedly diverge from those of commercial property owners in the area. 1-ER-35. The named plaintiffs need not be "identically situated with all other class members." *California Rural Legal Assistance, Inc. v. Legal Servs. Corp.,* 917 F.2d 1171, 1175 (9th Cir. 1990). Even if there are different properties within the class, so long as the class members share similar interests and injuries and seek similar remedies, that is sufficient.

*O'Connor v. Boeing North American, Inc.*, 180 F.R.D. 359 (C.D. Cal. 1997) is directly on point. In that environmental class action case, the court rejected defendant's typicality argument where "Plaintiffs' properties [were] all single family residences, while 60% of the properties in the class [were] non-residential," because "all owners of property within the subclass will seek similar remedies from their claims" and "share the same injury and interest of potentially contaminated property." *Id.* at 374–375. The same reasoning applies with equal force to the issue of adequacy. *Id.* at 375 ("Adequate representation turns on the representatives' interests as compared to the interests of the absent class members, similar to the typicality requirement.). As in *O'Connor,* Navarro and other residential property owners have the same injury and interests, and seek the same

remedies (abatement and remediation) as the commercial property owners. 19-ER-5226-27; 18-ER-5055-57, 5091-5105; 25-ER-7242-43.

The court also found Navarro to be inadequate because he purportedly "does not appear to be particularly concerned about the injuries alleged in his own complaint such that he will vigorously prosecute the case." 1-ER-36. This conclusion is rife with flaws.

First, Navarro expressed "concern" about the health risk from the Refinery's emissions. *See supra,* at p. 88. Second, expert testimony establishes that Navarro's property is located in zones with demonstrably unsafe levels of soil vapor intrusion and air contamination. 18-ER-5054-55. The court's citation to *Com. of Puerto Rico v. M/V Emily S.,* 158 F.R.D. 9, 14 (D.P.R. 1994), is not relevant to Navarro's adequacy because there is no evidence that Navarro's claim is "weak" such that he would "develop a litigation approach that dilutes the value of strong claims."

The court also incorrectly found that Navarro is unfamiliar with the case and questioned his commitment. 1-ER-36-40. The evidence supports the opposite conclusion. Navarro asked to be class representative. 18-ER-5138. He understands his role in the case. 18-ER-5129-30, 5138-39. He knows who the defendants are. 18-ER-5111. He knows who the experts are. 18-ER-5115, 5117-18. He has reviewed documents – the complaint,

responses to interrogatories and portions of the expert reports – and discussed translated copies with his counsel through an interpreter. 18-ER-5001; 18-ER-5115-18, 5120; 18-ER-5149; 17-ER-4800-03. He knows that the case was certified and that there were two subclasses – Ground and Air. 18-ER-5129. He knows that the air pollution is caused by three components, diesel or welding particles and that benzine is involved. 18-ER-5139-40. He expressed his goals if he became the class representative – to clean the ground and stop the air pollution. 18-ER-5139. He knows what damages he is not claiming. 18-ER-4901-02; 18-ER-5148, 5167-68.

The court ignored Navarro's testimony that he regularly discussed the case with his attorneys via video through an interpreter "every week, every two weeks" for "around one hour" from May, when he was added as a plaintiff, until his deposition in September. 18-ER-5112-14, 5121-23. They met on two days to prepare for his deposition. 18-ER-5112-14. Yet, "the amount of communications between [the proposed lead plaintiff] and his attorney[s] before the deposition do not establish a failure…to prosecute the case vigorously." *Aguayo v. U.S. Bank,* No. 08-CV-2139-W LSP, 2015 WL 13344755, at *5 (S.D. Cal. 2015).

Even if Navarro does not have in-depth knowledge of the legal claims, that is not the operative standard. "'It would be unfair to deny [Plaintiffs]

access to our courts merely because [they] are unable to articulately respond to questions from attorneys.'" *Bias v. Wells Fargo & Co.,* 312 F.R.D. 528, 538 (N.D. Cal. 2015); *DuFour v. Be LLC,* 291 F.R.D. 413, 419 (N.D. Cal. 2013) ("The threshold knowledge required of the class representatives is low."); *Kanawi v. Bechtel Corp.,* 254 F.R.D. 102, 110 (N.D. 2008) ("[A] named plaintiff need" only have "some minimal familiarity with the litigation."); *Welling v. Alexy,* 155 F.R.D. 654, 659 (N.D. Cal. 1994) (plaintiff inadequate only where they demonstrate "striking unfamiliarity" with the litigation).

The fact that Navarro did not know the answer to certain questions or could not remember certain facts about when he first became concerned about contamination from the Refinery or when he first had contact with his counsel is irrelevant to his adequacy as class representative. "In a complex lawsuit…the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 430 (4th Cir. 2003) (citation omitted); *Laurens v. Volvo Car USA, LLC,* No. 218CV08798JMVCLW, 2020 WL 10223641, at *10 (D.N.J. Dec. 8, 2020) (Plaintiff "should not [be] expected …to speak fluently about the complicated legal issues in this action."). "Rule 23 should not be used to 'defeat the ends of justice' by facilitating the

dismissal of class action complaints involving unsophisticated named plaintiffs." *Buus v. WAMU Pension Plan,* 251 F.R.D. 578, 587 (W.D. Wash. 2008).

The fact that Navarro has not discussed the case with other persons also does not render him inadequate. *Pace v. PetSmart Inc.,* No. SACV 13-00500 DOC, 2014 WL 2511297, at *7 (C.D. Cal. June 3, 2014) ("Plaintiff need not have personal knowledge of other class members' experiences, and her lack of such knowledge does not…raise doubts about her ability to vigorously pursue the action on behalf of the class.").

That Navarro entered the litigation after the prior class representative Youssef unexpectedly moved out of the area is no reason to find Navarro inadequate. "[T]here is no bright line bar to a late addition of a class representative." *In re Pharm. Indus. Average Wholesale Price Litig.,* 277 F.R.D. 52, 60 (D. Mass. 2011). And if Navarro learned of the litigation from his counsel, that "is not disqualifying." *Guido v. L'Oreal, USA, Inc.,* No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *8 (C.D. Cal. July 1, 2013). "There is nothing inherently improper with the recruitment of class representatives, and where existing named plaintiffs become unavailable or unsuitable, allowing the recruitment of replacements is even recommended." *Id.*

The fact that the plaintiffs and the theories changed during the litigation also does not undermine Navarro's adequacy. Such developments are common in class action litigation. *Wit v. United Behav. Health,* No. 14-CV-02346-JCS, 2023 WL 8717488, at *29 (N.D. Cal. Dec. 18, 2023) ("[I]t is not uncommon for district courts to permit renewed certification motions that…rely upon different…legal theories."); *Fishon,* 2022 WL 958378, at *2 ("Substitution of a new named plaintiff to address the inadequacy of a class representative [is] a routine feature of class actions.") (citation omitted). And Navarro's counsel only sought leave once to replace a class representative. 18-ER-4956.

For the above reasons, Plaintiff strenuously disputes the court's characterization of this litigation as "attorney-driven." The evidence of Navarro's adequacy dispels that contention. Additionally, this case seeks to redress serious and substantiated environmental health hazards to a community. The record does not reflect Navarro's counsel's privileged communications with dozens of affected class members or community meetings regarding their concerns.

**C.** **The district court's conclusion that Navarro's counsel were not adequate was also grounded on legal errors.**

The district court also erred in holding that Navarro's counsel were inadequate, despite having previously determined that they "are capable of fairly and adequately representing the interests of the class." 1-ER-88.

Determining whether representation is adequate requires the court to consider whether (1) plaintiff's counsel have any conflicts of interest with other class members and (2) plaintiff's counsel will prosecute the action vigorously on behalf of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

There is no evidence of a conflict of interest. 1-ER-40-41. And the course of proceedings below and in this Court demonstrate that Navarro's counsel has and will vigorously work on behalf of the class. Counsel have devoted years of work and expenses to this litigation. They filed two motions for class certification, supported by numerous class member declarations. 27-ER-7684, 7714-15, 7729-50; 34-ER-9877-9905. They retained expert witnesses, who performed contamination sampling, contour mapping, and modeled air emissions, and obtained expert declarations and reports comprising thousands of pages. 3-ER-475-4-ER-785; 5-ER-1201-7-ER-1929; 15-ER-4290; 17-ER-4773-94; 18-ER-5003-5108; 19-ER-5336-19-ER-5440, 5468-70; 23-ER-5915-25-ER-7227; 26-ER-7440-66; 27-ER-7751-

30-ER-8725, 8729-33-ER-9677. They propounded and responded to written discovery and reviewed Defendants' discovery responses and voluminous document productions (39-ER-11229, 11247-40-ER-11542; 18-ER-5149), defended Plaintiffs, class members, and Plaintiffs' experts at their depositions, and deposed Defendants' fact and expert witnesses. 18-ER-5109; 19-ER-5336-5470; 25-ER-7261; 26-ER-7503-74; 34-ER-9928-35-10131. They obtained scientific documents from state and federal agencies. 8-ER-2014-13-ER-3617. They filed motions to compel further discovery responses. 36-ER-10566-39-ER-11246; 40-ER-11613. They opposed all pleading challenges. 15-ER-4267; 16-ER-4358; 19-ER-5237; 36-ER-10498; 40-ER-11651, 11747. They filed a Rule 23(f) petition for permission to appeal. 33-ER-9679.

The court's focus on Navarro's counsel's alleged errors or missteps, to the exclusion of their substantial and diligent work, was an abuse of discretion. *Sali v. Corona Reg'l Med. Ctr.,* 909 F.3d 996, 1008 (9th Cir. 2018) (district court abused its discretion in "discuss[ing] only the apparent errors by [plaintiff's] counsel with *no mention* of the evidence in the record demonstrating class counsel's substantial and competent work on this case.").

The court unfairly criticized Navarro's counsel for not "present[ing] a viable class representative" (1-ER-41), but the discussion in this brief confirms that Navarro *is* a viable class representative. The alleged number of contacts with Youssef is irrelevant. 1-ER-40-41. That Navarro's counsel once mistakenly filed the wrong version of a complaint does not render them inadequate. 1-ER-41.

For the above reasons, the court abused its discretion in finding Navarro's counsel inadequate to serve as class counsel.

## CONCLUSION

For all of the foregoing reasons, the judgment should be reversed and the case remanded with instructions to re-certify the class.

Dated: May 24, 2024                    Respectfully submitted,

                                       **MATERN LAW GROUP, PC**

                              By: */s/ Kiran Prasad*
                                  Matthew J. Matern
                                  Joshua D. Boxer
                                  Kiran Prasad
                                  Max N. Sloves
                                  *Attorneys for Plaintiff and Appellant*
                                  Jose Navarro

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) 23-3274**

I am the attorney or self-represented party.

**This brief contains 20,279 words,** including 230 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ X ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Kiran Prasad*              **Date** May 24, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

### 9th Cir. Case Number(s) 23-3274

The undersigned attorney or self-represented party states the following:

[X ] I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** */s/ Kiran Prasad*                    **Date** May 24, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

101

# ADDENDUM

# ADDENDUM OF STATUTORY AND
# REGULATORY AUTHORITIES

## TABLE OF CONTENTS

**Statutory Authorities**                                    **Pages**

California Civil Code § 3334……………….…………………Addendum 1

California Civil Code § 3479 ……………….………………Addendum 2

California Civil Code § 3480……………….…..…………...Addendum 3

California Health and Safety Code § 25249.5…..……………Addendum 4

Federal Rules of Civil Procedure, Rule 23……..……… ...……Addendum 5

**Regulatory Authorities**

California Code of Regulations Title 22, Div. 4.5,
    Ch. 51, § 69021…………………………………..…………Addendum 6

California Code of Regulations, Title 22, § Div. 4.5,
    Ch. 51, App. I to § 69021…..……………………….…Addendum 7

California Code of Regulations, Title 23, § 2923…..…...…...Addendum 8

California Code of Regulations, Title 27, § 25703…...……Addendum 9

**California Civil Code § 3334**

(a) The detriment caused by the wrongful occupation of real property, in cases not embraced in Section 3335 of this code, the Eminent Domain Law (Title 7 (commencing with Section 1230.010) of Part 3 of the Code of Civil Procedure), or Section 1174 of the Code of Civil Procedure, is deemed to include the value of the use of the property for the time of that wrongful occupation, not exceeding five years next preceding the commencement of the action or proceeding to enforce the right to damages, the reasonable cost of repair or restoration of the property to its original condition, and the costs, if any, of recovering the possession.

(b)(1) Except as provided in paragraph (2), for purposes of subdivision (a), the value of the use of the property shall be the greater of the reasonable rental value of that property or the benefits obtained by the person wrongfully occupying the property by reason of that wrongful occupation.

(2) If a wrongful occupation of real property subject to this section is the result of a mistake of fact of the wrongful occupier, the value of the use of the property, for purposes of subdivision (a), shall be the reasonable rental value of the property

**Addendum 1**

**California Civil Code § 3479**

Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance

**Addendum 2**

**California Civil Code § 3480**

A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.

**California Health and Safety Code § 25249.5**

No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

**Federal Rules of Civil Procedure, Rule 23**

(a)    Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

(b)    Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

(1)    prosecuting separate actions by or against individual class members would create a risk of:

(A)    inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B)    adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

**Addendum 5**

available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

**Code of Regulations Title 22, Div. 4.5, Ch. 51, § 69021**

Consistent with Health and Safety Code section 25356.1.5, all human health risk assessments, human health risk-based screening levels, and human health risk-based remediation goals used for the cleanup of sites described under section 69020, subdivision (b), shall use the cancer and non-cancer toxicity criteria for each COPC from the following sources in the order listed below:

(a) The OEHHA peer-reviewed unit risk factors, oral slope factors, chronic reference exposure levels, reference dose(s) (RfDs), and blood lead values in Table A and B of Appendix I to this Chapter, shall be used for the COPCs that are listed in that Appendix, so long as the Appendix I values remain no less stringent than toxicity criteria available from the source in subdivision (b) below. If Appendix I does not list toxicity criteria for a specific COPC or contains a value that is less stringent, then the toxicity criteria listed under section 69021, subdivision (b) shall be used.

(b) The peer-reviewed unit risk factors, oral slope factors, RfDs, and reference concentrations, in IRIS shall be used where either Appendix I does not specify toxicity criteria for a particular COPC, or the IRIS toxicity criteria value is more stringent than the value listed in Appendix I. If neither Appendix I nor IRIS lists toxicity criteria for a specific COPC, then the toxicity criteria listed under section 69021, subdivision (c) shall be used.

(c) Toxicity criteria from another source, that applies the best available science and is health-based, may be used in human health risk assessments upon approval by the Supervising Toxicologist, of the Department's Human and Ecological Risk Office, or his or her designee, when neither subdivision (a) nor subdivision (b) above specifies toxicity criteria for the particular COPC. Other sources include, but are not limited to: OEHHA toxicity criteria that are not listed in Appendix I (e.g., those toxicity criteria used in U.S. EPA's Regional Screening Levels), U.S. EPA Provisional Peer Reviewed Toxicity Values (PPRTVs), Agency for Toxic Substances and Disease Registry Minimal Risk Levels, PPRTV Appendix Screening Toxicity Values, and U.S. EPA Superfund Health Effects Assessment Summary Table values. However, use of TPH PPRTVs is not required, but may be determined to be appropriate based on site-specific circumstances. Any selected toxicity criteria or value used under this subdivision shall be consistent with Health and Safety Code section 25356.1.5, subdivisions (b) and (c).

**Addendum 6**

**Cal. Code Regs. tit. 22, § Div. 4.5 Ch. 51 App. 1**

**Appendix I to Section 69021: California OEHHA Toxicity Criteria**
22 CA ADC Div. 4.5 Ch. 51 App. I
Barclays Official California Code of Regulations

Barclays California Code of Regulations
Title 22. Social Security
Division 4.5. Environmental Health Standards for the Management of Hazardous Waste
Chapter 51. Site Remediation

22 CCR Div. 4.5 Ch. 51 App. I
**Appendix I to Section 69021: California OEHHA Toxicity Criteria**
Currentness

| Table A | | | Cancer Potency Values | | | | Non-cancer Health-Hazard Values | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Oral Slope Factor (CSF$_o$) | | Inhalation Unit Risk (IUR) | | Oral Reference Dose (RfD$_o$) | | Chronic Reference Exposure Level (REL) | |
| | | CAS Registry Number | CSF$_o$ (mk/kg-d)$^{-1}$ | Reference | IUR ($\mu g/m^3$)$^{-1}$ | Reference | RfD$_o$ (mk/kg-d)$^{-1}$ | Reference | REL ($\mu g/m^3$)$^{-1}$ | Reference |
| Analyte | | | | | | | | | | |
| 1 | Acetaldehyde | 75-07-0 | -- | -- | 2.70E-06 | OEHHA | -- | -- | -- | -- |
| 2 | Ammonia | 7664-41-7 | -- | -- | -- | -- | -- | -- | 2.00E+02 | OEHHA |
| 3 | Arsenic | 7440-38-2 | 9.50E+00 | OEHHA PHG | -- | -- | 3.50E-06 | OEHHA | 1.50E-02 | OEHHA |
| 4 | Arsine | 7784-42-1 | -- | -- | -- | -- | 3.50E-06 | OEHHA | 1.50E-02 | OEHHA |
| 5 | Benzene | 71-43-2 | 1.00E-01 | OEHHA | 2.90E-05 | OEHHA | -- | -- | 3.00E+00 | OEHHA |

**Addendum 7**

| 6 | Benzidine | 92-87-5 | 5.00E+02 | OEHHA | 1.40E-01 | OEHHA | -- | -- | -- | -- |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | Benzo[a]anthracene | 56-55-3 | -- | -- | 1.10E-04 | OEHHA | -- | -- | -- | -- |
| 8 | Benzo[a]pyrene | 50-32-8 | -- | -- | 1.10E-03 | OEHHA | -- | -- | -- | -- |
| 9 | Benzo[b]fluoranthene | 205-99-2 | -- | -- | 1.10E-04 | OEHHA | -- | -- | -- | -- |
| 10 | Benzo[k]fluoranthene | 207-08-9 | -- | -- | 1.10E-04 | OEHHA | -- | -- | -- | -- |
| 11 | Beryllium | 7440-41-7 | -- | -- | -- | -- | 2.00E-04 | OEHHA PHG | 7.00E-03 | OEHHA |
| 12 | Beryllium oxide | 1304-56-9 | -- | -- | -- | -- | 2.00E-04 | OEHHA PHG | 7.00E-03 | OEHHA |
| 13 | Beryllium sulfate | 13510-49-1 | -- | -- | -- | -- | 2.00E-04 | OEHHA PHG | 7.00E-03 | OEHHA |
| 14 | Boron Trifluoride | 7637-07-2 | -- | -- | -- | -- | 4.00E-02 | OEHHA (Fluorides) | -- | -- |
| 15 | 1,3-Butadiene | 106-99-0 | 6.00E-01 | OEHHA | 1.70E-04 | OEHHA | -- | -- | 2.00E+00 | OEHHA |
| 16 | Cadmium | 7440-43-9 | -- | -- | 4.20E-03 | OEHHA | -- | -- | -- | -- |
| 17 | Carbon tetrachloride | 56-23-5 | -- | -- | -- | -- | -- | -- | 4.00E+01 | OEHHA |
| 18 | Carbonyl sulfide | 463-58-1 | -- | -- | -- | -- | -- | -- | 1.00E+01 | OEHHA |
| 19 | Chromium (VI) | 18540-29-9 | 5.00E-01 | OEHHA PHG | 1.50E-01 | OEHHA | -- | -- | -- | -- |
| 20 | Chrysene | 218-01-9 | -- | -- | 1.10E-05 | OEHHA | -- | -- | -- | -- |
| 21 | Dibenz[a,h]anthracene | 53-70-3 | 4.10E+00 | OEHHA | 1.20E-03 | OEHHA | -- | -- | -- | -- |
| 22 | 3,3'-Dichlorobenzidine | 91-94-1 | 1.20E+00 | OEHHA | 3.40E-04 | OEHHA | -- | -- | -- | -- |
| 23 | 1,1-Dichloroethene | 75-35-4 | -- | -- | -- | -- | -- | -- | 7.00E+01 | OEHHA |
| 24 | Epichlorohydrin | 106-89-8 | 8.00E-02 | OEHHA | 2.30E-05 | OEHHA | -- | -- | -- | -- |

**Addendum 7**

| 25 | bis(2-Chloroethyl) ether | 111-44-4 | 2.50E+00 | OEHHA | 7.10E-04 | OEHHA | -- | -- | -- | -- |
|----|----|----|----|----|----|----|----|----|----|----|
| 26 | Ethylene dibromide | 106-93-4 | -- | -- | -- | -- | -- | -- | 8.00E-01 | OEHHA |
| 27 | Formaldehyde | 50-00-0 | -- | -- | -- | -- | -- | -- | 9.00E+00 | OEHHA |
| 28 | HCH (mixed isomers) | 608-73-1 | 4.00E+00 | OEHHA | 1.10E-03 | OEHHA | -- | -- | -- | -- |
| 29 | Hexachlorobenzene | 118-74-1 | 1.80E+00 | OEHHA | 5.10E-04 | OEHHA | -- | -- | -- | -- |
| 30 | Hexachloro dibenzo-p-dioxin Mixture (2:1 1,2,3,7,8,9- and 1,2,3,6,7,8-) | Hexachloro-dibenzo-p-dioxin Mixture | -- | -- | 3.80E+00 | OEHHA (WHO-05 TEF) | -- | -- | -- | -- |
| 31 | Hydrochloric acid | 7647-01-0 | -- | -- | -- | -- | -- | -- | 9.00E+00 | OEHHA |
| 32 | Indeno[1,2,3-cd]pyrene | 193-39-5 | -- | -- | 1.10E-04 | OEHHA | -- | -- | -- | -- |
| 33 | Lead and compounds# | 7439-92-1 | -- | -- | -- | -- | See Table B | OEHHA | -- | -- |
| 34 | Lead subacetate | 1335-32-6 | 3.80E-02 | OEHHA | 1.10E-05 | OEHHA | -- | -- | -- | -- |
| 35 | Mercuric Chloride | 7487-94-7 | -- | -- | -- | -- | 1.60E-04 | OEHHA REL | 3.00E-02 | OEHHA |
| 36 | Mercury | 7439-97-6 | -- | -- | -- | -- | 1.60E-04 | OEHHA REL | 3.00E-02 | OEHHA |
| 37 | Methylene Chloride | 75-09-2 | -- | -- | 1.00E-06 | OEHHA | -- | -- | 4.00E+02 | OEHHA |
| 38 | 4,4'-Methylene-bis(2-chloroaniline) | 101-14-4 | 1.50E+00 | OEHHA | -- | -- | -- | -- | -- | -- |
| 39 | Methylene diphenyl diisocyanate | 101-68-8 | -- | -- | -- | -- | -- | -- | 8.00E-02 | OEHHA |

**Addendum 7**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | Polymeric methylenediphenyl diisocyanate | 9016-87-9 | -- | -- | -- | -- | -- | -- | 8.00E-02 | OEHHA |
| 41 | Nickel | 7440-02-0 | -- | -- | 2.60E-04 | OEHHA | 1.10E-02 | OEHHA | 1.40E-02 | OEHHA |
| 42 | Nickel Hydroxide | 12054-48-7 | -- | -- | 2.60E-04 | OEHHA | 1.10E-02 | OEHHA | 1.40E-02 | OEHHA |
| 43 | Nickel Oxide | 1313-99-1 | -- | -- | 2.60E-04 | OEHHA | 1.10E-02 | OEHHA | 2.00E-02 | OEHHA |
| 44 | Nickel refinery dust | Nickel refinery dust | -- | -- | 2.60E-04 | OEHHA | 1.10E-02 | OEHHA | 1.40E-02 | OEHHA |
| 45 | Nickel subsulfide | 12035-72-2 | -- | -- | -- | -- | 1.10E-02 | OEHHA | 1.40E-02 | OEHHA |
| 46 | N-Nitroso-di-n-butylamine | 924-16-3 | 1.10E+01 | OEHHA | 3.10E-03 | OEHHA | -- | -- | -- | -- |
| 47 | Styrene | 100-42-5 | -- | -- | -- | -- | -- | -- | 9.00E+02 | OEHHA |
| 48 | Tetrachloroethene | 127-18-4 | 5.40E-01 | OEHHA PHG | 6.10E-06 | OEHHA | -- | -- | -- | -- |
| 49 | Toluene | 108-88-3 | -- | -- | -- | -- | -- | -- | 3.00E+02 | OEHHA |
| 50 | Toluene 2,4/2,6-Diisocyanates | 26471-62-5 | 3.90E-02 | OEHHA | -- | -- | -- | -- | 8.00E-03 | OEHHA |
| 51 | Toluene-2,4-diisocyanate | 584-84-9 | 3.90E-02 | OEHHA (toluene diisocyantes) | -- | -- | -- | -- | 8.00E-03 | OEHHA (toluene diisocyantes) |

**Addendum 7**

| 52 | Toluene-2,6-diisocyanate | 91-08-7 | 3.90E-02 | OEHHA (toluene diisocyantes) | -- | -- | -- | -- | 8.00E-03 | OEHHA (toluene diisocyantes) |
| 53 | Toxaphene | 8001-35-2 | 1.20E+00 | OEHHA | -- | -- | -- | -- | -- | -- |
| 54 | 1,1,1-Trichloroethane | 71-55-6 | -- | -- | -- | -- | -- | -- | 1.00E+03 | OEHHA |
| 55 | 2,4,6-Trichlorophenol | 88-06-2 | 7.00E-02 | OEHHA | 2.00E-05 | OEHHA | -- | -- | -- | -- |
| 56 | Vinyl chloride | 75-01-4 | -- | -- | 7.80E-05 | OEHHA | -- | -- | -- | -- |

**FOOTNOTES:**

CAS = Chemical Abstracts Service

$CSF_o$ = oral cancer slope factor

IUR = inhalation unit risk factor

OEHHA = California Office of Environmental Health Hazard Assessment

PHG = Public Health Goal

RfD = chronic oral referen

REL = chronic reference exposure level

WHO-05 TEF = 2005 World Health Organization, Toxicity Equivalency Factor

| | *Table B* | | *Non-Cancer Health-Hazard Values* | |
| :---: | :--- | :---: | :---: | :---: |
| *Line #* | *Analyte* | *CAS Registry Number* | *Benchmark Incremental Change in Blood Lead (µg/dL)* | *Reference* |
| 1 | Lead and compounds[#] | 7439-92-1 | 1.0 | OEHHA |

**Addendum 7**

| | |
|---|---|
| | **FOOTNOTES:** |
| | |
| | # The toxicity criterion for lead represents a benchmark incremental change in blood lead concentration. The units are in microgram per deciliter (µg/dL). |
| | |
| | CAS = Chemical Abstracts Service |
| | |
| | OEHHA = California Office of Environmental Health Hazard Assessment |

This database is current through 5/3/24 Register 2024, No. 18.

Cal. Admin. Code tit. 22, Div. 4.5 Ch. 51 App. I, 22 CA ADC Div. 4.5 Ch. 51 App. I

**California Code of Regulations, Title 23, § 2923**

On May 1, 2012, the State Water Resources Control Board (State Water Board) adopted the Low-Threat Underground Storage Tank Case Closure Policy (Policy), which is a statewide policy on the closure of leaking petroleum underground storage tank (UST) sites in California. See State Water Board Resolution No. 2012-0016. The Policy applies to petroleum UST sites subject to Chapter 6.7 of the Health and Safety Code. The Policy establishes both general and media-specific criteria. If both the general and applicable media-specific criteria are satisfied, then the leaking UST case is generally considered to present a low threat to human health, safety and the environment. The Policy recognizes, however, that even if all of the specified criteria in the Policy are met, there may be unique attributes of the case or site-specific conditions that increase the risk associated with the residual petroleum constituents. In these cases, the regulatory agency overseeing corrective action at the site must identify the conditions that make case closure under the Policy inappropriate.

Under existing policy, regulatory agencies consider site-specific conditions when determining if the level of corrective action ensures the protection of human health, safety and the environment pursuant to Health and Safety Code section 25296.10, subdivision (g). With the knowledge and experience gained over the last 25 years of investigating and remediating petroleum UST releases, site conditions and characteristics have been identified that, if met, will generally ensure the protection of human health, safety and the environment. This Policy identifies those standardized criteria. The Policy is necessary to establish consistent, statewide case closure criteria for low-threat petroleum UST sites in California.

**General Criteria**

General criteria that must be satisfied by all candidate sites are listed as follows:

    a. The unauthorized release is located within the service area of a public water system;

    b. The unauthorized release consists only of petroleum;

    c. The unauthorized ("primary") release from the UST system has been stopped;

d. Free product has been removed to the maximum extent practicable;

e. A conceptual site model that assesses the nature, extent, and mobility of the release has been developed;

f. Secondary source has been removed to the extent practicable; and

g. Soil or groundwater has been tested for MTBE and results reported in accordance with Health and Safety Code section 25296.15.

If all the general criteria are satisfied, the site must meet applicable, media-specific criteria in order to be closed under the policy. The exposure scenarios related to petroleum releases have been combined into three media-specific criteria: Groundwater, vapor intrusion to indoor air, and direct contact and outdoor air exposure.

**Media Specific Criteria:**

a. Groundwater: To satisfy the groundwater criteria, the contaminant plume that exceeds water quality objectives must be stable or decreasing in areal extent, which means a plume where a contaminant mass has expanded to its maximum extent: the distance from the release where attenuation exceeds migration. In addition, the site must meet all of the specified criteria of at least one of the five classes of sites listed on page 6 of the Policy. The Policy also addresses sites where petroleum-contaminated soil threatens to impact groundwater. Sites with soil that does not contain sufficient mobile constituents to cause groundwater to exceed the groundwater criteria in the Policy shall also be considered low threat for the groundwater medium.

b. Vapor Intrusion to Indoor Air: The vapor-intrusion criterion applies to petroleum release sites when existing buildings are occupied or are reasonably expected to be occupied or where buildings for human occupancy are reasonably expected to be constructed in the near future. If one of the three specified tests under Section 2 "Petroleum Vapor Intrusion to Indoor Air" is satisfied, then the site satisfies the media-specific criteria. Appendices 1 through 4 illustrate four potential exposure scenarios and describe characteristics associated with each scenario. For sites using test 2a, conditions at the release site conditions must satisfy all of the characteristics and criteria of scenarios/Appendices 1 through 3, or all of the characteristics of scenario/Appendix 4.

The Policy contains an exception to the media-specific criteria for vapor intrusion to indoor air for active commercial petroleum fueling facilities.

c. Direct Contact and Outdoor Air Exposure: The Policy describes conditions where direct contact with petroleum-contaminated soil or inhalation of petroleum volatized to outdoor air poses an insignificant threat to human health. If one of the three tests identified under Section 3 is satisfied, the media-specific criterion for direct contact is satisfied. For test 3a, the requirements in Table 1 must be satisfied.

The Policy requires regulatory agencies, annually or at the request of a responsible party, to conduct a review to determine if site meets the criteria in the Policy. The Policy also contains notification requirements, as well as requirements to destroy monitoring wells and remove waste debris, before the regulatory agency issues the uniform closure letter described in section 25296.10 of the Health and Safety Code.

**California Code of Regulations, Title 27, § 25703**

(a) A quantitative risk assessment which conforms to this section shall be deemed to determine the level of exposure to a listed chemical which, assuming daily exposure at that level, poses no significant risk. The assessment shall be based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for listing the chemical as known to the state to cause cancer. In the absence of principles or assumptions scientifically more appropriate, based upon the available data, the following default principles and assumptions shall apply in any such assessment:

(1) Animal bioassay studies for quantitative risk assessment shall meet generally accepted scientific principles, including the thoroughness of experimental protocol, the degree to which dosing resembles the expected manner of human exposure, the temporal exposure pattern, the duration of study, the purity of test material, the number and size of exposed groups, the route of exposure, and the extent of tumor occurrence.

(2) The quality and suitability of available epidemiologic data shall be appraised to determine whether the study is appropriate as the basis of a quantitative risk assessment, considering such factors as the selection of the exposed and reference groups, reliable ascertainment of exposure, and completeness of follow-up. Biases and confounding factors shall be identified and quantified.

(3) Risk analysis shall be based on the most sensitive study deemed to be of sufficient quality.

(4) The results obtained for the most sensitive study deemed to be of sufficient quality shall be applicable to all routes of exposure for which the results are relevant.

(5) The absence of a carcinogenic threshold dose shall be assumed and no-threshold models shall be utilized. A linearized multistage model for extrapolation from high to low doses, with the upper 95 percent confidence limit of the linear term expressing the upper bound of potency shall be utilized. Time-to-tumor models may be appropriate where data are available on the time of appearance of individual tumors, and particularly when survival is poor due to competing toxicity.

**Addendum 9**

(6) Human cancer potency shall be derived from data on human or animal cancer potency. Potency shall be expressed in reciprocal milligrams of chemical per kilogram of bodyweight per day. Interspecies conversion of animal cancer potency to human cancer potency shall be determined by multiplying by a scaling factor equivalent to the ratio of human to animal bodyweight, taken to the one-fourth power.

(7) When available data are of such quality that physiologic, pharmacokinetic and metabolic considerations can be taken into account with confidence, they may be used in the risk assessment for inter-species, inter-dose, and inter-route extrapolations.

(8) When the cancer risk applies to the general population, human body weight of 70 kilograms shall be assumed. When the cancer risk applies to a certain subpopulation, the following assumptions shall be made, as appropriate:

| Subpopulation | Kilograms of Body Weight |
|---|---|
| Man (18+ years of age) | 70 |
| Woman (18+ years of age) | 58 |
| Woman with conceptus | 58 |
| Adolescent (11-18 years of age) | 40 |
| Child (2-10 years of age) | 20 |
| Infant (0-2 years of age) | 10 |

(b) For chemicals assessed in accordance with this section, the risk level which represents no significant risk shall be one which is calculated to result in one excess case of cancer in an exposed population of 100,000, assuming lifetime exposure at the level in question, except where sound considerations of public health support an alternative level, as, for example:

(1) where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination; or

**Addendum 9**

(2) where chlorine disinfection in compliance with all applicable state and federal safety standards is necessary to comply with sanitation requirements; or

(3) where a clean-up and resulting discharge is ordered and supervised by an appropriate governmental agency or court of competent jurisdiction.