# Case No. 23-3274

# In the United States Court of Appeal for the Ninth Circuit

**JOSE NAVARRO**,

*Plaintiff-Appellant,*

v.

**EXXON MOBIL CORPORATION, ET AL.**

*Defendants-Appellees*,

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:17-CV-02477
HON. DALE FISCHER

## TORRANCE REFINING COMPANY LLC'S AND EXXON MOBIL CORPORATION'S MOTION TO EXCEED WORD COUNT FOR ANSWERING BRIEF

Mark E. Elliott
Stephanie Amaru
PILLSBURY WINTHROP
SHAW PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 90017
Tel.: 213-488-7100
mark.elliott@pillsburylaw.com
stephanie.amaru@pillsburylaw.com

*Counsel for Appellee Torrance Refining Company LLC*

Dawn Sestito
Lauren Kaplan
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Fl.
Los Angeles, CA 90071
Tel.: 213-430-6000
dsestito@omm.com
lkaplan@omm.com

*Counsel for Appellee Exxon Mobil Corporation*

Pursuant to Ninth Circuit Rule 32-2(a), Defendants-Appellees Torrance Refining Company LLC ("TORC") and Exxon Mobil Corporation ("ExxonMobil" and together, "Appellees") request an order permitting them to file their joint Answering Brief with a type-volume limit in excess of the 15,400 prescribed by Circuit Rules 32-1(a) and 32-2(b). Appellees' joint Answering Brief contains 21,364 words.

This Court should grant the requested relief because Plaintiff-Appellant Jose Navarro ("Navarro") was granted permission to file an Opening Brief containing 20,279 words (Dkt. Entry No. 30), that challenges three separate orders:

(1) an order granting summary judgment in favor of TORC on Navarro's private and public nuisance claims;

(2) an order granting judgment on the pleadings on Navarro's trespass claim against Appellees; and

(3) an order that both denied a motion to appoint Navarro as class representative and decertified two subclasses. Declaration of Mark E. Elliott at ¶¶ 3-11.

Those orders collectively total almost 100 pages and involve a multitude of complex factual and legal issues and different legal

1

standards. *Id.* In addition to reiterating challenges to the District Court's decisions, Navarro's Opening Brief also asserts new arguments that were not raised in the proceedings below and to which Appellees must respond. *Id.* Appellees are filing a single consolidated Answering Brief and have worked diligently to streamline that brief. Nevertheless, given the length of the Opening Brief and record below, and the number and complexity of the issues raised, this Court should grant Appellees a similar expansion of the word limits.

The attached joint Answering Brief is 21,364 words. This word count is less than 21,679 words, which is the sum of the length of Navarro's Opening Brief (20,279 words) plus the additional 1,400 words for a joint brief contemplated by Circuit Rule 32-2(b). Appellees did not oppose Navarro's motion to file the oversized Opening Brief.

Navarro's counsel was informed of Appellees' intent to file this Motion. Navarro's counsel stated that Navarro would not oppose a request *provided the total is 20,300 words or less.* The attached joint Answering Brief exceeds 20,300 words by 1,064 words.

4889-9429-3732.v4

Respectfully submitted,

Dated: September 25, 2024  PILLSBURY WINTHROP
        SHAW PITTMAN LLP
       MARK E. ELLIOT
       STEPHANIE AMARU

       By: _____ s/ Mark E. Elliott _____
         Mark E. Elliott

       *Attorneys for Appellee*
       *Torrance Refining Company,*
         *LLC*

Dated: September 25, 2024  O'MELVENY & MYERS LLP
       DAWN SESTITO
       LAUREN KAPLAN

       By: _____ s/ Dawn Sestito _____
         Dawn Sestito

       *Attorneys for Appellee Exxon*
       *Mobil Corporation*

3

**Attestation**

I hereby attest that all signatories listed, and on whose behalf this filing is submitted, concur in its content and have authorized its filing.

Dated: September 25, 2024      PILLSBURY WINTHROP
     SHAW PITTMAN LLP
MARK E. ELLIOT
STEPHANIE AMARU

By: _____ s/ Mark E. Elliott
     Mark E. Elliott

*Attorneys for Appellee*
*Torrance Refining Company*
*LLC*

4

4889-9429-3732.v4

## DECLARATION OF MARK E. ELLIOTT

1.      I am a partner at Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") and counsel of record for Defendant-Appellee Torrance Refining Company, LLC ("TORC") in these proceedings. I am an attorney admitted to practice in this Court. I make this declaration on behalf of TORC and Defendant-Appellee Exxon Mobil Corporation ("ExxonMobil" and together, "Appellees") in support of Appellees' Motion to Exceed Word Count for Joint Answering Brief ("Motion"). I make the statements in this Declaration based on my personal knowledge of the facts set forth herein, and if sworn, I could and would competently testify to them.

2.      I prepared the Joint Answering Brief filed concurrently with this Motion with the assistance of other Pillsbury attorneys and counsel for ExxonMobil.

3.      The Joint Answering Brief responds to an oversized Opening Brief filed in support of Plaintiff-Appellant Jose Navarro's ("Navarro") appeal. That Opening Brief is 20,279 words and challenges three orders:

    a.  An order granting summary judgment in favor of TORC on Navarro's private and public nuisance claims;

b. An order granting judgment on the pleadings on Navarro's trespass claim against Appellees; and

c. An order that both denied a motion to appoint Navarro as class representative and decertified two subclasses.

4. On May 24, 2024, Appellant filed his Opening Brief concurrently with a Motion to Exceed Word Count for Opening Brief ("Navarro's Motion"). As noted in Navarro's Motion, the orders from which Navarro appeals are collectively almost 100 pages and involve a multitude of complex factual and legal issues and different legal standards.

5. The order decertifying two subclasses did so on multiple bases and analyzed myriad expert and other evidence. The summary judgment order from which Navarro appeals is subject to de novo review and involves a voluminous record and analysis of expert evidence and multiple regulatory benchmarks, which Navarro cited in his Opening Brief and opposition papers below. Accordingly, Appellees' response must discuss certain scientific concepts and respond to Navarro's technical arguments, most of which relate to the alleged exposure of Navarro and the surrounding community to certain pollutants and a purported health risk flowing therefrom.

6. Moreover, in the lower court, because Navarro replaced a prior plaintiff and class representative and proffered testimony and legal theories that differed from his predecessor, the District Court had to reconcile prior (i.e., pre-Navarro) rulings and evidence with the case that was then before it. This, in combination with the evolution of fact and expert evidence during the multi-year pendency of the case, gave rise to multiple, separate arguments in both Navarro's lower court briefing and in Navarro's Opening Brief.

7. Navarro's Opening Brief asserts new arguments that were not raised in the proceedings below. For example, Navarro disclaims and recharacterizes certain judicial admissions made in the lower court for the first time on appeal. He also proffers a novel technical argument that attempts, without expert support, to quantify the health risk giving rise to his alleged nuisance claims as being up to approximately 260 times the figure presented in the District Court.

8. The excess words granted to Navarro for his Opening Brief, in addition to multiple new arguments asserted therein, necessitate a similar expansion of the word count for Appellees' joint Answering Brief to avoid prejudice to the Appellees and allow them to fully respond to the Opening Brief's arguments.

4889-9429-3732.v4

9.     I, along with my colleagues and joint defense counsel, put significant time and effort into making the arguments in the joint Answering Brief as concise as possible and streamlining Appellees' recitations of fact and law without compromising the merits of Appellees' responsive arguments regarding multiple complex, technical issues raised in the Opening Brief.

10.     In addition, the joint Answering Brief is filed on behalf of two Appellees, TORC and ExxonMobil. A joint brief is automatically permitted an additional 1,400 words. *See* Circuit Rule 32-3(b). The joint Answering Brief attached hereto as <u>Exhibit A</u> is 21,364 words.

11.     For the foregoing reasons, Appellees respectfully request that this Court authorize the filing of their joint Answering Brief in excess of the 15,400 maximum word count provided by Circuit Rules 32-1(a) and 32-2(b).

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on this 25th day of September, 2024 at Los Angeles, California.

By:   <u>*/s/ Mark E. Elliott*</u>
Mark E. Elliott

## CERTIFICATE OF COMPLIANCE

## PURSUANT TO FED. R. APP. P. 27(d), 32(a)(5) and (6)

## AND CIRCUIT RULE 27-1(d)

I certify that, pursuant to Fed. R. App. P. 27(d), Fed. R. App. P. 32(a)(5) and (6), and Ninth Circuit Rule 27-1(d), the foregoing motion is proportionately spaced, has a typeface of 14 points and contains 1,064 words.

Dated: September 25, 2024

    s/ Mark E. Elliott   
Mark E. Elliott

4889-9429-3732.v4

# Exhibit A

# Case No. 23-3274

# In the United States Court of Appeal for the Ninth Circuit

**JOSE NAVARRO**,

*Plaintiff-Appellant,*

v.

**EXXON MOBIL CORPORATION, ET AL.**

*Defendants-Appellees*,

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:17-CV-02477
HON. DALE FISCHER

## TORRANCE REFINING COMPANY LLC'S AND EXXON MOBIL CORPORATION'S ANSWERING BRIEF

<table>
<tr>
<td>

Mark E. Elliott
Stephanie Amaru
PILLSBURY WINTHROP
SHAW PITTMAN LLP
725 South Figueroa St., 36th Fl.
Los Angeles, CA 90017
Tel.: 213-488-7100
mark.elliott@pillsburylaw.com
stephanie.amaru@pillsburylaw.com

*Counsel for Appellee Torrance
Refining Company LLC*

</td>
<td>

Dawn Sestito
Lauren Kaplan
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Fl.
Los Angeles, CA 90071
Tel.: 213-430-6000
dsestito@omm.com
lkaplan@omm.com

*Counsel for Appellee Exxon Mobil
Corporation*

</td>
</tr>
</table>

4876-9460-6047

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee Torrance Refining Company LLC certifies that its direct or indirect parent corporations are PBF Energy Company LLC and PBF Holding Company LLC. Torrance Refining Company LLC is one of PBF Energy Company LLC's principal operating subsidiaries and a wholly-owned subsidiary of PBF Holding Company LLC. PBF Energy Inc. is the sole managing member of, and owner of an equity interest representing approximately 99.9% of the outstanding economic interest in, PBF Energy Company LLC.


Dated: September 25, 2024  

PILLSBURY WINTHROP
 SHAW PITTMAN LLP
MARK E. ELLIOTT
STEPHANIE AMARU

By: */s/ Mark E. Elliott*  
Mark E. Elliott

*Attorneys For Appellee*  
*Torrance Refining Company LLC*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellee Exxon Mobil Corporation states that it does not have a parent company and no publicly held corporation owns 10% or more of its stock.

Dated:  September 25, 2024             O'MELVENY & MYERS LLP

By:    */s/ Dawn Sestito*
       Dawn Sestito

       *Attorneys For Appellee*
       *Exxon Mobil Corporation*

## Attestation

I hereby attest that all signatories listed, and on whose behalf this filing is submitted, concur in its content and have authorized its filing.

Dated:  September 25, 2024             PILLSBURY WINTHROP
                SHAW PITTMAN LLP
             MARK E. ELLIOTT
             STEPHANIE AMARU

By:    */s/ Mark E. Elliott*
       Mark E. Elliott

       *Attorneys For Appellee*
       *Torrance Refining Company LLC*

4876-9460-6047

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

ISSUES PRESENTED ...........................................................................3

STATEMENT OF THE CASE ...............................................................4

    A.    Overview of the Facts..............................................................4

    B.    The First Four Years of Litigation (2017-2020) ...................5

    C.    The Third Amended Complaint ..............................................7

    D.    Plaintiffs' Motion to Substitute Navarro and Decertification..............8

    E.    The Court Dismisses Navarro's Trespass Claim ...................9

    F.    The Court Grants Summary Judgment on Navarro's Private and Public Nuisance Claims ...................................................10

SUMMARY OF THE ARGUMENT ....................................................10

STANDARD OF REVIEW ..................................................................12

ARGUMENT ........................................................................................13

I.    Navarro's Trespass Claim was Properly Dismissed and Decertified............13

    A.    Navarro made an unequivocal judicial admission that his trespass claim was premised on an alleged vapor intrusion risk. .....................13

    B.    The District Court properly granted judgment on the pleadings on Navarro's trespass claim. ...................................17

    C.    The District Court did not abuse its discretion in decertifying the trespass class claim............................................................22

        1.    Navarro's trespass claim failed the typicality inquiry. .............24

        2.    Navarro's trespass claim did not present common questions appropriate for class certification. .............................................28

        3.    The Ground Subclass did not satisfy the "predominance" requirement. ...............................................................................32

            a.    Individual questions predominate in analyzing the trespass claim............................................................34

            b.    Laton's plume map was not sufficient "common evidence" that would satisfy Rule 23(b)(3)....................36

4876-9460-6047

        c.    There was a lack of common proof as to the abatement remedy sought by the Ground Subclass. ........................39

        d.    The Ground Subclass's trespass claim also fails the superiority analysis. ........................................40

II.    The District Court Properly Rejected Navarro's Nuisance Claims ...............42

    A.    The District Court properly granted summary judgment against Navarro on his nuisance claims ...........................................42

        1.    Navarro's expert testimony regarding impacts of Refinery emissions on Navarro's health did not create a factual dispute for trial ....................................................................44

        2.    The District Court's summary judgment decision was not improperly based on policy concerns. .....................................50

        3.    The District Court did not improperly discount evidence of "community concern" regarding Refinery emissions...............53

        4.    The District Court did not improperly discount Navarro's testimony relating to the issue of "substantial harm." ..............56

        5.    Navarro's new "additive" health risk theory on appeal has been waived and has no support in the record. .........................60

            a.    Navarro's new theory attempting to quantify an additive health risk from subsurface contamination should be rejected..................................................................60

            b.    Navarro's new nuisance theory is not supported by expert testimony ........................................................63

    B.    The District Court did not abuse its discretion in decertifying the class as to Navarro's nuisance claims. ........................................67

        1.    Navarro's nuisance claims were not typical of the Air Subclass...................................................................67

        2.    The District Court did not engage in an improper merits analysis in its decertification of Navarro's nuisance claims.....73

        3.    Plaintiffs' nuisance claims lacked commonality. ....................76

        4.    The Air Subclass did not satisfy Rule 23(b)(2). .......................78

III.    The District Court Did Not Abuse its Discretion in Denying Navarro's Request to Serve as Class Representative .....................................82

    A.    Navarro was unwilling and unable to adequately protect the class's interests.................................................................83

4876-9460-6047

B.     Navarro did not demonstrate an intent to vigorously prosecute his claims on behalf of the class. ...........................................................86

C.     The District Court had well-founded concerns about class counsel's adequacy. .............................................................................91

CONCLUSION ...............................................................................92

CERTIFICATE OF COMPLIANCE ..............................................95

STATEMENT OF RELATED CASES ............................................96

4876-9460-6047

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Abarca v. Franklin Cty. Water Dist.*,
   761 F. Supp. 2d 1007 (E.D. Cal. 2011) ...................................................48, 49, 75

*Am. Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) ........................................................................13, 14

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997).......................................................................................33, 40

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................56, 57

*Andrews v. Plains All Am. Pipeline, L.P.*,
   2018 WL 2717833 (C.D. Cal. Apr. 17, 2018) .......................................32, 38, 78

*Aydin Corp. v. Loral Corp.*,
   718 F.2d 897 (9th Cir. 1983) ........................................................................56, 59

*Bader v. N. Line Layers, Inc.*,
   503 F.3d 813 (9th Cir.2007) .................................................................................62

*Bailey v. Patterson*,
   369 U.S. 31 (1962).................................................................................................70

*Bakersfield v. Miller*,
   64 Cal. 2d 93 (1966) .............................................................................................44

*Birke v. Oakwood Worldwide*,
   169 Cal. App. 4th 1540 (2009) .............................................................................47

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ...............................................................................75

*Bradley v. Am. Smelting & Ref. Co.*,
   104 Wash.2d 677 (1985)........................................................................................22

*Bustamante v. KIND, LLC*,
   100 F.4th 419 (2024) ......................................................................3, 22, 67, 82

vi

4876-9460-6047

*Carmen v. San Francisco Unified Sch. Dist.*,
  237 F.3d 1026 (9th Cir. 2001) ................................................55

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
  270 F.3d 863 (9th Cir. 2000) .................................................60

*Castillo v. Bank of Am., NA*,
  980 F.3d 723 (9th Cir. 2020) ...........................................13, 23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................54

*Christian Legal Soc'y Chapter of Univ. of Calif. v. Wu*,
  626 F.3d 483 (9th Cir. 2010) ...............................................56

*City of San Jose v. Superior Ct.*,
  12 Cal. 3d 477 (1974) ...................................................*passim*

*Comcast Corp. v. Behrend*,
  569 U.S. (2013)...................................................................29

*Coomes v. Edmonds Sch. Dist. No. 15*,
  816 F.3d 1255 (9th Cir. 2016) .............................................63

*In re Delta Air Lines, Inc.*,
  2023 WL 2347074 (C.D. Cal. Feb. 8, 2023) ...................32, 38

*Desire, LLC v. Manna Textiles, Inc.*,
  986 F.3d 1253 (9th Cir. 2021) .............................................12

*Dunlap v. Credit Protection Ass'n LP*,
  419 F.3d 1011 (9th Cir. 2005) .............................................13

*Ebert v. Gen. Mills, Inc.*,
  823 F.3d 472 (8th Cir. 2016) ...............................................79

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...............................................29

*Elton v. Anheuser-Busch Beverage Group, Inc.*,
  50 Cal.App.4th 1301 (1996) ................................................20

4876-9460-6047

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ...................................................................33

*In re Facebook, Inc., PPC Advertising Litigation*,
  282 F.R.D. 446 (N.D. Cal. 2012) ..........................................87, 90

*Fisher v. Ciba Specialty Chems. Corp.*,
  238 F.R.D. 273 (S.D. Ala. 2006) .............................................35

*Franco v. Allied Interstate LLC*,
  2018 WL 3410009 (S.D.N.Y 2018) ..........................................83

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
  771 F.3d 1119 (9th Cir. 2014) .................................................56

*Frieman v. San Rafael Rock Quarry, Inc.*,
  116 Cal. App. 4th 29 (2004) ...................................................80

*Gates v. Rohm and Haas Co.*,
  655 F.3d 255 (3d. Cir. 2011) ...............................36, 49, 73, 75

*Gospel Missions of Am. v. City of Los Angeles*,
  328 F.3d 548 (9th Cir. 2003) ..................................................16

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (1992) ...............................................................24

*Harmsen v. Smith*,
  693 F.2d 932 (9th Cir. 1982) ..................................................88

*Hellman v. La Cumbre Golf & Country Club*,
  6 Cal. App. 4th 1224 (1992) ..............................................57, 71

*Int'l Union of Bricklayers, et al. v. Martin Jaska, Inc.*,
  752 F.2d 1401 (9th Cir. 1985) ................................................55

*Koll-Irvine Ctr. Prop. Owners Ass'n v. Cty. Of Orange*,
  24 Cal. App. 4th 1036 (1994) .................................................72

*Lee-Bolton v. Koppers Inc.*,
  319 F.R.D. 346 (N.D. Fla. 2017) ............................................76

viii

*MacDonald v. General Motors Corp.*,
110 F.3d 337 (6th Cir. 1997) ...............................................................17

*Marlo v. United Parcel Serv., Inc.*,
251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011)........23, 75

*Maxwell v. Simmons, U.S.A. Corp.*,
841 F.2d 1129 (9th Cir. 1988) .........................................................60, 61

*McClure v. Life Ins. Co. of N. Am.*,
84 F.3d 1129 (9th Cir. 1996) ...............................................................47

*MDR Hotels, LLC v. Dow Chem. Co.*,
2024 WL 650406 (C.D. Cal. Jan. 5, 2024)...........................................20

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ...............................................................82

*Monks v. City of Rancho Palos Verdes*,
167 Cal. App. 4th 263 (2008) ...............................................................43

*O'Connor v. Boeing N. Am., Inc.*,
180 F.R.D. 359 (C.D. Cal. 1997).................................................35, 36, 85

*O'Connor v. Boeing N. Am., Inc.*,
197 F.R.D. 404 (C.D. Cal. 2000).....................................................22, 85

*Pac. Gas & Elec. Co. v. Zuckerman*,
189 Cal. App. 3d 1113 (1987) ...............................................................20

*Rhodes v. E.I. DuPont de Nemours & Co.*,
253 F.R.D. 365 (S.D.W.Va. 2008) .........................................................49

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010) .........................................................81, 82

*Rutledge v. Electric Hose & Rubber Co.*,
511 F.2d 668 (9th Cir. 1975) ...............................................................40

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ...............................................................92

4876-9460-6047

*San Diego Gas & Elec. Co. v. Superior Court*,
13 Cal.4th 893 (1996) ...................................................................*passim*

*Schaffer v. Gregory Village Partners, L.P.*,
105 F.Supp.3d 951 (N.D. Cal. 2015) .................................................45

*Singer v. State Farm Mutual Automobile Insurance Company*,
116 F.3d 373 (9th Cir. 1997) ............................................................17

*Thrifty-Tel, Inc. v. Bezenek*,
46 Cal. App. 4th 1559 (1996) ............................................................20

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016).........................................................................33

*United Steel, Paper & Forestry, et al. v. ConocoPhillips Co.*,
593 F.3d 802 (9th Cir. 2010) ............................................................23

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) ............................................................23

*Vaquero v. Ashley Furniture Indus., Inc.*,
824 F.3d 1150 (9th Cir. 2016) ..........................................................78

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).........................................................................*passim*

*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994).......................................................89

*Westways World Travel, Inc. v. AMR Corp.*,
265 Fed. Appx. 472 (9th Cir. 2008)...................................................22

*Whittaker Corp. v. Execuair Corp.*,
953 F.2d 510 (9th Cir. 1992) .......................................................15, 19

*Wilson v. Interlake Steel Co.*,
32 Cal. 3d 229 (1982) ......................................................................*passim*

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ..........................................................40

4876-9460-6047

*Zobrest v. Catalina Foothills Sch. Dist.*,
    509 U.S. 1 .................................................................................................63

## Statutes and Codes

California Civil Code
    Section 3479...........................................................................................42

California Health and Safety Code
    Section 40400, *et seq.* .........................................................................43

## Rules and Regulations

Federal Rules of Civil Procedure
    Rule 23 ...............................................................................23, 30, 73, 75
    Rule 23(a)........................................................................................*passim*
    Rule 23(a)(2)...........................................................................................78
    Rule 23(a)(3)....................................................................24, 28, 72, 83
    Rule 23(a)(4)...................................................................................*passim*
    Rule 23(b) ......................................................................................12, 23
    Rule 23(b)(2)...................................................................................*passim*
    Rule 23(b)(3)...................................................................................*passim*
    Rule 41(b) ...............................................................................................92
    Rule 56(a)................................................................................................56
    Rule 56(c)................................................................................................54

South Coast Air Quality Management District Rules
    Rule 1402 .......................................................................43, 46, 52, 66

## Other Authorities

Manual for Complex Litigation, Fourth §10.123 ...................................42

4876-9460-6047

## INTRODUCTION

The Torrance oil refinery has been legally operating for 95 years. For over 25 years, Plaintiff-Appellant Jose Navarro lived nearby and never expressed any fear or annoyance due to Refinery operations. In fact, Navarro concedes he enjoys his property.

Nevertheless, after years of litigation and a revolving door of named plaintiffs who lost interest in their claims, Navarro belatedly joined a lawsuit against the Refinery's current owner, Torrance Refining Company LLC ("TORC") and former Refinery owner Exxon Mobil Corporation ("ExxonMobil"), asserting nuisance and trespass claims.[1] The District Court, however, denied a motion to appoint Navarro as class representative and decertified two subclasses, granted judgment on the pleadings against Navarro on his trespass claim against TORC and ExxonMobil, and granted summary judgment against Navarro on his private and public nuisance claims against TORC.

Specifically, the Court granted judgment on the pleadings because Navarro's own admissions undermined his trespass claim alleging migration of contaminants through groundwater and soil into his home. Navarro judicially admitted that this trespass claim was "premised on evidence that subsurface contamination from the

---

[1]  Navarro asserted nuisance claims against only TORC. Accordingly, ExxonMobil does not join in Section II of the Argument, which relates only to those claims.

4876-9460-6047

Refinery poses a vapor intrusion risk to the structures in the class area." 1-ER-23; 17-ER-4761. Accordingly, the Court properly held that, under California law, "allegations of [intangible] soil vapor intrusion do not support a trespass claim" as opposed to a nuisance claim given the circumstances here. 1-ER-23-24.

The Court also granted summary judgment on Navarro's nuisance claims, which were largely premised on an alleged increased health risk, finding that Navarro's "own testimony fails to raise a triable issue that he finds the Refinery's emissions offensive, seriously annoying, or intolerable." 1-ER-11. Navarro's expert testimony was based primarily on inapplicable regulatory screening levels that have no bearing on whether an individual has suffered a substantial harm or injury constituting a nuisance. *Infra* sections II.A.1 & II.A.5. And, as the Court correctly found, any potentially "increased risk from TORC's [Refinery] operations is *significantly lower* than that regularly tolerated by the people of Los Angeles and Torrance." 1-ER-10 (emphasis added). That ends Navarro's nuisance claims.

Ultimately, Plaintiffs' allegations were superseded by the evidence that was developed to support their claims. Contrary to broad nuisance and trespass allegations, the evidence and argument presented to the Court narrowed Plaintiffs' claims significantly as they sought to preserve their class action. And Navarro's judicial admissions and testimony, along with the opinions of Plaintiffs' experts, confirmed that both claims were premised on alleged increased health risks that

could neither be supported by relevant data nor substantiate a trespass or nuisance under California law.

On appeal, Navarro wants to walk back those case-ending concessions and challenge the District Court's proper application of California substantive law to the pleadings on his trespass claim, and to the summary judgment evidence on his nuisance claim. Because the Court properly dismissed these claims, this Circuit should affirm its judgment.

If this Circuit concludes—as it should—that the District Court correctly granted both judgment on the pleadings and summary judgment, it need not reach Navarro's additional appellate issues. *Bustamante v. KIND, LLC*, 100 F.4th 419, 434 (2024). But even if this Court were to reach them, those rulings were correct—there was no justification for class treatment of the claims as Navarro's theories evolved, undermining any claims of typicality, commonality, or predominance, and Navarro was not a suitable class representative in any event. Accordingly, this Court should affirm.

## JURISDICTIONAL STATEMENT

Appellees agree with Navarro's jurisdictional statement.

## ISSUES PRESENTED

1. Whether the District Court properly granted judgment on the pleadings on Navarro's trespass claim, given his (1) judicial admission that interference by

3

intangible soil vapor intrusion constituted the factual basis for the alleged trespass, and (2) failure to allege that soil vapor caused damage to or deposited on his property.

2.    Whether the District Court properly granted summary judgment on Navarro's nuisance claims where Navarro failed to raise a triable factual issue that any future, theoretical health risk allegedly caused by Refinery emissions was a substantial interference constituting a nuisance.

3.    Whether, in any event, the District Court acted within its discretion in:

   a. Decertifying the Ground and Air Subclasses based on: (1) the testimony and judicial admissions of Navarro, a newly added putative class representative, (2) Navarro's legal theories, and (3) California trespass and nuisance law.

   b. Denying the motion to substitute Navarro as class representative because: (1) his claims were atypical; (2) he would have been an inadequate class representative; and (3) class counsel was also not adequate.

## STATEMENT OF THE CASE

### A.    Overview of the Facts

This case turns on the activities of the Torrance oil refinery, which has been legally operating for 95 years, was previously owned by ExxonMobil and is now

4

owned by TORC. Despite Navarro's claims that Refinery operations led to dangerous contamination, no relevant, competent evidence established that any individual suffered a substantial harm or injury due to the alleged contamination. Indeed, Navarro's evidence: (1) included community indoor air testing results, which failed to prove vapor intrusion; (2) confirmed that those indoor air testing results had remained relatively unchanged, were typical of background levels, and even tended to decrease, from 2008 to 2018; and (3) corroborated the California Department of Toxic Substances Control's ("DTSC") conclusion that any indoor air contamination levels here do not pose a health risk to occupants. 1-ER-53-55. As noted above and discussed herein, Navarro has lived near the Refinery for over 25 years, never expressed any fear or annoyance due to Refinery operations to anyone, and concedes that he uses and enjoys his property.

## B. The First Four Years of Litigation (2017-2020)

Since this case was filed, Plaintiffs' theories and identities have evolved significantly over time. In February 2017, Plaintiffs Arnold Goldstein, John Covas, and Gisella Janette La Bella filed a putative class action alleging injuries arising from Refinery emissions based on a 2015 equipment malfunction within the Refinery that allegedly released certain non-hazardous materials into the air. *See* SER-133.

In July 2018, Plaintiffs filed a Second Amended Complaint that expanded the case, adding groundwater and subsurface soil contamination allegations. 36-ER-10537. Plaintiffs also sought to certify four subclasses relating to soil and groundwater contamination, operational emissions, explosion debris, and physical exposure, with the original plaintiffs (save Covas, who no longer wished to participate, *see* SER-110-14), plus new plaintiff Hany Youssef, as class representatives. SER-120-30. The Court denied the motion, finding that Plaintiffs' proposed class and subclasses had been defined too broadly. SER-96-109.

In May 2019, only Plaintiffs Goldstein and Youssef moved to certify two subclasses: (1) the Ground Subclass comprised of real property owners within the boundaries of groundwater plume maps attached to the declaration of their expert, W. Richard Laton, asserting claims for trespass, negligence, and strict liability; and (2) the Air Subclass comprised of "persons who currently own or lease property within the boundaries" identified in James J.J. Clark's expert declaration, asserting claims for nuisance, negligence, and strict liability. 27-ER-7698.

The motion was granted in part for (1) the Ground Subclass against TORC and ExxonMobil for trespass, under Rule 23(b)(3); and (2) the Air Subclass against TORC for the private and public nuisance claims, under Rule 23(b)(2). 1-ER-94. Plaintiffs subsequently redefined the Air Subclass in a manner that excluded Goldstein, leaving Youssef as the sole class representative. 1-ER-94.

6

### C. The Third Amended Complaint

In December 2020, after the close of fact discovery and the deadline for Plaintiffs' expert disclosure, Plaintiffs sought leave to file a third amended complaint naming Navarro as a plaintiff for the first time. 41-ER-11943, 1-ER-33. Plaintiffs argued that: (1) the amendment was limited to substituting Navarro for Youssef— who sold his home at a significant profit and with real estate disclosures that were inconsistent with his sworn statements in this case, SER-20-25, 28-74; 18-ER-4941- 42; 19-ER-5303; 21-ER-5819; and (2) would not prejudice Defendants because Navarro lived down the street from Youssef and presumably had the same claims. SER-76-85. The District Court granted leave based on Navarro's assurances that substituting him for Youssef would not "alter the claims in the case or much of the discovery or case strategy." 1-ER-30. But, recognizing the prejudice Defendants faced in combating Plaintiffs' shifting theories and identities throughout the litigation, it warned that if Navarro "proves to be inadequate, the Court will decertify the classes." 19-ER-5304-05.

The Third Amended Complaint ("TAC"), filed in August 2021, asserted causes of action for (1) private nuisance, (2) public nuisance, and (3) trespass, with Navarro as the sole representative plaintiff.[2] 19-ER-5213. It alleged that soil and

---

[2]   In June 2021, the Court dismissed Youssef, Goldstein, and La Bella from the action with prejudice, leaving only class claims. SER-13-14.

4876-9460-6047

groundwater contamination caused by Refinery operations "includes volatile chemicals which intrude into the surrounding properties below the surface level of those properties and which volatize into soil gas that harmfully intrude into those same properties both above and below ground." 19-ER-5219-20 ("soil gas contaminants further intrude into the residences … of the surrounding community exposing CLASS MEMBERS to harmful toxic substances on the land, and/or a lingering malicious odor, pollutants and noxious odors in the air").

Regarding Navarro's nuisance claims, the TAC alleged that TORC's operation of the Refinery:

> created a condition that harmed PLAINTIFF and interfered with PLAINTIFF'S free use and enjoyment of his land, as PLAINTIFF, along with numerous other neighbors, have suffered the loss of the use and enjoyment of their properties, in the form of damage to buildings and personal property, and/or exposure to an array of toxic substances on the land, and/or a lingering malicious odor, noise, soot, ash, and dust in the air.

19-ER-5221-22.

Regarding the trespass claim, the complaint further alleged that Defendants caused a trespass by "an array of toxic substances, a lingering malicious odor, noise, soot, ash, and/or dust." 19-ER-5223.

### D. Plaintiffs' Motion to Substitute Navarro and Decertification

Plaintiffs' October 2021 Motion to Substitute Navarro as Class Representative clarified the factual and legal bases of their nuisance and trespass claims. 41-ER-

11947. In particular, Plaintiffs' reply brief in support of that motion stated that the nuisance claims were based on an increased future risk of health effects due to air pollution from the Refinery, and abandoned any (1) claimed nuisance premised on soot, ash, dust, noise, or odor; and (2) trespass claim premised on soot, ash, and/or dust. 1-ER-31; 17-ER-4761; 17-ER-4763-64.

Conforming the trespass claim to the only evidence they had developed, Plaintiffs also confirmed that the alleged trespass claim was "premised on evidence that subsurface contamination from the Refinery poses a *vapor intrusion risk* to the *structures* in the class area." 1-ER-31 (emphasis in original); 17-ER-4761.

The Court denied Plaintiffs' motion and decertified both subclasses. *See* 1-ER-26; *infra* sections I.C., II.B. & III.

### E.    The Court Dismisses Navarro's Trespass Claim

In January 2023, Defendants moved for judgment on the pleadings, arguing that Navarro's trespass claim (1) could no longer stand following his judicial admissions and the Court's decertification order, (2) was contrary to California trespass law, and (3) was contradicted by his own admissions. The Court granted that motion, dismissing Navarro's trespass claim. 1-ER-25; *see infra* section I.A. & I.B.

9

### F. The Court Grants Summary Judgment on Navarro's Private and Public Nuisance Claims

Navarro's March 2023 Fourth Amended Complaint reasserted private and public nuisance claims against TORC premised on allegations about "an increased risk of developing cancer or [an]other harm … due to actual exposure to the emissions of toxic contaminants from the Refinery." 16-ER-4321-24. TORC moved for summary judgment, arguing that Navarro could not prove the substantiality or causation required for his nuisance claims and that he lacked admissible evidence that he faces a "'credible threat' or 'substantial risk' of future harm." 1-ER-4. The Court agreed and dismissed the entire case with prejudice. 1-ER-12; 41-ER-11954-55; *see infra* section II.A.

### SUMMARY OF THE ARGUMENT

1. The District Court properly granted judgment on the pleadings on Navarro's trespass claim. Navarro judicially admitted that his alleged trespass was premised on *soil vapor intrusion*—an intangible interference. Unless a plaintiff alleges damage to or the deposit of particulate matter on property (which Navarro did not do here), any alleged intangible property intrusion is not a trespass and instead must be dealt with under California nuisance law. (*Infra* sections I.A. & I.B.)

2. The Court also properly granted summary judgment on Navarro's nuisance claims because Navarro failed to proffer evidence raising a triable issue of fact that a future, theoretical health risk allegedly caused by Refinery emissions was

10

4876-9460-6047

a substantial interference sufficient to support a nuisance under California law. (*Infra* section II.A.)

The regulatory benchmarks and guidelines Navarro's expert claimed demonstrated an "unacceptable" risk were not applicable to Refinery emissions. Moreover, even if they could be applied, they did not establish that Navarro suffered a substantial harm due to exposure to Refinery emissions. Nor did that expert's theoretical health risk assessment prove exposure or substantial harm. And setting aside that purported expert testimony, Navarro's own testimony did not raise a triable issue that Refinery emissions were substantially offensive, seriously annoying, or intolerable. Finally, on appeal, Navarro claims for the first time that he allegedly faced an "additive" health risk from air emissions and exposure to subsurface contamination up to 260 times greater than that asserted in the District Court proceedings. In addition to being patently wrong, this argument is new and therefore waived.

3.    Although this Circuit need not reach these issues if it agrees with Appellees on the first two issues, Navarro's challenge to the decertification order fares no better. The Court properly exercised its discretion in decertifying the Ground and Air Subclasses based on (1) Navarro's testimony and judicial admissions, (2) Navarro's legal theories, and (3) California trespass and nuisance

11

law as applied to Navarro's proffered arguments and evidence. (*Infra* sections I.C & II.B.)

Here, the Court conducted a rigorous analysis of the elements of Rule 23(a) and (b), and correctly held that Navarro had not established by a preponderance of the evidence that Rule 23(a)'s commonality and typicality requirements had been satisfied for either subclass, that Rule 23(b)(3) had been satisfied for the Ground Subclass, or that Rule 23(b)(2) had been satisfied for the Air Subclass.

4.     And although, again, this Circuit need not reach this issue, the Court was well within its discretion in denying the Motion to Substitute. Navarro failed to satisfy Rule 23(a)(4)'s requirements because (1) he was atypical and inadequate to serve as class representative, and (2) class counsel was inadequate. (*See infra* section III.)

That conclusion was supported by evidence that Navarro was willing to forego a remedy that would appeal to absent class members; Navarro did not demonstrate an intent to vigorously prosecute the class claims; and Navarro's counsel had engaged in numerous missteps during the pendency of the litigation that undermined their fiduciary obligations to the class.

## STANDARD OF REVIEW

A district court's decision to grant or deny summary judgment or a summary adjudication motion is reviewed de novo. *Desire, LLC v. Manna Textiles, Inc.*, 986

12

F.3d 1253, 1259 (9th Cir. 2021). A decision to grant judgment on the pleadings is reviewed de novo, and "is properly granted when, taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Dunlap v. Credit Protection Ass'n LP*, 419 F.3d 1011, 1012 n.1 (9th Cir. 2005) (per curiam) (cleaned up). Finally, a district court's decision regarding class certification is reviewed for an abuse of discretion and "will be upheld unless it 'identified [or] applied the [in]correct legal rule' or its 'resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020).

## ARGUMENT

### I. Navarro's Trespass Claim was Properly Dismissed and Decertified

#### A. Navarro made an unequivocal judicial admission that his trespass claim was premised on an alleged vapor intrusion risk.

"Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). "Not only are such admissions … binding before the trial court, but they are binding on appeal as well." *Id.* (cleaned up).

When seeking to serve as class representative, Navarro affirmatively stated that "[t]he trespass claim asserted on behalf of the Ground Subclass *remains*

13

4876-9460-6047

*unchanged*. It is premised on evidence that subsurface contamination from the Refinery poses a *vapor intrusion risk to the structures in the class area*." 17-ER-4761 (emphasis added); *see also* 17-ER-4643-44[3] (Navarro's counsel confirming at the hearing on the Motion to Substitute "we're dealing with subsurface contamination … which is benzine [sic] in the soil vapor which *we've alleged is intruding into the indoor air of the class members*") (emphasis added).

In dismissing Navarro's trespass claim, the District Court within its discretion "considere[d] this statement a judicial admission" about the nature of his allegations—i.e., Navarro was seeking relief for soil vapor intrusion that cannot be properly deemed a trespass under California law. 1-ER-23; *American Title Ins. Co.*, 861 F.2d at 227 ("statements of fact contained in a brief may be considered admissions of the party in the discretion of the district court").

Navarro argues for the first time on appeal that he made no judicial admissions, and that he "did not abandon trespass claims based on physical intrusion of pollutants into the soil and groundwater of his property." OB 27 (further arguing the Court ignored "allegations that the Refinery caused a subsurface plume of toxic

---

[3]  Navarro cites the hearing transcript as evidence that his trespass claim addresses "subsurface contamination," Opening Brief ("OB") 32, but that does not alter Navarro's admission that the alleged <u>property interference</u> for that claim is vapor intrusion.

substances to intrude into the soil and groundwater on Navarro's property").[4] Because this argument was not "raised sufficiently for the trial court to rule on it," it is waived. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992).

Despite several opportunities below, Navarro never argued in opposing dismissal of his trespass claim that construing his prior statement as a judicial admission would be improper or that his judicial admission was inadvertent, incorrect, or misconstrued. Instead, Navarro doubled down: he stood by his representations as the factual and legal basis for his trespass claims, and he did not dispute this characterization of his claims when opposing Defendants' motion for judgment on the pleadings. 16-ER-4376, 16-ER-4344 ("Navarro does not dispute that, as he represented in his Reply, his trespass claim is premised solely on intrusion by 'chemical vapors.'"). He instead argued (incorrectly) that soil vapor intrusion—which he admits "can't be seen, [] can't be smelled, [and] can't be heard," 16-ER-4403, 16-ER-4486—can be deemed a "tangible" trespass under California law

---

[4] While the TAC generally alleged that the Refinery caused groundwater and soil contamination, OB 29-30, soil vapor intruding onto Navarro's property has always been the professed "interference" underlying his trespass claim. The groundwater and soil contamination described in the TAC is simply the alleged source of that soil vapor. 1-ER-82 ("Youssef contends that his property shows elevated levels of certain harmful soil vapors [], which the groundwater then carries onto his property before it dissipates through the soil.").

15

despite not physically interfering with or damaging his property. *See* 16-ER-4376-80.

Given this record, the District Court properly exercised its discretion in finding Navarro's characterization of his trespass claim was a judicial admission. 1-ER-24; *see also Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557 (9th Cir. 2003). This Circuit should therefore disregard the various trespass theories Navarro now seeks to recast on appeal. OB 27-31.

This Circuit should also reject Navarro's newly-raised suggestion that his counsel may have "advocated for a narrower theory of liability in the context of class certification" than Navarro presumably wished to pursue individually. OB 48. That is both disingenuous and wrong. Navarro's admission was made to salvage the class action by conforming his claim to the only evidence he could identify to try to support typicality after several years of litigation, *see* 17-ER-4761-62 (citing soil gas data), and Appellees relied on that admission. In any event, Navarro's brief discussed the trespass claim as being asserted "*on behalf of himself* and the Ground Class"—not just on behalf of the class. 17-ER-4761 (emphasis added). And Navarro did not even back away from that admission when opposing a motion to dismiss his own *individual* claims. Navarro cannot now walk away from his judicial admission because it ultimately undermined his trespass claim. *See Gospel Missions*, 328 F.3d

16

at 557 (statement made in a brief binding judicial admission where plaintiff "tried to benefit from the admission," and defendant relied on it).

Navarro wrongly asserts that the judicial admission doctrine applies only to factual statements and is "not a basis for the court to find abandonment of legal theories." OB 33. But the cases Navarro cites do not support that claim.[5] In *Singer v. State Farm Mutual Automobile Insurance Company*, 116 F.3d 373, 376 (9th Cir. 1997), for example, this Circuit simply stated that a waiver or stipulation to submit to federal jurisdiction cannot avoid a defect in jurisdiction and that a judicial admission of fact was not such a waiver or stipulation. *Id.* And it found that the trial court reasonably accepted a judicial admission "made in open court by the plaintiff's attorney" about the amount in controversy in denying the plaintiff's motion for remand. *Id.* This Circuit should do the same here—the District Court "reasonably exercised [its] discretion to accept" Navarro's own characterization of the basis for his claim and dismissed that claim on that basis. *See id.*

### B. The District Court properly granted judgment on the pleadings on Navarro's trespass claim.

This Circuit should affirm the dismissal of Navarro's trespass claim. Because Navarro limited his trespass theory to soil vapor intrusion and did not allege "the

---

[5] *MacDonald v. General Motors Corp.,* 110 F.3d 337, 340-41 (6th Cir. 1997), simply found that the district court was within its discretion to reject as judicial admissions statements that (unlike here) were "guarded" and "qualified."

deposit of particulate matter on his property" or physical property damage, the Court correctly held that under *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal.4th 893, 937 (1996) ("*SDG&E*") and *Wilson v. Interlake Steel Co.*, 32 Cal. 3d 229, 233 (1982), "Navarro's allegations ... do not support a trespass claim," as opposed to a nuisance claim. 1-ER 24 ("imperceptible substances must either (1) deposit particulate matter upon the plaintiffs' property or (2) cause actual physical damage thereto to constitute a trespass" (citation and quotation omitted)).

On appeal, Navarro acknowledges that a trespass must be premised on "an unauthorized and tangible entry on or into the plaintiff's land." OB 26 (emphasis added). Indeed, the California Supreme Court in *Wilson* recognized that "[a]ll intangible intrusions, such as noise, odor, or light alone, are dealt with as nuisance cases, not trespass," except for claims premised "upon the deposit of particulate matter upon the plaintiffs' property or on actual physical damage thereto." 32 Cal. 3d at 232-33.

Nevertheless, Navarro argues that "soil vapor physically intruding into Navarro's property is not 'intangible'" and specifically that "[b]enzene is a tangible

18

substance" present in air. OB 34. That argument was not raised in the District Court and is therefore waived. [6] *Whittaker Corp.*, 953 F.2d at 515. It is also wrong.

In opposing judgment on the pleadings, Navarro argued that: (1) "Benzene, a volatile organic compound, is a *measurable* substance that … Plaintiff alleges is found embedded in Plaintiff's soil," and (2) "result[s] in *tangible consequences*: long-term exposure to harmful contaminants, […] is proven to lead to adverse health effects." 16-ER-4378 (emphasis added).[7] That argument is different from what Navarro is now arguing for the first time on appeal—that airborne benzene soil vapor is itself tangible and interfered with his possession of his property.

In any event, that a vapor is "measurable" does not establish that it tangibly interferes with the possession of property in violation of California trespass law. If that were true, the California Supreme Court would not have rejected trespass claims premised on unquestionably measurable, but still imperceptible "electric and magnetic fields arising from powerlines." *SDG&E*, 13 Cal.4th at 937. California

---

[6] The "facts" Navarro points to in support of this argument were also not presented to the District Court and this Circuit should decline to take judicial notice of them. Response to Motion for Judicial Notice, Dkt. 27-1.

[7] Navarro's argument below was consistent with his TAC allegations: "soil and groundwater contamination remains today and these plumes of harmful contaminants, including Benzene … have consistently volatized into gases and vapors ('soil gas') in the areas above these plumes." 19-ER-5214.

trespass law is clear: there must be deposit on or damage to Navarro's property to support a trespass.[8]

Navarro argues that "courts have repeatedly held that the intrusion of 'soil vapor' can contaminate soil, supporting the assertion that vapors of benzene and other toxins are tangible." OB 35-36. But none of the cases Navarro cites establish that California trespass claims may be based on only allegations of airborne soil vapor intrusion into a home.

Navarro also argues that "[d]ue to the advance of science, the meaning of 'tangible has been relaxed almost to the point of being discarded,' with courts holding that 'microscopic particles' can give rise to trespass." OB 36. But neither of the cited cases support that notion, let alone say that. *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1566-67 n. 6 (1996), simply acknowledged a Washington state case regarding microscopic particles and reaffirmed the California Supreme Court's rule that "migrating intangibles" can result in a trespass only if they "cause damage." And *Elton v. Anheuser-Busch Beverage Group, Inc.*, 50 Cal.App.4th 1301 (1996), involved a fire that caused "actual damage" to the plaintiff's property and cursorily

---

[8] Navarro's citations, OB 34-35, do not alter this conclusion. *Pac. Gas & Elec. Co. v. Zuckerman*, 189 Cal. App. 3d 1113, 1139 (1987) (condemnation case addressing ownership of gas stored underground, rather than any actual escape of gas); *MDR Hotels, LLC v. Dow Chem. Co.*, 2024 WL 650406, at *6-8 (C.D. Cal. Jan. 5, 2024) (addressing oil and gas that caused blowouts resulting in *gas, saltwater, and sand* rushing to surface).

4876-9460-6047

cited an Oregon case regarding compounds that *deposited* on the land and made it unsuitable for livestock.

Here, Navarro alleged neither property damage nor that particulate matter deposits on his property. 1-ER-24. Navarro agrees he failed to "use the magic words," but nonetheless argues that the TAC sufficiently alleges that particulate matter was deposited because it alleges that "contamination of the soil and groundwater" includes volatile chemicals that have contaminated the land itself. OB 39.[9] But this ignores Navarro's judicial admission that his trespass claim is based on soil vapor intrusion alone.

Finally, despite the fact that, as his counsel admitted below, the soil vapor at issue "can't be seen, [] can't be smelled, [and] can't be heard," 17-ER-4644, Navarro argues that the "gases and vapors" that allegedly intruded into his home are nonetheless "particulate matter." OB 39 ("'[P]articulate matter' is a term synonymous with tangible physical substance, regardless of whether that substance is immediately perceptible."). To justify this implausible claim, Navarro relies on a 40-year-old Washington case that *rejected* a trespass claim because "substantial

---

[9] Navarro adds that "[b]y alleging harmful health effects and requesting remediation of the contamination of his land, the complaint also effectively alleged that the contamination damaged Navarro's property." OB 39-40. But Navarro did not argue that the soil *vapor* forming the sole basis of his trespass claim (which is different from *liquid* benzene, 16-ER-4377-78) caused physical property damage.

21

damages to the *res*" is required to establish a trespass by air pollution. *Bradley v. Am. Smelting & Ref. Co.*, 104 Wash.2d 677, 691-92 (1985) ("When airborne particles are transitory or quickly dissipate, they do not interfere with a property owner's possessory rights and, therefore, are properly denominated as nuisances … When, however, the particles or substance accumulates on the land and does not pass away, then a trespass has occurred.").

The District Court properly granted judgment on the pleadings under these circumstances.

### C. The District Court did not abuse its discretion in decertifying the trespass class claim.

Navarro argues that the District Court abused its discretion in decertifying the Ground Subclass as to the trespass claim. There is no need to address that issue, unless this Circuit reverses the judgment on the pleadings against Navarro. *Bustamante*, 100 F.4th at 434 ("Because we affirm the District Court's grant of summary judgment … the issue of class decertification is now moot."). If this Court does reach the issue, though, it should affirm.

A court may within its discretion "sua sponte alter, amend, or vacate [a] certification Order at any time before a decision on the merits is made." *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 410 (C.D. Cal. 2000); *see Westways World Travel, Inc. v. AMR Corp.*, 265 Fed. Appx. 472, 475 (9th Cir. 2008) (courts have

"broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings").

And, as relevant here, decertification is appropriate where the evidence "has ripened into doubt regarding the continuing efficacy of a class action in [the] case." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 480 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942, 945 (9th Cir. 2011); *United Steel, Paper & Forestry, et al. v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) ("[A] district court retains the flexibility to address problems with a certified class as they arise, including the ability to decertify.").

In assessing whether to decertify a class, a court "must conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996). To satisfy that inquiry, plaintiffs must "affirmatively demonstrate" with evidentiary proof that each of Rule 23(a)'s requirements—numerosity, commonality, typicality, and adequacy—as well as Rule 23(b)'s requirements, are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

Moreover, a "class certification decision may be affirmed on any ground supported by the record." *Castillo*, 980 F.3d at 928. Here, the District Court appropriately decertified the Ground Subclass on four different grounds: (1) Navarro was not an adequate class representative, *see infra* section III; (2) the Ground

23

Subclass could not establish commonality; (3) the Ground Class did not satisfy Rule 23(b)(3); and (4) Navarro's trespass claim was not typical of the putative class's claim. Any of these grounds warranted decertification, and Navarro fails to demonstrate any error, let alone one requiring reversal.

### 1. Navarro's trespass claim failed the typicality inquiry.

A class representative's claims or defenses must be typical of those of the class, Fed. R. Civ. P. 23(a)(3), "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (1992). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id*.

The District Court here correctly held that Navarro did not satisfy "typicality" because "he did not have the same or similar injury as absent class members, as evidenced by the numerous differences between Navarro and Youssef, and between Navarro and the allegations in the operative complaint, the Corrected TAC." 1-ER-56.

On appeal, Navarro contends that he alleged "'the same or a similar injury' as the Ground Subclass, resulting from 'a course of conduct that is not unique' and … 'at the center of the class claims"—specifically, the alleged "elevated risk to human

24

health due to harmful contaminants from the Refinery." OB 87-88. But that purported injury—which essentially forms the entire basis of Navarro's typicality argument on appeal, *see* OB 87-88—supports neither an individual nor a class-wide trespass claim, and does not demonstrate that the Court abused its discretion in finding a lack of typicality here (based on evidence that was actually relevant to the Ground Subclass claim).

The Court noted that, unlike Youssef, Navarro did not seem to be asserting an actionable trespass claim. 1-ER-89 (a trespass claim requires "something tangible to enter [a plaintiff's] property"). Navarro's purported trespass was characterized as "subsurface contamination" that "poses a vapor intrusion risk to the structures in the class area" via indoor air. 1-ER-63 (citing 17-ER-4761). By contrast, the abandoned allegations in Plaintiffs' TAC characterized the trespass as one based on allegations of "odor, noise, soot, ash, and/or dust." 18-ER-5223. Indeed, as discussed *infra*, Navarro complained only of occasional odor, an intangible that is not an interference with or damage to real property and can only be addressed under California nuisance law. *SDG&E*, 13 Cal.4th at 936; *Wilson*, 32 Cal.3d at 23.

Therefore, the District Court observed, "the only 'trespass' claims Navarro might have in common with the absent class members are not viewed as a trespass at all." 1-ER-39.

4876-9460-6047

The District Court further found that Navarro's own testimony undercut any typicality claim, except to the extent the evidence suggested that no one in the Ground Subclass has a trespass claim at all. *Id.*

Navarro testified that he had not experienced any of the harms alleged in the TAC other than odors he claims to smell 10 to 12 times a year *outside*—not inside (i.e., not in the "structure" of his home). 17-ER-4761. The District Court drew the obvious conclusion that an odor outside is not evidence of vapor intrusion indoors and noted that Plaintiffs had proffered no expert evidence of odor. 1-ER-64-65. Moreover, Plaintiffs' own data demonstrated that benzene, the contaminant allegedly creating a health risk, was for the most part present in the indoor air of homes at *lower levels* than in outdoor ambient air. 1-ER-65 (citing 27-ER-7641-42; 30-ER-8609, 30-ER-8612-13, 30-ER-8713). That is not evidence of vapor *intrusion.*

Even if the Ground Subclass could sustain a trespass claim, Navarro's testimony did not demonstrate that he himself had experienced an "interference" rising to the level of a viable trespass. 1-ER-65. Notably, his experience was markedly different from that of Youssef, his neighbor, which also militates against typicality. Navarro initially testified that the ground smelled of petroleum, but when pressed for details, clarified that he was referring to his experts' conclusions and that he had not personally smelled petroleum in his yard. *Id.* (citing 18-ER-4908-09). And, unlike Youssef, Navarro further testified that he had "never changed his plans

26

due to smell from the ground," 1-ER-65; cf. 40-ER-11631, and did not think something in the ground was killing his plants. 1-ER-65; cf. 40-ER-11631. As the Court observed, in contrast to Youssef's initial testimony, Navarro's claimed trespass, by his own admission, did not interfere with his possession of his property or cause any damage to it. 1-ER-65. Finally, as the Court noted, Navarro had not acted upon or told anyone about *any* of the concerns he raised on behalf of the class in the litigation. 1-ER-65-66.[10]

Ultimately, those many profound differences between Navarro's injuries and those alleged in the TAC, and between Navarro's experiences and Youssef's at their respective properties, undercut any claim that Navarro's claims as the proposed class representative were typical of the Ground Subclass. 1-ER-41. Plus, Navarro's sworn admissions effectively disavowing any harm to himself meant that Defendants would have had a unique defense against Navarro's trespass claim that could jeopardize absent class members' recovery. *Id.* As the Court correctly observed, "if he doesn't have a personal claim, then I don't know how he can represent the class." 17-ER-4662.

---

[10] The District Court also noted that Plaintiffs proffered no evidence that anyone remaining in the case or subclass still shared the purported concerns Navarro specifically expressed or the TAC generally alleged. 1-ER-65.

Accordingly, the Court correctly decertified the trespass claim because Navarro failed to satisfy typicality under Rule 23(a)(3).

### 2. Navarro's trespass claim did not present common questions appropriate for class certification.

In reevaluating class certification, the District Court also found that individual, property-specific issues rendered Navarro's trespass claim inappropriate for class certification. The District Court's 2019 certification order was made before Navarro judicially admitted the limits of his trespass claim. *See supra* section I.A.; 1-ER-24 (trespass based on "vapor intrusion risk to the structures in the class area"). Because Navarro subsequently abandoned any trespass claim based on the mere presence of contamination in soil or groundwater, the Court properly determined that its prior commonality findings no longer applied for two reasons. *See* 1-ER-53-55.

*First,* as the Court found, because "vapor present in indoor air" is "not properly dealt with as a trespass," Plaintiffs' evidence of vapor in certain homes could "not support the inference that there is a trespass with respect to all members in the Ground Subclass area." 1-ER-55.

In response, Navarro argues that the Court improperly and prematurely considered the merits in its decertification order. OB 75-78. But the Supreme Court has rejected such an artificial divide, holding instead that courts must conduct a "rigorous analysis" to determine whether Rule 23(a) is satisfied that will often "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564

28

U.S. at 350-51; *see also Comcast Corp. v. Behrend*, 569 U.S. at 27, 33-34 (2013) (criticizing lower court's "refus[al] to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. [A] district court *must* consider the merits if they overlap with the Rule 23(a) requirements.") (emphasis in original).

Accordingly, the District Court did not engage in any improper inquiry. Instead, it recognized that certain trespass claims are more appropriately examined on an individual basis—in this case, to determine whether and where vapor intrusion is occurring within the Ground Subclass area. *See* 1-ER-53-54.

Because vapor intrusion is intangible, the trespass claim would require proof as to each property that vapor intrusion resulted in "the deposit of particulate matter upon the plaintiffs' propert[ies]" or "actual physical damage" to those properties. *See Wilson*, 32 Cal. 3d at 232; *SDG&E*, 13 Cal. 4th at 935-37. Such individualized analyses, with potentially disparate results among properties, cannot be squared with the commonality requirement.

***Second,*** the District Court held, long after the close of fact discovery and Plaintiffs' expert disclosures, that Navarro could not satisfy commonality because

29

he had not proffered any evidence of a class-wide trespass claim based on vapor intrusion.

In so doing, the District Court appropriately examined Navarro's evidence in support of the class-wide trespass claim to determine whether it satisfied the rigors of Rule 23 and established sufficient common injury in light of Navarro's judicial admission that the Ground Subclass's trespass claim was premised solely on interference by vapor intrusion.

Simply put, it did not. That evidence included: (1) community indoor air testing results, which failed to prove vapor intrusion; (2) the fact that those indoor air testing results had remained relatively unchanged, and even tended to decrease, from 2008 to 2018; and (3) DTSC's conclusion that any indoor air contamination levels here do not pose a health risk to occupants. 1-ER-53-55. Accordingly (and with good reason), the Court was "not persuaded that members of the Ground Subclass suffer a common injury, if any." 1-ER-54.

While Navarro may dispute how the District Court interpreted the evidence, he cannot meaningfully dispute that the evidence did not establish that vapor intrusion resulted in deposition of particulate matter on, or physical damage to, properties in the Ground Subclass.[11] He has not argued it, and his experts certainly

---

[11]  Navarro notes that pollution is a "compensable harm[] which can be redressed with recovery costs to abate and clean up contaminated groundwater and soil." OB

did not opine upon it. Accordingly, the Court did not abuse its discretion in considering this evidence and concluding that its "truth or falsity" would not resolve a common question dispositive of the Ground Subclass's trespass claim. *Dukes*, 664 U.S. at 350.

Navarro argues that other courts have certified trespass claims where a "common source contaminates proposed class members' properties." *See* OB 74. While that may be true, here the alleged trespass is intangible vapor intrusion, and Navarro cannot prove on a class-wide basis that alleged vapor intrusion resulted in "the deposit of particulate matter upon the plaintiffs' propert[ies]" or "actual physical damage" to those properties. *Wilson*, 32 Cal. 3d at 232; *SDG&E*, 13 Cal. 4th at 935-37 (1996). Navarro's assertion that the Court somehow improperly "discount[ed]" the alleged "health risks class members faced from soil vapor intrusion" is irrelevant absent physical damage to property, which Navarro did not claim.[12] OB 76.

---

76. That does not alter the analysis, particularly given that Navarro limited the Ground Subclass's claim to trespass by vapor intrusion.

[12]   The purported health risk evidence Navarro cites does not relate to common proof that vapor intrusion resulted in "the deposit of particulate matter upon" or "actual physical damage" to properties in the Ground Subclass area, and thus may be disregarded. *Wilson*, 32 Cal. 3d at 232; *SDG&E*, 13 Cal. 4th at 935-37 (for purposes of trespass, "a risk of *personal* harm to [] occupants, [] is manifestly different from damage to the property itself").

31

The cases Navarro cites all involve alleged property contamination that, unlike here, was clearly *tangible*. The release of jet fuel engulfing the community in *In re Delta Air Lines, Inc.*, 2023 WL 2347074, at *3 (C.D. Cal. Feb. 8, 2023), resulted in properties being "doused in liquid jet fuel" that deposited as residue in backyards, gave the ground a wet appearance, and caused fogginess on the windows of homes.

In *Andrews v. Plains All Am. Pipeline, L.P.*, 2018 WL 2717833 (C.D. Cal. Apr. 17, 2018), class members either owned or rented residential property located on or with access to a common, oil-impacted coastline, and the court was satisfied that plaintiffs' expert's model would show "which properties experienced oiling," i.e., a tangible impact. *Id.* at *9-10. Here, in contrast, Navarro attempts to base class claims on an undeposited gas.

Thus, the Court did not abuse its discretion in finding that individual, property-specific issues rendered Navarro's trespass claim insufficiently "common" for class treatment.

### 3. The Ground Subclass did not satisfy the "predominance" requirement.

Navarro fares no better in challenging the District Court's finding that common questions did not predominate over individualized ones. 1-ER-68-70. In determining predominance, a court must evaluate whether common questions prevail over individualized ones. "[A] common question is one where the same

32

evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452 (2016). The standard for certification imposed by Rule 23(b)(3) is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

Here too, Navarro erroneously argued that his trespass claim was not limited to soil vapor intrusion. For all the reasons described in *supra* section I.A., this argument fails. The District Court properly tethered its analysis to Navarro's claims as he argued them then, not as he would argue them now. *See* 1-ER-69.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). As Navarro's lawsuit evolved, so too did the theory of the trespass claim, which shifted to "a vapor intrusion risk to the structures in the class area." 17-ER-4761. The District Court thus properly revisited its prior certification ruling and reassessed whether common questions capable of class-wide proof predominated with respect to the Ground Subclass's trespass claim. *Wilson*, 32 Cal. 3d at 232.

As the Court noted, its prior certification ruling had been "based on Plaintiffs' expert's mapping of soil vapor detections which purport to be able to prove the extent of soil and groundwater contamination on a class-wide basis." 1-ER-69. This

33

mapping by Laton, Plaintiffs' expert, even if assumed reliable, would at best serve as evidence that some level of soil and groundwater contamination exists in the Ground Subclass area. It would not demonstrate that airborne *vapor intrusion*, the sole remaining interference purportedly supporting a trespass claim, is occurring consistently throughout the Ground Subclass area. 1-ER-69.

### a. Individual questions predominate in analyzing the trespass claim.

In decertifying the Ground Subclass, the District Court found that individual inquiries into each class member's claim for trespass would predominate. 1-ER-69-70. Navarro did not proffer evidence demonstrating that every putative class member could realistically attribute soil vapor at his or her property to contamination from the Refinery. 1-ER-69 (citing 27-ER-7645). Nor did Navarro proffer evidence of vapor intrusion into each class member's property; in fact, the Court found that Navarro's own evidence tended to refute the potential for vapor intrusion throughout the Ground Subclass area. *Id.*

Specifically, Navarro's indoor air sampling data indicated that benzene levels were lower than the maximum outdoor ambient concentrations at 14 of 16 residences sampled in 2018 and 2019, indicating not just that there was substantial variation,

34

but also that there was that potentially *no* measurable vapor intrusion occurring. 1-ER-70.[13]

The District Court's predominance ruling is consistent with other courts' decisions considering other proposed property contamination class actions. *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 305 n.70 (S.D. Ala. 2006) ("[A] property-by-property inquiry will unquestionably be necessary to determine whether that source [of contamination] and that pathway have any bearing on the experience of a particular property owner within the Proposed Class Area.").

For example, *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 382 (C.D. Cal. 1997), held that, despite numerous potential common questions of law and fact, individual questions nevertheless predominated in a proposed property owner subclass where, "Plaintiffs [had] not explained how class-wide determination of exposure levels for certain areas will contend with the fact that two properties next

---

[13] Navarro contends that variation in soil vapor intrusion levels is immaterial. OB 83-84. But Navarro never explains how this variation—which includes properties with no evidence of vapor intrusion at all—could be immaterial to a class claim of trespass by vapor intrusion. Navarro asserts that each of the "zones" Laton identified corresponds to different levels of alleged health risk linked to his model of **soil contamination** (not vapor intrusion into real property structures) and conflates this purported common evidence of health risk with common evidence of trespass. *Id.* However, a model depicting zones of theoretical health risk does nothing to demonstrate the deposition of particulate matter on, or "actual physical damage" to, properties within those zones as a result of intangible vapor intrusion. *SDG&E*, 13 Cal. 4th at 936-37 (1996).

4876-9460-6047

to each other may have different contamination levels because the alleged releases of hazardous substances are affected by [ . . . ] groundwater flow, etc." *Id.* (rejecting plaintiffs' computer model because individual examination of each subclass property was necessary to determine exposure); *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 272 (3d. Cir. 2011) (no abuse of discretion in finding individual questions predominated given "potential difference[s] in contamination on the properties" because "varied levels of vinylidene chloride at various times seeped into a shallow aquifer, degraded into vinyl chloride, diffused from the aquifer to the ground above, and evaporated into the air to be carried over the village").

Accordingly, the District Court properly found here that Navarro's class-wide proof could not establish that something tangible trespassed onto the Ground Subclass's properties and thus could not establish predominance. 1-ER-70.

### b. Laton's plume map was not sufficient "common evidence" that would satisfy Rule 23(b)(3).

On appeal, Navarro argues that Laton's "benzene isoconcentration map" constitutes common proof of the "contamination of all properties" in the Ground Subclass. OB 81. But Laton's map purports only to show *subsurface* contamination, and Navarro had narrowed the trespass claim to *airborne vapor intrusion* into real property structures.

As TORC's expert testified, Laton's plume map is not adequate common proof because, for multiple reasons, it is not a reliable predictive model for the

36

presence or concentration of soil vapor, let alone vapor intrusion into individual properties. 27-ER-7642. First, the presence of soil vapor is typically "not evaluated with mathematical models," but by collecting samples for a direct assessment. *Id.* Because not enough soil vapor samples were collected at the off-site areas here, a model cannot reliably predict the extent of petroleum hydrocarbons in soil vapor or establish their presence is associated with a Refinery source. *Id.*

Second, Laton's data were "sparse, show a high variation in concentration over a relatively short distance, are not attributable to a known source, and the contours do not conform with the actual data." *Id.* To reliably build and use a mathematical vapor migration model, Laton needed to (but did not) consider extensive and variable parameters including soil permeability, porosity, moisture, and organic carbon content. 27-ER-7643 (citing DTSC and Regional Board guidance documents).

And that leads to the third problem: No such model was created to actually identify the fate, transport, and composition of soil vapor in the Ground Subclass area, even though that was critical to determining the source of any soil vapor detected and the potential for vapor intrusion. 27-ER-7643-47 (TORC's expert explaining the concept and relevance of fate and transport to this inquiry, the low likelihood that one could reliably conclude based on available data that soil vapor

from a Refinery-related source has contributed to soil vapor in the Ground Subclass area, and contradictions in Laton's maps).

Given these complexities and the model's unreliability, the Court did not abuse its discretion by concluding that Laton's plume map could not constitute common evidence of vapor *intrusion* into homes in the Ground Subclass area, or of a "zone of impact" for vapor intrusion (*see* OB 81), particularly given contrary evidence that actual indoor air samples did not indicate vapor intrusion. [14] 27-ER-7638-42.

Finally, whether the Refinery contributed to a source of benzene (*see* OB 82-83) that could ultimately result in soil vapor intrusion into properties in the Ground Subclass area might be relevant to causation. But that inquiry is nowhere near enough to establish predominance, given the Ground Subclass's focus on vapor intrusion. Accordingly, the Court did not abuse its discretion by concluding that this narrowed claim could not satisfy predominance.

---

[14] *Andrews* and *Delta* do not support Navarro's arguments. OB 78-79. In those cases, class-wide evidence was proffered to show the distribution of oil—the liquid substance actually alleged to form the basis of a trespass—in the class area. *Delta*, 2023 WL 2347074, at *14 (under California law, class-wide proof of physical damage or the deposit of particulate matter is required to prove a trespass by an intangible pollutant); *Andrews*, 2018 WL 2717833, at *9.

38

### c. There was a lack of common proof as to the abatement remedy sought by the Ground Subclass.

In its Rule 23(b)(3) analysis, the District Court expressed concern that the Ground Subclass lacked common evidence to support a class-wide remedy, pointing to the fact that Plaintiffs' experts, over the course of years of litigation, had "offered *no opinion* on required cleanup levels for impacted soil vapor."[15] 1-ER-70. Indeed, Laton testified that determining appropriate cleanup levels was outside the scope of his expert opinion. 1-ER-70-71.

While Laton did state that groundwater extraction wells and soil vapor extraction systems could generally be used for abatement throughout the Ground Subclass, OB 84, he also agreed that each property's particular construction methods would result in different (i.e., individualized) remedial measures. 1-ER-71. Laton also admitted that his soil vapor mapping does not contemplate the differences that would inevitably arise in remediation of residential versus commercial properties. *Id.*

Given Laton's admission that more investigation would be necessary to identify the proper remedy for each individual property, the Court properly found

---

[15] Navarro argues that the District Court erred in concluding that "plaintiffs could not use common proof to establish how abatement or remediation could be performed," OB 84, but the Court found only that Navarro's proffered evidence failed to establish how remediation could be performed on a classwide basis.

that those admissions confirmed that the Ground Subclass's trespass claim could not be resolved by common proof and thus failed predominance. *Id.*

### d. The Ground Subclass's trespass claim also fails the superiority analysis.

The District Court also correctly found that the Ground Subclass's case presented such extensive individual issues that it defeated any potential benefit from allowing it to proceed as a class action. 1-ER-71; *e.g.*, *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975) (superiority determinations lie "in an area where the trial court's discretion is paramount").

Generally, in assessing superiority, courts consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).[16]

The District Court's reevaluation of the predominance factor, following the close of fact discovery and Plaintiffs' expert disclosure deadline, underscored the flaws in Navarro's superiority arguments: (1) Plaintiffs had "no reliable way to

---

[16] These factors are pertinent to a court's "close look" at Rule 23(b)(3)'s related predominance and superiority criteria. *Amchem Prods., Inc.*, 521 U.S. at 615-16. The District Court here found that the predominance inquiry weighed against class certification. 1-ER-71.

4876-9460-6047

establish the extent of vapor intrusion using class-wide proof"; (2) it was "uncertain whether vapor intrusion [was] even taking place in the properties located in the Ground Subclass"; and, (3) both Navarro, the proposed named plaintiff, and unnamed class members lacked interest in pursuing the claim (evidenced in part by the numerous previous plaintiffs that had dropped out and the fact that, years after its filing, Navarro was the best named plaintiff class counsel could find). 1-ER-72.

The District Court also reexamined its 2019 finding that a class action was the superior method because damages in any individual trespass action were likely to be modest. 1-ER-92. As the Court noted, the Ground Subclass did not seek damages for the alleged trespass, but rather sought abatement or the cost of abatement. *Id*. According to Laton, the total abatement cost for the proposed Ground Subclass allegedly totals more than $155 million. *Id*. For Zone A alone, abatement could cost as much as $1,656,375 per property. *Id*. The Court noted that this was far from the modest stakes Plaintiffs emphasized in their original class certification briefing. *Id*.[17]

This decision did not, as Navarro claims (OB 85), conclude that only cases involving "modest stakes" can be certified—it simply looked at the $155 million price tag of an unduly broad and complex proposed remedy that could only be

---

[17] The Court further found that the proposed costs of Laton's abatement plan demonstrated that the Ground Subclass's case did not contemplate nominal damages, as originally envisioned by the Court, and that significant individualized issues would predominate in resolving the Ground Subclass' damages claims. 1-ER-72.

41

reached after resolving a host of individualized issues, and decided that this remedy would be best pursued in an individual action by any landowner that was actually interested (if any still existed).[18]

For these reasons, the Court properly concluded that the Ground Subclass, following years of shifting theories and plaintiffs, no longer satisfied Rule 23(b)(3).

## II.     The District Court Properly Rejected Navarro's Nuisance Claims

### A.     The District Court properly granted summary judgment against Navarro on his nuisance claims.

The District Court properly granted summary judgment on Navarro's nuisance claims because there is no evidence that Plaintiff has suffered any injury to his health. *See* Civ. Code § 3479.

On appeal, Navarro challenges the District Court's finding that he had presented "at most a scintilla of evidence" that was insufficient to raise a triable issue of fact and that "[n]o reasonable juror could find by a preponderance of the evidence that the alleged nuisance [was] substantial." 1-ER-12. But that was an accurate assessment of Navarro's evidence, or lack thereof. The Court properly applied California law and correctly found no genuine issue as to any material fact and granted TORC's summary judgment motion.

---

[18] The District Court observed that, even if additional related cases were filed, they could be adequately handled in a coordinated mass action and consolidated for pre-trial purposes. Manual for Complex Litigation, Fourth §10.123.

4876-9460-6047

Navarro nevertheless claims that the District Court committed several "legal errors," including allegedly: (1) focusing "exclusively on evidence of health risks from *air* emissions, ignoring evidence of substantial harm caused by the Refinery's *subsurface* contamination"; (2) discounting "expert testimony regarding the harmful effects of the Refinery's contamination by relying on only one of several relevant regulatory standards," the South Coast Air Quality Management District's [19] ("SCAQMD") Rule 1402, "rather than drawing all inferences in favor of Navarro"; and (3) "appl[ying] incorrect legal principles to discount evidence from Navarro and his neighbors about the harms they suffered." OB 43-44. Navarro's contentions, which are largely factual, not legal, do not support the existence of a triable issue and are without merit.

As the District Court explained, TORC had to (and did) show an "absence of evidence that the harm suffered from the Refinery emissions is both substantial and unreasonable," *see* 1-ER-4. The burden then shifted to Navarro "to provide admissible evidence, beyond the pleadings, of specific facts showing a genuine issue for trial," *id*., that TORC caused him to "suffer 'substantial actual damage,'" *Monks v. City of Rancho Palos Verdes*, 167 Cal. App. 4th 263, 303 (2008), or "significant harm," meaning a "harm of importance" and a "real and appreciable invasion of [his]

---

[19]  *See generally*, Cal. Health & Safety Code, §§ 40400, *et seq.*

43

interests." 1-ER-5 (citing Rest.2d Torts, § 821F, com. c). Under California law, the degree or seriousness of harm needed to prove a nuisance claim is a matter of "considerable judicial discretion." *Bakersfield v. Miller*, 64 Cal. 2d 93, 99 (1966).

### 1. Navarro's expert testimony regarding impacts of Refinery emissions on Navarro's health did not create a factual dispute for trial.

On appeal, Navarro argues that the District Court "usurped the role of the jury in deciding which regulatory standards would be dispositive of Navarro's nuisance claims and finding that the risks posed by air emissions alone did not create a disputed factual issue." OB 47-48. Not so.

First, although Navarro's expert, Clark, testified that diesel particulate matter ("DPM") and chromium, two chemicals Navarro identified in the Refinery's air emissions, are carcinogens and *can* contribute to a risk of serious injury or mortality at some elevated levels, abstract carcinogenicity does not prove the concentrations of those contaminants actually present in the air, or to what extent Navarro and the community near the Refinery were allegedly exposed to them. 2-ER-140-41.

Second, the District Court properly concluded that the various regulatory screening levels Clark relied on to determine what constitutes an unacceptable or substantial health risk did not create a factual dispute. In so doing, it did not "ignore" Clark's expertise or analysis in finding that the referenced screening levels are not properly used to evaluate whether an individual or community is likely to suffer a

44

health risk. 1-ER-7-9; 2-ER-141-42; 15-ER-4158, 15-ER-4168-72. Those regulatory screening levels do not apply to airborne refinery emissions; they are simply risk-based benchmarks used by regulators in evaluating the need for further investigation and cleanup of potentially contaminated properties.[20] (*See also* section II.A.5.)

Navarro proffered no evidence that any of the screening levels Clark relied on can be used as a proxy for substantial harm to a plaintiff for any period of exposure. In fact, TORC proffered undisputed evidence that the screening levels, referred to as Environmental Screening Levels or "ESLs," are not proper risk criteria, and that the barely detectable benzene concentrations in the 2018/2019 air samples taken from Navarro's residence were (1) not "substantial" given that such concentrations are well below 3 $\mu g/m^3$, the California Office of Environmental Health Hazard Assessment's ("OEHHA") reference exposure level ("REL")[21] for chronic exposure to benzene, and (2) consistent with ambient background levels measured in Long

---

[20] Navarro cites *Schaffer v. Gregory Village Partners, L.P.*, 105 F.Supp.3d 951, 956 (N.D. Cal. 2015), as "explain[ing] the relevance of ESLs in determining human health risk and need for remediation in nuisance action [sic]." OB 52. But *Schaffer* includes no such explanation. It simply cites plaintiff's expert's testimony that ESLs are conservative screening levels that, if exceeded, generally require further investigation and "may" be indicative of exposure to health risks. 105 F.Supp.3d at 956.

[21] According to OEHHA, "RELs are based on the most sensitive, relevant, adverse health effect reported [,] designed to protect the most sensitive individuals in the population … [and] err on the side of public health protection in order to avoid underestimation of non-cancer hazards. Exceeding the REL does not automatically indicate an adverse health impact." 14-ER-3855-56; 14-ER-3713.

45

Beach (as well as ambient levels outside Navarro's home). 2-ER-179-80; 2-ER-182-83; 2-ER-189; 2-ER-191; 8-ER-1998-99; 15-ER-4171-76.

And, as the District Court recognized, the only regulatory standard applicable to the Refinery's air emissions is SCAQMD's Rule 1402, which, in the regulatory context, only requires action to reduce emissions if they rise to a theoretical "action risk" level of 25 in 1 million excess cancer risk. Notably, SCAQMD defines a "significant" risk as 100 in 1 million excess cancers—ten times the excess cancer risk that Navarro alleged indicates a risk of future harm. 1-ER-9-10; *see* 8-ER-1975, 1977; 15-ER-4156-57.[22]

Under Clark's theory, nearly every activity and product that contains a *de minimis* concentration of a carcinogen, including many daily necessities, would give rise to tort liability. Clark assumes "there is no threshold dose below which carcinogenic effects do not occur" and that the risk of cancer is only zero at a zero level of exposure. 15-ER-4294; *but see* 15-ER-4176-79 (benzene present in automobile gas, exhaust, paint, secondhand smoke, and food items including ground beef, bananas, and coleslaw). No reasonable juror could conclude that the 10 in 1 million risk Clark contended that Navarro faces due to Refinery emissions is

---

[22] As is the case with all regulatory benchmarks, the SCAQMD's risk metrics are theoretical and conservative—not measurable or specifically tailored to any individual or community. 15-ER-4157. Clark's risk assessment, too, estimates only theoretical risk. 15-ER-4157-58, 4162.

46

"substantial," particularly given the increased risk of injury citizens in Los Angeles and Torrance regularly tolerate and the fact that the lifetime probability of a man of Navarro's age developing an invasive cancer is 136,000 in 1 million. 15-ER-4178-79.

Navarro's reliance on *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1549 (2009), is unpersuasive. As the District Court noted, *Birke* dealt with whether the plaintiffs' asthma and chronic allergies constituted an injury that was "different in kind" for purposes of a public nuisance claim relating to secondhand smoke in a shared, common area of their apartment complex. 1-ER-6. As *Birke* makes clear, alleging "a substantially increased risk of developing heart disease and lung cancer" due to exposure to toxins <u>can</u> sustain a cognizable nuisance claim *at the pleading stage*, but, without additional evidence, does not constitute *proof* of such a nuisance. *See id.* at 1549-51.

Moreover, the flaws in Navarro's expert evidence are themselves sufficient reason for affirming summary judgment against Navarro. *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1133 (9th Cir. 1996) ("We may affirm a summary judgment for reasons other than those relied on by the district court," so long as the basis for affirming is "supported by the record.").

Navarro's primary expert evidence purportedly linking exposure to Refinery emissions to a future health risk was Clark's air dispersion model and associated

47

health risk assessment[23] projecting a risk of 10 in 1 million excess cancers in the community surrounding the Refinery. 2-ER-153-54; 8-ER-1975; *see* 1-ER-7; *see also infra* section II.A.5. Clark contends these risk levels demonstrate significant increased future health risk but, in concluding such risk exists, he relies solely on state regulatory guidelines (i.e., screening levels or ESLs). But the use of those guidelines is scientifically indefensible as a means of assessing risk of harm due to airborne exposures in civil litigation. 8-ER-1968-74. It is also effectively undisputed that there was no individualized risk assessment evaluating Navarro's individual health risk. 8-ER-1970; 15-ER-4159-61.

Clark's generalized assessment that Navarro faces an excess cancer risk overstates that risk and is not particular to Navarro, rendering it neither reliable nor credible evidence of health risk—immediate or otherwise; it thus cannot be used to satisfy Navarro's burden of proving the existence of a condition that is substantially injurious to health or causation. 8-ER-1970-75. As other courts have recognized, risk assessments are of "'limited utility' in a toxic tort case based on [their] distinct regulatory purpose," *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007,

---

[23] A health risk assessment, such as that discussed here, generally refers to a screening tool that helps identify theoretical health risks to an exposed population for purposes of making risk-based remedial decisions.

48

1041 (E.D. Cal. 2011), because they are intended "to be particularly cautious [and] overstate the actual risk" to the population, *id.*

For that reason, federal courts have consistently excluded risk assessments as not credible evidence of actual exposure or risk. *See, e.g.*, *id.* at 1042 (granting partial summary judgment on the ground that the agency's risk assessment was not relevant "to prove actual causation to appreciable levels of contaminants"); *Gates*, 655 F.3d at 265-68; *Rhodes v. E.I. DuPont de Nemours & Co.*, 253 F.R.D. 365, 378 (S.D.W.Va. 2008) ("Because a risk assessment overstates the risk to a population to achieve its protective and generalized goals, it is impossible to conclude with reasonable certainty that any one person exposed to a substance above the criterion established by the risk assessment has suffered a significantly increased risk").

Indeed, *Abarca* found that plaintiffs' risk assessment was not relevant to the issue of general exposure because those risk estimates were conservative and "provide[d] a wide margin of protection for human health," did "not establish general exposure," were not particularized, and did not "include an identifiable risk of exposure" to the community. *Abarca*, 671 F. Supp. 2d at 1041-42. So too here. Clark's risk assessment, like *Abarca*'s, "was based on a hypothetical scenario that never occurred, and it does not purport to accurately calculate actual exposures or risks." *See id.*, 761 F. Supp. 2d at 1041.

In addition, Clark's 2021 report recommended, without explanation, lowering emission levels in a zone of elevated cancer risk to the community of 10 in 1 million to a level of 7 in 1 million excess cancers. 8-ER-1968, 1975-76. Clark does not explain the discrepancy between his proposed "acceptable" risk threshold of 7 in 1 million and the 1 in 1 million Plaintiff originally alleged was a "generally accepted de minimis" risk level, *see* 16-ER-4297, 4315. Irrespective, Clark's "acceptable" risk threshold exceeds the theoretical risk to Navarro—5.6 in 1 million—when his home address is plugged into Clark's model to estimate a more precise theoretical risk level for him alone. And that risk is reduced to 2 in 1 million if Clark's erroneous airborne exposure assumptions in his model are corrected. 8-ER-1970-76, 8-ER-1982-84, 8-ER-1989-90.

Thus, Navarro failed to create a genuine, material factual dispute as to Navarro's claim of substantial injury resulting from Refinery emissions.

### 2. The District Court's summary judgment decision was not improperly based on policy concerns.

Navarro argues that the District Court erred by noting that it was hesitant to supplant the role of regulators because the Refinery's emissions comply with the law and do not pose a significant harm according to the Refinery's primary regulator. OB 54.

That was not the Court improperly applying its own policy views. To the contrary, the Court properly acknowledged that compliance with regulatory

50

standards does not preclude nuisance actions and simply considered the regulator's views in assessing whether there was a genuine factual dispute regarding whether the Refinery poses a significant risk to the community. 1-ER-9-10. As the Court explained, Navarro failed to proffer evidence that a normal person in his community would be "substantially annoyed or disturbed" by an alleged risk from the Refinery that is objectively low and otherwise dwarfed by that regularly tolerated in his community. 1-ER-10.

As discussed *infra*, TORC's participation in the SCAQMD's Voluntary Risk Reduction Program ("VRRP"), a regulatory program that encourages industrial emissions reductions to reduce potential health risks, is also not evidence of a significant risk supporting a nuisance claim. *See infra* section II.A.5. Notwithstanding Navarro's arguments, this participation has resulted in consistent reductions in emissions for chromium, benzene, and DPM at the Refinery since 2017 as a result of operational changes under SCAQMD oversight. 8-ER-1989; 15-ER-4182-83; 15-ER-4216.

Navarro misrepresents the record in stating that TORC's 2020 VRRP submittal indicated a 38% increase in emissions. OB 55. The number that increased in 2020 is the theoretical cancer risk for the maximum increased cancer risk ("MICR"), i.e., the risk one would face at the most exposed location in the vicinity

of the Refinery.[24] The MICR is (1) not located at Navarro's property and (2) significantly lower than SCAQMD's "significant risk" threshold.1-ER-9-10; 2-ER-177-79; 3-ER-530. Because the MICR does not reflect and is by definition significantly higher than the risk to any individual in the area surrounding the Refinery, this number is immaterial and did not raise a genuine factual dispute.

In any event, Navarro also overstates the District Court's purported deference to regulatory agencies. For example, Navarro asserts that the Court did not address subsurface contamination and therefore did not or could not defer to a "primary regulator" like SCAQMD with respect to that contamination source. OB 55-56. However, the regulatory screening levels Navarro cites are nevertheless inappropriate and irrelevant to whether Navarro or the community has suffered a substantial harm because they were developed by government regulators for initial screening of environmental investigation of property, do not equate to final action levels or regulatory cleanup standards, and are not indicative of risk of injury. 15-ER-4168-72. Therefore, they do not support the conclusion that Navarro (or anyone else) faces any risk of harm or injury associated with vapor intrusion. *Id.*

---

[24] The MICR is a regulatory construct used in the VRRP program to ensure consistent application of Rule 1402.

4876-9460-6047

### 3. The District Court did not improperly discount evidence of "community concern" regarding Refinery emissions.

Navarro contends that the District Court erred in concluding there was no evidence of community disturbance from Refinery emissions because of other air emissions sources. OB 57. That mischaracterizes the Court's analysis. In fact, Navarro failed to present evidence showing that the community surrounding the Refinery is disturbed by its activities or that the public suffered a substantial increase in potential harm caused by the Refinery.

First, Navarro misconstrues the District Court's consideration of TORC's expert evidence regarding the overall excess cancer risk to members of Navarro's community. *See* OB 57-58. TORC never claimed, and the Court did not find, that the existence of other sources of air emissions in the community provides a "defense" to a nuisance action. Rather, the Court found that there was "no evidence in the record that a normal person in Navarro's community would be 'substantially annoyed or disturbed by the [Refinery].'" 1-ER-10.

This conclusion was based on expert testimony and data indicating that "toxic air contaminants alleged to cause an increased risk of cancer in and around Navarro's home are at or below background levels in the air" throughout the South Coast Basin (primarily attributable to mobile sources and, in Torrance, specifically due to emissions from freeways, the airport, and ports). *Id.*; 15-ER-4159, 4179-83. Contrary to Navarro's suggestion, the Court did not rule that one must tolerate

53

"noxious pollution" if they continue to live near sources of such pollution. OB 58. The point is, rather, that there are many sources of increased cancer risk, and the low-level risk allegedly caused by the Refinery is *de minimis* when compared to ambient air emissions. 1-ER-10.

Ultimately, Navarro proffered <u>no evidence</u> that other members of his community were offended, annoyed, or disturbed by the alleged theoretical low level health risk resulting from the Refinery. This failure of proof warranted summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("Rule 56(c) mandates the entry of summary judgment [. . . ] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . .").

In fact, Navarro's experts both testified that neither of them was aware of any person in the community that had suffered an acute injury or cancer resulting from soil vapor contamination or exposure to DPM or benzene associated with Refinery emissions. 8-ER-1966-67 (citing 14-ER-3718, 15-ER-4057-58;14-ER-3719, 15-ER-4064-65. And both experts admitted that they could not state to a reasonable scientific certainty that any person residing or working in the nearby community, including Navarro, was more likely than not to contract an illness due to such exposures. 8-ER-1967-68.

4876-9460-6047

Navarro also erroneously contends that the District Court was required to infer that individuals in Navarro's community *do not* regularly tolerate contamination arising from freeways and ports in the area, "given that the record evidence showed that at least seven members of the community who live or work near the Refinery submitted declarations expressing concern" that the Refinery's operations will cause health problems. OB 59. But in the District Court, Navarro cited only his own testimony regarding his "concern about being vulnerable to adverse health consequences from airborne contamination" as an argument supporting his nuisance theory, *see* 3-ER-432—not the concerns of community members.[25]

The declarations Navarro cites on appeal were neither raised nor proffered to the District Court in opposing TORC's summary judgment motion and should not be considered now. *Int'l Union of Bricklayers, et al. v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985) (absent exceptional circumstances, "appellants may not upset an adverse summary judgment by raising an issue of fact on appeal that was not plainly disclosed as a genuine issue before the trial court"); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029, 1031 (9th Cir. 2001) (affirming summary judgment where declaration that would have been "enough to establish a

---

[25] The declarations cited by Navarro were form declarations, largely by former plaintiffs who were either deemed no longer a part of the class, were dismissed by the District Court, or lost interest in the case. SER-13; SER-15; SER-110; SER-112; *see also* 1-ER-87; 21-ER-5839.

genuine issue of fact" was not quoted, mentioned, or otherwise brought to the court's attention in opposition papers); *Christian Legal Soc'y Chapter of Univ. of Calif. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs").

### 4. The District Court did not improperly discount Navarro's testimony relating to the issue of "substantial harm."

Finally, Navarro contends that the District Court erred in "weigh[ing] and discount[ing] evidence of Navarro's own perception that he suffered substantial harm." OB 59.

However, courts must grant summary judgment when, as here, the moving party shows by a preponderance of the evidence that no "genuine dispute" exists as to any "material fact" such that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material" facts are those that, under applicable substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). A "genuine" factual dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In other words, the opposition evidence must be sufficient to "require a jury or judge to resolve the parties' differing versions of the truth." *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983). Opposition evidence that is

56

simply "colorable" or "not-significantly probative" is insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 249-50.

None of Navarro's testimony creates a genuine factual dispute. *Id.* at 252 ("mere existence of a scintilla of evidence" is "insufficient"). It is undisputed that Navarro expressed little concern regarding a perceived health risk, and that what he admitted were "minor" changes to his use of his property were not necessarily attributable to the Refinery.

Navarro now points to testimony that he goes indoors and closes windows when he would notice "bad odors or flaring events at the Refinery that might threaten his health." OB 59. But he conceded in his Statement of Genuine Disputes that he had abandoned odor as a basis for his nuisance claims and that it was "not a material fact," 8-ER-1958-59, that he was not certain where any odor was coming from, 8-ER-1959, that he was not sure how odors that "could be bad" for his health impact the use of his property, *id.*, and that going indoors due to infrequent odors is a "minor" change in use of his property, 8-ER-1960. *Hellman v. La Cumbre Golf & Country Club*, 6 Cal. App. 4th 1224, 1230 (1992) (whether an interference "is continual or occasional, and the nature and extent of the nuisance and of the injury sustained therefrom" are factors considered in determining whether a use is "unreasonable."); 14-ER-3718, 15-ER-4015-18, 4036-37; *see also* 15-ER-4019, 4021, 4038-39; 1-ER-21; 17-ER-4764.

4876-9460-6047

Navarro also cites on appeal testimony that plants on his property produce rotten fruit and that he no longer eats lemons from his lemon tree, allegedly because of health risk concerns. OB 59-50. But that was not Navarro's testimony below. Navarro testified that he eats meals outside with his wife, 15-ER-4022-23, and gives lemons from his property away to *his own children* and people in his community. *Id.* And although Navarro testified that a peach tree he planted produced rotted fruit, he did not contend that any vegetation on his property died as a result of the Refinery. 15-ER-4033-34.

In addition, although Navarro claimed that he tried to keep his children and grandchildren indoors most of the time, the undisputed evidence makes clear that any purported fear was superficial. Navarro testified that he: (i) was not aware of any alleged health risk until he learned of it from his lawyers and experts, 8-ER-1966-67; (ii) never communicated fear or annoyance regarding exposure to air contamination outdoors to anyone, including his wife, children, grandchildren, or third parties, 8-ER-1961-65; and (iii) perceives nothing from the Refinery other than odor, which he disclaimed as a basis for his nuisance claims. 8-ER-1960-61. Although Navarro claimed at deposition that he was concerned about a health risk arising from conditions on his property, he was unable to provide any answer as to when he first became concerned and what, if not his experts, caused his concern. 15-ER-4019, 4027-29.

4876-9460-6047

Contrary to Navarro's suggestion, OB 61, the District Court did not indicate that his past cigarette use precludes him from finding Refinery emissions to be offensive, annoying, or intolerable. The Court's discussion merely contextualizes Navarro's extremely low level of benzene exposure due to Refinery emissions, and follows a discussion of multiple other undisputed facts demonstrating that Navarro simply had not raised a triable issue, including that he: (1) has lived at his residence for over 25 years; (2) did not attribute any sickness or health problems to Refinery emissions; (3) has incurred no expense or diminution in property value as a result of Refinery emissions; and (4) only believes his health is at risk due to communications from his lawyers and experts. 1-ER-11; 8-ER-1954-55, 1957-58, 1966.

The District Court properly reviewed the evidence regarding Navarro's individual experience and concluded that no reasonable jury could have returned a verdict for Navarro. Put simply, the opposition evidence was not "enough 'to require a jury or judge to resolve the parties' differing versions of the truth.'" *Aydin Corp.*, 718 F2d at 902.

Finally, the newfound notion that Navarro's nuisance claim is "based on a future health risk for himself *and his family*," OB 61, is unsupported by the record. Nowhere in Navarro's opposition to summary judgment did he assert that his claim is based on any future theoretical risk to his family, and he cannot pivot now.

4876-9460-6047

5. **Navarro's new "additive" health risk theory on appeal has been waived and has no support in the record.**

   a. **Navarro's new theory attempting to quantify an additive health risk from subsurface contamination should be rejected.**

Navarro claims that the District Court's summary judgment order "improperly ignored evidence regarding the Refinery's subsurface contamination"[26] and focused exclusively on air emissions. OB 44.

This argument raises a new legal theory that was not presented to the District Court, was not considered by that Court, and thus has been waived. *Maxwell v. Simmons, U.S.A. Corp.*, 841 F.2d 1129 (9th Cir. 1988) ("It is well settled that a party opposing summary judgment must inform the district court of the reasons, factual or legal, that summary judgment should not be entered. Failure to do so ordinarily waives the right to raise the issue on appeal.").

This argument is obviously new. In his opposition to summary judgment, Navarro did not seek to quantify alleged health risk from soil vapor beyond the 10 in 1,000,000 health risk estimated by his expert.

---

[26] *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 874 (9th Cir. 2000), cited by Navarro, is inapposite. In *Carson Harbor*, the district court made an incorrect evidentiary ruling that a prior inconsistent statement by an expert regarding whether the regulatory agency would require a cleanup was inadmissible hearsay. *Id.* at 873-74.

Rather, Navarro argued that, per Clark's expert report, the "actual invasion of Navarro's property and the community by toxic contaminants from the Refinery" resulted from "*both* (1) airborne contaminants from the Refinery, and (2) a plume of groundwater contamination from the Refinery that has generated soil vapor intrusion in Navarro's property and properties in the surrounding community." 3-ER-419 (emphasis added). Significantly, Navarro argued in the same paragraph that "the danger posed by these emissions is additive and cumulative, and 'the sum of the cancer risks for the Refinery's emissions of hexavalent chromium, diesel particulate matter, and benzene are in excess of 10 in 1,000,000 in the community.'" *Id.* This additive, cumulative effect of exposure to contamination allegedly caused by the Refinery was based on Clark's isopleth map. *Id.*

Navarro further argued that the risk forming the basis for an increased risk of injury was premised on exceedances of certain regulatory benchmarks. But while he cited the VRRP submittals by TORC to SCAQMD, showing a MICR ("maximum increased cancer risk") of between 21.6 and 29.8 in 1 million between 2017 and 2020 from Refinery air emissions, 3-ER-419-21, the MICRs depicted on TORC's VRRP maps were at locations that are not on Navarro's property. *See, e.g.*, 1-ER-9-10; 2-ER-114-19, 177-79, 3-ER-530.

In addition, the TAC identified Navarro's risk with reference to his home being located within a "10 in 1 million contour map of elevated cancer due to

61

emissions from the Refinery." *See* 8-ER-1975. But Navarro's own expert's model calculated an estimated theoretical cancer risk of only 5.6 to Navarro specifically— lower than the 7 in 1 million theoretical risk Clark opined is "unacceptable." 8-ER-1970-76.

Aside from Clark's model and estimated 10 in 1 million excess cancer risk to Navarro's community, Navarro made no attempt in opposing summary judgment to further quantify the health risk allegedly forming the basis of Navarro's nuisance claims from groundwater and air exposures combined. *See Bader v. N. Line Layers, Inc.,* 503 F.3d 813, 820 n. 4 (9th Cir.2007) ("[B]are assertions of a legal conclusion, not supported by any other 'specific facts showing that there is a genuine issue for trial,'" are "insufficient to raise a genuine issue of material fact.").

Now, in a new argument on appeal, Navarro projects beyond his expert's 10 in 1,000,000 estimated health risk, 8-ER-2013, and—with no expert support— quantifies his purported health risk by adding the amount by which indoor air and soil vapor sampling purportedly near his property exceeds certain regulatory benchmarks for each contaminant. Those benchmarks, however, are not proxies for Navarro's (or anyone's) individual health risk, and Navarro cannot use them to present a completely different technical argument about an allegedly "additive" health risk. Nevertheless, Navarro contends this risk level ranges "from 34.7 to as

62

high as 2,666 times" above the 1 in 1 million level he contended is "the generally accepted de minimis" excess cancer risk level. *See* OB 16; 16-ER-4315.

It is not the province of counsel to provide an expert toxicological opinion, particularly for the first time on appeal, to argue a risk of future harm to Navarro that differs from that presented at the trial court level. Accordingly, this Circuit should not consider Navarro's new argument. *See Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8-9; *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1261, fn. 4 (9th Cir. 2016) ("declin[ing] to address new evidence cited for the first time on appeal" of summary judgment where plaintiff raised content from her declaration that was not cited in the lower court as showing a genuine issue of material fact).

> **b.    Navarro's new nuisance theory is not supported by expert testimony.**

Navarro's new theory is also not supported by the expert testimony in the record. That testimony only quantified an estimated 10 in 1 million health risk to the community as the "sum of the cancer risks for the Refinery's emissions." 8-ER-2013.

On appeal, however, Navarro identifies an "additive" health risk from the Refinery's air and subsurface contamination and cites as "evidence" environmental sampling results "in the vicinity of" his property and utilizes several inapplicable and nonbinding regulatory guidelines. OB 44.

4876-9460-6047

But the 2,666 in 1 million figure Navarro touts corresponds to the amount by which groundwater concentrations of benzene purportedly "in the vicinity of" Navarro's property exceed the Vapor Intrusion Screening Levels ("VISLs") for benzene. OB 44-45. But generic risk levels extrapolated from groundwater concentrations of a contaminant "in the vicinity" of a property are not commensurate with actual exposure to vapor intrusion on the property.

It is improper for Navarro to rely on the VISL set by EPA for groundwater as a metric for health risk. Although groundwater contamination *can* in theory give rise to vapor intrusion and expose a property occupant to a volatile chemical, exceeding a VISL is neither indicative of the potential for Navarro's or the community's actual exposure to chemicals nor the health risk associated with that exposure. 2-ER-194-95.

VISLs are screening levels that fail to consider two important factors—the depth of groundwater and potential for chemicals to attenuate and biodegrade in soil vapor—both of which are relevant to whether a chemical such as benzene is actually transported from the groundwater source to above ground surface where it might pose a potential vapor intrusion risk. 2-ER-194-95. As such, "the VISLs provide a simplistic and conservative baseline … [and] are not the basis for determining if a human health risk is present, but rather that additional evaluation, such as soil vapor and/or indoor air sampling," a more reliable evaluation of whether vapor intrusion

64

is occurring, "is needed." 2-ER-195. Considering this context, Navarro's newly raised evidence on appeal does not raise a genuine issue regarding Navarro's individual health risk.

Nevertheless, Navarro improperly attempts to quantify his purported health risk by simply adding the amount by which sampling of indoor air and soil vapor exceed the environmental screening levels for various contaminants, and based on that, claiming a combined increased cancer risk of 34.7 in 1 million from indoor air data and a 170 in 1 million from soil vapor data. OB 31, 45. These numbers represent the sum of the purported risk levels associated with exposures to chlorinated solvents, which are common in indoor air from household products, and exposures from a release of petroleum—assuming all exposures are from the Refinery's petroleum release. This position is indefensible double counting (since indoor air is supposed to be measured for vapor intrusion) and not supported by the record.

Importantly, environmental screening levels do not represent a health risk to any individual. 2-ER-179, 183-84; 2-ER-188-89, 192. Navarro's expert, Clark, conceded that "ESLs are generally intended to help identify and evaluate potential environmental concerns at contaminated sites." 15-ER-4171-72; *see also* 21-ER-5946. Environmental screening levels "are not to be used to perform human health baseline risk assessments, but to assist in the tasks that precede the baseline risk assessment." 15-ER-4171-72. This is because ESLs are not specific to any location

65

and are not thresholds for substantial exposure or health risk. 15-ER-4172-73. With respect to the potential for vapor intrusion, they are merely a metric used as a first step to determine whether further investigation is needed. *Id.*[27]

Finally, Navarro proposes that these purported risk levels from subsurface contamination should be added to a 29.8 in 1 million risk represented by the MICR depicted in the Refinery's VRRP.[28] But the MICR does not quantify Navarro's individual health risk and is not even located at Navarro's property. 2-ER-178-79. In addition, the MICR reported in the Refinery's plan is less than the "significant risk" level of 100 in 1 million defined in the Voluntary Risk Reduction program. 2-ER-178. The MICR does not reflect a risk level for Navarro's or any residence in

---

[27] Moreover, any minor elevation of concentrations of contaminants in Navarro's indoor air is indicative of neither a health risk nor vapor intrusion due to subsurface contamination. 2-ER-187-93; 15-ER-4172-76. The benzene levels measured in indoor air at Navarro's home were not evidence of substantial harm because they were consistent with ambient background concentrations measured in Long Beach, and were well below 3 µg/m³, OEHHA's RELs for chronic exposure to benzene (*see* 2-ER-182-83; 15-ER-4167, 4174-76). And, as the District Court acknowledged, the benzene levels in indoor air at Navarro's home were "dwarfed by a risk that is tolerated everyday by individuals in his community." 1-ER-10; *see* 15-ER-4167, 4176-79.

[28] The MICR is used in the VRRP program to provide a benchmark for facilities as they voluntarily reduce their emissions. Under the program, the target is for residential risk from a facility to be less than 10 in one million. This is lower than risk levels defined as action levels (25 in 1 million) or significant risk (100 in 1 million). *See generally* SCAQMD Rule 1402. Through operational changes, the Refinery has consistently met the goal of the program to reduce residential risk to less than 10 in 1 million. 2-ER-178.

the Del Amo neighborhood. The District Court properly found that it does not raise a genuine factual dispute. 1-ER-9-10; 2-ER-177-79.

Accordingly, there is no basis for Navarro to claim for the first time here that he is subject to an "additive" health risk—which, at the high end, is over 260 times greater than the risk level proposed by Navarro and his expert in the district court. 8-ER-2013. Thus, even under his new theory on appeal, Navarro has failed to create a genuine factual dispute.

## B. The District Court did not abuse its discretion in decertifying the class as to Navarro's nuisance claims.

Prior to granting summary judgment, the District Court decertified the class as to Navarro's nuisance claims. Navarro argues on appeal that the Court abused its discretion by doing so. As with Navarro's trespass claim, there is no need to address that issue, unless this Circuit reverses the summary judgment against Navarro. *Bustamante*, 100 F.4th at 434. Nonetheless, the Court did not abuse its discretion in doing so.

### 1. Navarro's nuisance claims were not typical of the Air Subclass.

The District Court did not abuse its discretion in finding that Navarro's nuisance claims were not typical of the Air Subclass and decertifying the class.

In its 2019 certification order, the District Court found Youssef's private nuisance claims typical of the Air Subclass's claims, with his loss of use and

67

enjoyment of property sounding in private nuisance. 1-ER-83. In its decertification order, the District Court reconsidered that finding after Navarro testified to significantly different "interferences" than those identified by Youssef and other previously named (and no longer participating) Plaintiffs. 1-ER-56-59. With those new developments, the District Court was unable to conclude that Navarro's nuisance claims were "typical" of the remainder of the Air Subclass. *Id.*

As noted above, to maintain a private nuisance claim, a plaintiff must allege a substantial and unreasonable interference with the use of his property. *SDG&E*, 13 Cal. 4th at 938. Here, the Air Subclass alleged that Plaintiffs "suffered loss of the use and enjoyment of their properties, in the form of damage to buildings and personal property, and/or exposure to an array of toxic substances on the land, and/or a lingering malicious odor, noise, soot, ash, and dust in the air." 19-ER-5221-22. Against that backdrop, the District Court compared Navarro's testimony with that of the former class representative, Youssef, and other witnesses in the community near the Refinery to reassess whether typicality was met. 1-ER-56-59.

The District Court first observed that Youssef claimed that he had experienced: unpleasant odors, noises, and light (27-ER-7737); dying grass and smells from the Torrance Refinery (*id.*); and concern that his property value would be negatively impacted by disclosure of "dangerous chemicals" to prospective purchasers or renters of his property (27-ER-7738). 1-ER-57. However, Youssef

4876-9460-6047

never substantiated those allegations and eventually admitted that the allegations in the complaint were no longer true and recanted the allegations related to odors, lights, and inability to use his backyard. *Id.* (citing 18-ER-4944-45, 4947). The only impact Youssef maintained Refinery operations had on his use of his property were "occasional noises." *Id.* (citing 18-ER-4944, 4948). With respect to his concern regarding property values, Youssef ultimately listed his home for sale *without disclosing any environmentally hazardous substances, potential harm, or other nuisance or trespass impacting his home* and sold it for $570,000—2.85 times the amount he paid for it. *Id.* (citing 18-ER-4941-42).

The District Court found that, in contrast, despite living in close proximity to Youssef, Navarro did not complain about noises at all. 1-ER-57. Navarro's only complaint was that 10 to 12 times a year he smells odors that he believes emanate from the Refinery during flaring events and goes inside. 17-ER-4885-86, 4890. But Youssef, who lived seven houses down from Navarro, confirmed that the odors had gone away. 18-ER-4944. As the District Court correctly concluded, the bases for Youssef's and Navarro's nuisance claims were "completely different: one complains of noise while disclaiming any odor and the other complains of odor without any noise," and each complaint would necessitate entirely different remedies. 1-ER-58. In addition, the District Court pointed out that, contrary to what the Corrected TAC alleged with respect to Navarro himself, his testimony under oath demonstrated that

69

he has no claim of damage to his real or personal property, noise, soot, ash, or dust in the air, and his complaint related to odor directly conflicted with Youssef's testimony under oath that the odors went away. *Id.*

The testimony of various former named Plaintiffs and witnesses in this case similarly illustrated the lack of typicality between Navarro and the remainder of the class. 1-ER-58-59. Putative class members varied significantly in how long they had resided in the neighborhood near the Refinery (ranging from three years to decades) and would similarly vary in how long they have worked in Torrance with respect to commercial property interests. *Id.* Their distance from the Refinery varied (with Goldstein located more than two miles away, and declarant putative class members Victoria Heard ("V. Heard") and Kevin Heard ("K. Heard"), Youssef, Shahid Karim, and Kit Clark located on the same street adjacent to the Refinery). *Id.* Several former putative class members conceded they could hear or smell the Refinery from certain locations in Torrance within a three-mile radius but not others. *Id.*

The District Court further reasoned that Plaintiffs failed to show that Navarro himself had a viable claim for private nuisance. 1-ER-59-60. Typicality implicitly requires that the named plaintiff be a member of the class he purports to represent. *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962). But Navarro admitted that going inside 10 to 12 times a year was a "minor" change to his use of his property. 17-ER-4884. Such a "minor" change, in light of Navarro's acknowledgement that he had

70

no desire under any circumstance to move and Plaintiffs' counsel's struggle to find a class representative to replace Youssef, failed to persuade the District Court that a class-wide "substantial and unreasonable interference" existed such that Navarro could sustain a private nuisance claim on behalf of the class. *Hellman*, 6 Cal. App. 4th at 1230-31 (whether an interference "is continual or occasional, and the nature and extent of the nuisance and of the injury sustained therefrom" are among factors to be considered in determining whether a use is "unreasonable").

Despite claims that he was concerned and fearful about a health risks, Navarro regularly used his backyard by, for example, eating meals outside with his wife, giving lemons from his lemon tree to the community and his children, and eating cactus that he picked from his neighbor's backyard. 1-ER-59. The District Court thus found no indication that Navarro had been impacted at all by the issues alleged in the case, and that Navarro's inability to support a nuisance claim was an independent reason why he failed to satisfy the typicality requirement. 1-ER-59-60.

In arguing that the District Court erred in decertifying the Air Subclass, Navarro points to the alleged risk to public health caused by Refinery emissions. OB 87-89. The boundaries of the Air Subclass were indeed premised on risk to public health. But, as the District Court explained, a public health risk is not the same as

interference with real property rights. [29] 1-ER-60 (citing 1-ER-94). Thus, the Air Subclass, by design, included members who would have not suffered any interference with a property right. *Id.* In addition, while Navarro claimed a supposed increased risk to his own health, the District Court reasonably concluded that those claims appeared to be lawyer-driven because Navarro testified that he did not even know why he was personally concerned about the claimed health risk. *Id.* Both Youssef and Navarro admitted that they and their families did not attribute any health problems to the operations of the Refinery. *Id.* Thus, the District Court found that Navarro's nuisance claims were not typical. *Id.*

Finally, the District Court found that typicality was lacking because, as discussed above, Navarro was not interested in and wished to give up potentially desirable remedies that members in the Air Subclass may have wished to pursue. 1-ER-66.

For these reasons, Navarro has not met his burden of demonstrating that the District Court abused its discretion in finding that Navarro failed to satisfy Rule 23(a)(3), another grounds for decertification.

---

[29] "[A] private nuisance action cannot be maintained for an interference in the use and enjoyment of land caused solely by the fear of a future injury." *Koll-Irvine Ctr. Prop. Owners Ass'n v. Cty. Of Orange*, 24 Cal. App. 4th 1036, 1041-1042 (1994).

4876-9460-6047

## 2. The District Court did not engage in an improper merits analysis in its decertification of Navarro's nuisance claims.

Navarro erroneously argues that the Court conducted an improper merits analysis in its decertification order. As discussed above, the "rigorous analysis" required for assessing whether Rule 23 has been satisfied will often "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.

Nonetheless, Navarro claims that the Court engaged in a "merits analysis" by basing its decertification ruling on a holding that the threat of future harm posed by contamination allegedly from the Refinery is not an interference with Plaintiffs' property rights, absent (1) evidence of actual harm or (2) claims that class members have resided in the community surrounding the Refinery for 30 years (the amount of time it would take for an individual to experience the alleged 10 in 1 million excess cancer risk estimated by Clark). OB 68-69.

But the Court made no such "holding." Rather, after fact discovery concluded and Plaintiffs' expert disclosure deadline passed, it examined Navarro's only evidence of class-wide harm and determined that such evidence—namely, expert testimony that one residing for 30 years at a property near the Refinery might face an increased cancer risk from Refinery emissions—could not sustain class certification of the nuisance claims, which covered both residential and commercial occupants with variable years and degrees of exposure. 1-ER-49-52; *Gates*, 655 F.3d at 265-67 (affirming denial of class certification because plaintiffs' expert opinion

73

did not show common proof of chemical exposure above background levels, and expert's isopleths did not "account[] for differences in exposure year-by-year or based upon an individual's characteristics").

Navarro points to the fact that a 10 in 1 million excess cancer risk allegedly accrues over time. But that does not alter the inevitable variation in exposure by class members. Moreover, no allegation was made that Navarro or others had resided in the community for 30 years. OB 69-70. If anything, the increased health risk for any duration shorter than 30 years is likely negligible, given the already-low alleged risk Clark estimated for 30 years of exposure. The District Court did not err in determining that Clark's conclusory testimony that any increase in excess cancer risk is de facto "unacceptable," OB 70, was insufficient to prove a common injury given the lack of evidence of any sort of illness in the community in connection with the Refinery. 1-ER-50-51 (citing 26-ER-7512-13) (Clark confirming he cannot state to a reasonable scientific or medical certainty that any person residing within or working within the class area will be injured or develop cancer as a result of exposure to diesel particular matter or benzene), 26-ER-7516-17, 7508-09). In fact, both Youssef and Navarro admitted that they and their families do not attribute any health problems to the Refinery. 1-ER-51.

Though "Clark mapped the areas subject to the highest concentrations of contaminants" through his health risk assessment, OB 70-71, it was well within the

74

District Court's discretion to determine that Clark's model was not sufficient common evidence of an injurious health risk that could be imputed to all class members with their variable property rights, durations of occupancy, and experiences. *See, e.g.*, *Marlo*, 639 F.3d 942 (affirming decertification order and finding that lower court did not abuse its discretion or improperly weigh the merits of class claims when considering plaintiff's evidence and its bearing on plaintiff's satisfaction of Rule 23); *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir. 1975) (in deciding whether to certify a class, a court must consider the nature and range of proof necessary to establish those allegations).

Navarro complains that the District Court cited *Gates*, 655 F.3d at 265, a medical monitoring case. There is nothing unusual about that—courts often exclude risk assessments like Clark's in non-medical monitoring cases as having "'limited utility' in a toxic tort case based on [their] distinct regulatory purpose." *Abarca*, 761 F. Supp. 2d at 1041.

Statistical health risk calculations for regulatory purposes are likely "to be particularly cautious [and] overstate the actual risk" to the population. *Id.* at 1041. In other words, the risk estimates provided in health risk assessments are conservative, "provide a wide margin of protection for human health," do "not establish general exposure," are not particularized, and overstate risk. *See id.* at 1041-42.

75

The fact that a theoretical risk assessment is helpful for purposes of regulatory decision-making does not mean it is relevant to establishing a common injury due to exposure. *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 376 (N.D. Fla. 2017) (expert's "statistical health risk calculation, no matter how reliable, is unhelpful to the class certification issues" because "[s]tatistical assessments, as opposed to clinical risk assessments, are largely used for regulatory purposes to protect public health and therefore are 'of limited utility' in proving a classwide tort because they 'do not provide information about actual risk or causation.'").

### 3.    Plaintiffs' nuisance claims lacked commonality.

Navarro is also wrong in asserting that the District Court held, as a matter of law, that nuisance claims can never be certified under California law due to the individualized nature of property interests. OB 63.

As noted in the opening brief, the District Court considered authoritative *City of San Jose v. Superior Ct.*, 12 Cal. 3d 477 (1974). The *San Jose* plaintiffs failed to present a common method to establish liability for nuisance caused by airport noise, which might not cause an actionable interference with respect to, for example, already noisy industrial properties. *Id.* at 461, n. 8.

Navarro points to the fact that, unlike in *City of San Jose*, Plaintiffs proffered expert modeling of threshold levels of cancer risk allegedly caused by the Refinery as evidence of interference of all class members' ability to comfortably enjoy their

properties without exposure to "unacceptable health risks." OB 63-64. This "common evidence," however, does not constitute an appropriate method to establish liability in this case, where the Air Subclass contains both residential and commercial properties (i.e., with significantly different durations of exposure), various property uses (i.e., permanent versus seasonal residents, those who commute offsite for work versus stay-at-home parents), various durations of occupancy, and various distances from where the maximum effects of Refinery emissions would exist.

The failure of this evidence is compounded by the fact that it is inappropriate to use a conservative health risk assessment to establish liability for an exposure-based injury in a toxic tort action, *see supra* section II.A.1., and Plaintiffs never proffered any evidence of actual health injury to class members at all. 1-ER-50-51 (citing 26-ER-7512-13). In other words, contrary to Navarro's opening brief, there is no injury "traceable to the same plumes of airborne contamination emanating from the Refinery." OB 66.

Navarro also incorrectly claims that the Court conflated injury with damages and concluded that only nuisance claims arising from contamination of a shared, common area—rather than separate parcels of land—can support a finding of

77

commonality under Rule 23(a)(2). OB 64 (citing 1-ER-49). Navarro cites *Andrews*, 2018 WL 2717833,[30] but that case is distinguishable.

In *Andrews*, the court was satisfied that the plaintiffs' expert's model would show "which properties experienced oiling," *i.e.*, "*[w]here* the oil was distributed, and *how much* oil invaded the properties"—a straightforward indication of liability for the invasion of property interests. *Id.* at *9. In contrast, Clark's generalized and overly conservative health risk model may estimate a future health risk based on Refinery emissions, but fails to consider the variety of different property uses, occupancy durations, and multitude of other factors necessary to generate a more accurate health risk assessment akin to the issues contemplated in *City of San Jose*. These issues do not relate to damages, but rather to whether an injury exists at all.[31]

### 4.    The Air Subclass did not satisfy Rule 23(b)(2).

The District Court also properly found that the Air Subclass could not be certified under Rule 23(b)(2). OB 72.

---

[30] Navarro cites *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016), OB 67, but the question in that case was obviously common: whether defendants' "compensation policy deprived the class members of earnings in violation of California's minimum wage laws." *Id.* at 1155-56.

[31] Navarro also challenges the District Court's statement in its decertification order that Navarro was required to prove a "special injury" that is different in kind from the injury to the public. Because class certification—and Navarro's individual claim—for private nuisance could not be sustained, the District Court's public nuisance ruling should not alter the result of decertifying the Air Subclass.

4876-9460-6047

Rule 23(b)(2) certification is appropriate when (and only when) "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Dukes*, 564 U.S. at 360. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted . . . In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* at 360.

The inquiry into the propriety of Rule 23(b)(2) certification is complicated where, as here, the nature of the alleged class injury, and any appropriate remedy, is inherently individualized. This renders certification under Rule 23(b)(2) inappropriate here. *See City of San Jose*, 12 Cal. 3d at 460-61 (nuisance liability requires "extensive examination of the circumstances surrounding each party" and requires evaluation of a myriad of factors); *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480-81 (8th Cir. 2016) ("The resolution of [the] question [of the defendant's liability] does not apply uniformly to the entire class, as in reality, the issue of liability and the relief sought by these homeowners is, at bottom, highly individualized" . . . "[i]t is the disparate factual circumstances of class members that prevent the class from being . . . certified under Rule 23(b)(2).") .

Here, liability for a nuisance can only be determined after an "extensive examination of the circumstances surrounding each party." *City of San Jose*, 12 Cal.

79

3d at 461; *see also Frieman v. San Rafael Rock Quarry, Inc.*, 116 Cal. App. 4th 29, 41-42 (2004). The necessary individualized inquiries would include location, nature, and use of each property. *See, e.g., City of San Jose*, 12 Cal. 3d at 460-61 (nuisance requires evaluation of a "myriad of individualized evidentiary factors").

The Air Subclass boundaries do not account for the presence of diverse properties and occupants, all of whom could have different concerns—or no concerns at all—about the Refinery, and whose concerns might not be tied to an interference with their property rights. With respect to the typicality inquiry, the Air Subclass's boundaries are premised on an increased risk to public health over a 30-year time period—not interference with enjoyment of real property rights. 1-ER-94; 21-ER-5941-44. As such, it necessarily includes members that have not suffered an interference with any property right and may never suffer such interference.

In arguing that certification under Rule 23(b)(2) was nonetheless appropriate, Navarro relies upon Clark's cancer risk contour maps as evidence that somehow cures the fact that the Air Subclass contains significantly different properties, uses, durations of use, and levels of alleged exposure. However, Clark's analysis is not a panacea for proving common interference with a property right. Nothing about the Air Subclass renders it unified or cohesive such that a single injunction "would provide relief to each member of the class" as a whole. *See Dukes*, 564 U.S. at 360.

4876-9460-6047

This is likely why Navarro's expert suggested only an unspecified and undetailed hodgepodge of "remedial" measures, including a list of hundreds of potential emission reduction measures applicable to all source categories to address the class's concerns, rather than identify a single, specific injunction that would provide relief to the entire class. 27-ER-7626-27. Notably, Clark did not pinpoint which of these remedies is actually suitable for class-wide injunctive relief, nor did he provide any method for estimating potential emission reduction benefits and how they would inure to members of the Air Subclass. *Id.* He also failed to account for evidence in the record that benefits of any emission reduction measures will apply unevenly to members of the class, will provide de minimis benefit when compared to background concentrations of the contaminants of concern, and that TORC already engages in an iterative process under SCAQMD oversight to modify its policies and operations to reduce emissions in a manner that is actually tailored to the Refinery. 27-ER-7627.

Navarro cites *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010), for the proposition that the "fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id.* at 1125. But the *Rodriguez* class did not involve individualized property rights and a nebulous, undefined injunction. In *Rodriguez,* the injunctive relief was revision to a single practice, subject to statutory

81

and regulatory constraints that would be in place irrespective of that change, which would completely and uniformly resolve the harm to all affected class members. *See id.* at 1126. By contrast, here, the nature of the potential injunction—and its relative benefit to the various Air Subclass members—was entirely uncertain and lacked cohesion. *See* 1-ER-66-68.

## III. The District Court Did Not Abuse its Discretion in Denying Navarro's Request to Serve as Class Representative

The District Court denied Navarro's Motion to Substitute because he failed to "affirmatively demonstrate" with evidentiary proof that he met the typicality and adequacy requirements of Rule 23(a) for both subclasses. 1-ER-32; *Dukes*, 564 U.S. at 350-51. There is no need to address that issue, unless this Circuit reverses the judgment on the merits. *Bustamante*, 100 F.4th at 434

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives act as fiduciaries for the class and therefore must be qualified to provide adequate representation for absent class members. *City of San Jose*, 12 Cal. 3d at 464. Resolution of the adequacy inquiry "requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

4876-9460-6047

In addition to finding that Navarro did not meet the "typicality" requirement of Rule 23(a)(3), *see supra* Secs. X & Y, the District Court also found that Navarro was inadequate. He joined the litigation "at a very late stage following the completion of discovery, ha[d] abdicated his authority as class representative to counsel and [was] not genuinely involved in the litigation such that he [would] vigorously prosecute the case." 1-ER-33. This deficiency in Navarro's adequacy was compounded by concerns regarding the adequacy of class counsel. *Id.*

In short, the District Court had multiple grounds to deny the Motion to Substitute, any one of which is sufficient justification for affirmance.

### A. Navarro was unwilling and unable to adequately protect the class's interests.

Ultimately, "[a] class representative will be a decisionmaker with regard to the acceptance or rejection of a settlement." *Franco v. Allied Interstate LLC*, 2018 WL 3410009, at *5 (S.D.N.Y 2018). Here, the District Court found that Navarro's willingness to forego a viable remedy "present[ed] a conflict of interest with members of the class who may wish to pursue such a settlement for their claims" and evidenced "that Navarro may not vigorously pursue what is in the interest of the class if it does not align with his own personal interest." 1-ER-34-45.

Specifically, Navarro testified that, despite claiming to fear living next to the Refinery, there was no price at which he would be willing to sell his house to avoid the conditions about which he complains. 18-ER-4904-06 (testifying that he cannot

4876-9460-6047

afford and is too old to move). Examining Navarro's testimony, the District Court found that—for his own personal reasons that are likely not aligned with other residential property owners in the class—moving was not a remedy Navarro was motivated to accept or entertain, rendering him inadequate. 1-ER-33.

The Ground Subclass excludes individuals who do not occupy or have a possessory interest in their properties. 1-ER-94. "For this reason," the District Court concluded that "a pecuniary interest in real property within the Ground Subclass area is clearly necessary for representation of the class," 1-ER-34, and could not envision a situation in which Navarro would negotiate on the Ground Subclass's behalf a settlement whereby TORC would agree to relocate property owners and purchase the properties surrounding the Refinery to create a buffer between the Refinery and the community, "a viable remedy that [would] likely appeal to absent class members who would perceive such a settlement as eliminating all the alleged potential harm." *Id.*

Navarro argues that this potential conflict with class members was unduly speculative. *See* OB 89. But it is far from speculative, given the nature of the alleged harm in this case and the fact that ExxonMobil actually *did* offer to (and did in fact) purchase several homes in Navarro's neighborhood when it owned the Refinery in 2008. 34-ER-9973-77, 9980-95, 35-ER-9996-99. Recognizing this, Navarro now claims on appeal that he "actually looked into selling." OB 90. But this is not

supported by the record. When asked at deposition whether he evaluated or considered selling his house, "given its increasing value," to move somewhere else in response to his alleged health risk concerns, Navarro responded, "*No, never, because I never intended to move*." 18-ER-5137 (emphasis added); 18-ER-5146 ("To this day I have not thought about selling."). Navarro is not merely "reluctant to move," as he states in his opening brief (OB 90)—he testified that he will *never* move.

Simply put, it was Navarro's burden to affirmatively establish through evidentiary proof that he satisfied the adequacy requirement of Rule 23(a)(4). Absent evidence indicating that other class members would similarly relinquish the remedy of relocation, it was reasonable for the Court to conclude that absent class members would want to keep that remedy on the table—and that, as a result, Navarro was not a proper named Plaintiff.

Navarro also contends the District Court wrongly concluded that he would be inadequate to represent commercial property owners, claiming *O'Connor*, 180 F.R.D. at 374 is "directly on point." OB 91. But the holding Navarro cites discusses typicality rather than adequacy. *Id.* (residential and non-residential property owners both seeking damages that might simply vary in amount, which would not defeat typicality). *O'Connor* did, however, identify typicality and adequacy issues arising from the medical remedy sought by the class when, like here, the representative

plaintiff's interest in a particular remedy was "not aligned with that of class members." *Id.* at 373.

### B. Navarro did not demonstrate an intent to vigorously prosecute his claims on behalf of the class.

The District Court further found that Navarro was inadequate because he "does not appear to be particularly concerned about the injuries alleged in his own complaint such that he will vigorously prosecute the case on behalf of the other class members, as required under Rule 23(a)(4)." 1-ER-36. Navarro contends that this conclusion was flawed because Navarro expressed some "concern" about health risks and because "expert testimony establishes that Navarro's property is located in zones with demonstrably unsafe levels of soil vapor intrusion and air contamination." OB 92.

This purported "concern" is impeached by Navarro's testimony that he refuses to move, 18-ER-5146, attributes no health problems to the Refinery, 1-ER-60, regularly uses his backyard, gives away lemons from his lemon tree, eats locally-picked cactus, *id.*, did not even know why he was personally concerned about the claimed health risk, 1-ER-60, and never in over 25 years complained to anyone—including his wife—about impacts of the Refinery, even after counsel informed him about the class action. 1-ER-39; 18-ER-4918-19; 17-ER-4883; 17-ER-4893-94.

4876-9460-6047

This testimony is "evidence that [his] claim is 'weak' such that he would 'develop a litigation approach that dilutes the value of strong claims.'"[32] OB 92. And the fact that his individual trespass and nuisance claims failed as a matter of law soon after decertification belies any suggestion that his claims were sufficiently strong to support a class action.

Given this record, the Court found that it was "clear … that plaintiff's counsel, and not the plaintiff, is the driving force behind this action," militating against the propriety of class treatment. 1-ER-36. Navarro became involved in the litigation at a very late stage and, despite living at his home for over 25 years, only learned of the class action for the first time when class counsel cold-called him about it in May 2021. 1-ER-36; *see* 17-ER-4859, 4872-73, 4876, 4878. Although Navarro met with his counsel and "'studied a little' (about two hours) for his deposition," 1-ER-37;

---

[32] Navarro's testimony also demonstrated that he, a residential property owner, could not adequately serve as a class representative for *commercial* property owners. *See* Dkt. 285 at 10. He testified that he does not know why he would be a good representative for commercial owner class members and did not proffer evidence that he would be able to adequately protect nonresidential property interests. *Id.*; *see* Dkt. 280 at 9-10; *id.* at 30:8–18; *see In re Facebook, Inc., PPC Advertising Litigation*, 282 F.R.D. 446, 454 (N.D. Cal. 2012) (class representative inadequate due to different experiences and interests). The Court explained in its order that it had overlooked this issue when it had previously permitted Youssef to represent commercial property owners and pointed out that Navarro failed to address it. Dkt. 285 at 11.

4876-9460-6047

*see* 27-ER-4798, the Court was unpersuaded that Navarro would be a check on the "unfettered discretion" of his counsel. 1-ER-37.

On appeal, Navarro points to certain evidence suggesting that he possessed some modest familiarity with the class action. OB 92-93. This, however, does not detract from the Court's discretion to conclude Navarro was inadequate to represent the class. *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir. 1982) ("A district court's determination as to adequacy of representation will be overturned only if the district court abused its discretion.").

The Court, based on its years overseeing the litigation, justifiably expressed concern regarding (1) class counsel's "inability to find and retain class representatives with an actual claim or continuing interest" in the case, and (2) the fact that, after losing Youssef when he sold his home at a significant profit, "class counsel were able to find only a proposed representative who had neither heard of the litigation nor perceived any of the numerous harms originally asserted as the basis of th[e] lawsuit, alleged in the then operative complaint, and allegedly observed by previous plaintiffs." 1-ER-37.

The Court observed that the "revolving door of plaintiffs and theories in this case indicates that this litigation is largely driven by Plaintiffs' counsel." *Id*. For example, the District Court found it troubling that more than 100 members in the Ground Subclass received notice of the class action in 2020 (SER-86-87), yet

4876-9460-6047

Navarro was the only representative class counsel could find. *Id.* Accordingly, the Court was not persuaded that Navarro was "anything more than a mere figurehead that counsel has enlisted for the sole purpose of satisfying Rule 23(a)(4)." *Id.*

Also of concern was Navarro's apparent inability to comprehend and answer very basic questions about his own communications with his attorneys, indicating he might be unable to fulfill the duties of a class representative and effectively oversee the litigation. *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (class representative was inadequate because he appeared "to have ceded control to his lawyers").

Contrary to Navarro's assertion that the District Court's ruling was based on Navarro's lack of "in-depth knowledge of the legal claims" at issue in the case, OB 93-95, the District Court discussed a host of issues regarding Navarro's adequacy. 1-ER-38-39. For example, during his deposition, Navarro could not answer simple questions about the claimed health risk he is alleging—whether it would arise over time or immediately, or even if he was personally concerned about it.[33] 17-ER-4887; 18-ER-4900-01. The only information Navarro had about the case was what counsel told him to prepare for a deposition at which counsel knew Navarro's qualifications to serve as a class representative would be scrutinized. 1-ER-38-39.

---

[33] Navarro was clear, however, that he does not attribute any health problems to the Refinery. 18-ER-4907.

The District Court did not conclude that Navarro's lack of personal knowledge of other class members' experiences or his late participation in the class action rendered him inadequate, as Navarro suggests. OB 95. Rather, based on the history of the case and Navarro's long tenure at his property, the District Court called into question whether Navarro himself—independent of his attorneys' or experts' opinions—actually believed he was aggrieved such that he would be motivated to prosecute the case on behalf of the class. 1-ER-39-40.

Put differently, Navarro identified no real injury as a result of the purportedly serious harms at issue in his own complaint, thereby undermining his claims and ability to adequately represent the class. *See, e.g.*, *In re Facebook, Inc.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012) (plaintiffs who had not "attempted to show that [they] suffered any concrete injury" were inadequate). The District Court therefore had "no question that Navarro [would] not be overseeing his counsel's work" because "Navarro appear[ed] to be simply repeating the concerns his attorneys ha[d] described to him." 1-ER-39.

Ultimately, the District Court observed that Navarro was not alone in his indifference and noted at the hearing on the Motion to Substitute that it is "troublesome" that despite "significant efforts from the part of class counsel, . . . they couldn't find anyone who actually seem[ed] to care about the case, at least not enough to want to be involved in it." 17-ER-4637-38. While "lawyer-driven class

90

actions are not unheard of," the District Court concluded that it was unwilling to allow one to stand where there did not appear to be viable class claims, and "only class counsel appear[s] to have any interest in pursuing" the class claims. 1-ER-40.

### C. The District Court had well-founded concerns about class counsel's adequacy.

The District Court also did not abuse its discretion in denying Navarro's Motion to Substitute in part based on class counsel's inadequacy. The desire to avoid lawyer-driven class litigation was even more pronounced here, where the Court had expressed "grave concern" regarding Navarro's counsel's adequacy since "very early in the litigation." 1-ER-40; SER-100 ("The Court has expressed its concerns on several occasions regarding counsel's ability to prosecute this action vigorously on behalf of the class"); SER-94.

Indeed, "even the process of trying to replace Youssef with Navarro uncovered serious mistakes by counsel," as revealed when supplemental briefing about Youssef demonstrated that "class counsel had little or no contact with Youssef [over] *more than five years*." 1-ER-41 (emphasis added); 19-ER-5304 ("Counsel's performance so far in this regard has been uninspiring, to say the least."). When ordered to file the TAC, Plaintiffs' counsel filed a new version without Court

permission.[34] SER-3 ("This is not the Amended Complaint that was presented to me and it's not proper… How you could possibly have thought that that was something you could do?"). In determining that Navarro failed to support a finding of adequacy, District Court concluded that counsel, again, did not produce a viable class representative after having been "given chance after chance, all to sustain litigation that no potential class member appears to care about." 1-ER-41; *see* 17-ER-4654.

The District Court did not abuse its discretion in considering class counsel's pattern of missteps over the course of years of litigation,[35] and the fact that counsel performed significant work to salvage the case and their investment in it does not alter this conclusion. OB 97-98.

## CONCLUSION

For these reasons, the judgment should be affirmed.

---

[34] The District Court deemed these ongoing errors so egregious that it considered Rule 41(b) involuntary dismissal. Dkt 256 at 7 (dismissal was "tempting" and "Mr. Navarro is what's keeping them hanging on by a thread here").

[35] In *Sali*, cited by Navarro, this Circuit found that the district court's decision on inadequacy of class counsel was premature, but that "the district court [was] not precluded from considering counsel's prior sanctions as evidence of inadequacy if [counsel] continue[d] to neglect their duties." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1008 (9th Cir. 2018). Here, the District Court expressed "grave concern" over the adequacy of class counsel as early as mid-2018. SER-118.

4876-9460-6047

Respectfully submitted,

Dated: September 25, 2024      PILLSBURY WINTHROP
      SHAW PITTMAN LLP
     MARK E. ELLIOT
     STEPHANIE AMARU

By:     s/ Mark E. Elliott
           Mark E. Elliott

*Attorneys for Appellee*
*Torrance Refining Company LLC*

Dated: September 25, 2024      O'MELVENY &
      MYERS LLP
     DAWN SESTITO
     LAUREN KAPLAN

By:     s/ Dawn Sestito
           Dawn Sestito

*Attorneys for Appellee*
*Exxon Mobil Corporation*

93

**Attestation**

I hereby attest that all signatories listed, and on whose behalf this filing is submitted, concur in its content and have authorized its filing.

Dated: September 25, 2024      PILLSBURY WINTHROP
         SHAW PITTMAN LLP
     MARK E. ELLIOT
     STEPHANIE AMARU

     By: _____s/ Mark E. Elliott_____
            Mark E. Elliott

     *Attorneys for Appellee*
     *Torrance Refining Company LLC*

4876-9460-6047

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-3274 _____

I am the attorney or self-represented party.

**This brief contains** __21,364_____ **words,** including _____

words manually counted in any visual images, and excluding the items exempted by

FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Mark E. Elliott_____ **Date** September 25, 2024_____

95

4876-9460-6047

## STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 23-3274

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Mark E. Elliott **Date** September 25, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

96

4876-9460-6047

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s) 23-3274**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ X ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

| |
|---|
| TORRANCE REFINING COMPANY LLC'S AND EXXON MOBIL CORPORATION'S ANSWERING BRIEF |
| APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD INDEX VOLUME & VOLUME 1 OF 1 |

**Signature** *Kathy Stout*  **Date** September 25, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**
*Rev. 12/01/18*
4880-1307-9526.v1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s) 23-3274**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ X ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

TORRANCE REFINING COMPANY LLC'S AND EXXON MOBIL CORPORATION'S MOTION TO EXCEED WORD COUNT FOR ANSWERING BRIEF

**Signature** *Kathy Stout*  **Date** September 25, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**  *Rev. 12/01/18*
4880-1307-9526.v1